IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALVIN AVON BRAZIEL, JR.,

          Petitioner,

VS.

RICK THALER,
Director, Texas Department of Criminal
Justice, Institutional Division,

          Respondent

Cause No. 3:09-CV-1591-M

Death Penalty Case

### PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, ALVIN AVON BRAZIEL, JR. Petitioner in the above

captioned cause and pursuant to 28 U.S.C. § 2254 submits to this court his Petition

for Habeas Corpus as follows:

### **PROCEDURAL HISTORY**

Mr. Braziel was convicted of capital murder in the 282nd District Court of

Dallas County, Texas, for the murder of Douglas White.  The trial court accepted

the jury's answers to the two special issues mandated by CCP Art. 37.071 and

sentenced Braziel to death on July 26, 2001.

On October 1, 2003 the Texas Court of Criminal Appeals issued an

unpublished opinion affirming Mr. Braziel's conviction and sentence.

1

On July 3, 2003, Braziel filed his State Application for Writ of Habeas Corpus. On November 26, 2003 the State answered and on May 12, 2009, the trial court approved Findings of Fact and Conclusions of Law and denied relief.

On August 19, 2009 , the Texas Court of Criminal Appeals entered an order adopting the trial court's findings and denying Petitioner's application for writ of habeas corpus.

The undersigned were appointed to represent Braziel to prosecute this petition on September 29, 2009.

## STATEMENT OF FACTS - GUILT/INNOCENCE

**Commission of the Offense**

On September 21, 1993, Lora White was at home waiting for her husband, Douglas White, to return. The two had been married ten days earlier. After eating dinner, the two decided to go for a walk. They decided to go to Eastfield College for their walk. They arrived at Eastfield College between 8:45 and 9:15 p.m. (RR vol. 30, p. 31-36.)

While walking on the walking trail, an individual approached from some nearby bushes. Lora White identified Petitioner in court as that individual. (RR vol. 30, pp. 41-43.) She stated that Petitioner demanded money, and brandished a handgun. The Whites told Petitioner they did not have any money on them, but

2

had money in their nearby truck.  They turned and started walking toward their truck.  While walking away, Lora heard Petitioner comment to her husband that he had looked at Applicant and should not have done so.  White's husband told her to run.  Petitioner placed the gun to the back of Doug's head, saying that if Lora ran, he would shoot Doug.

Petitioner then told the two to lay down.  The Whites got down on their knees and began praying.  As Lora laid face down on the ground, Petitioner shot Doug White one time.  (RR vol. 30, pp.43-48.)  Petitioner grabbed Doug's arm, pulled him up, and shot him a second time in the chest area.  Petitioner then grabbed Lora and walked her across the field away from Doug.  Petitioner directed Lora into some nearby bushes.  (RR vol. 30, pp. 48-51.)  While walking, Petitioner demanded that Lora look at him.  She refused.  Petitioner held the gun against Lora's ear and she pushed it away.  When she pushed the gun away, she apparently dislodged the magazine that held the ammunition.  (RR vol. 30, pp. 52-53.)  Petitioner then forced Lora to the ground and raped her.  (RR vol. 30, pp. 53-54.)  Petitioner then demanded that Lora perform oral sex upon him.  When she refused, he placed the gun between her eyes, forcing her to do the act.  (RR vol. 30, pp. 56-57.)

After the assault, Lora went back to where here husband was lying, and

3

found a man kneeling over him.  Lora then ran to try to get help.  (RR vol. 30, pp.

57-58.)  Someone assisted Lora into a college building and 911 was called.  A

security guard drove Lora back to the crime scene to try and locate her husband.

(RR vol. 30, pp. 60-61.)  By the time she arrived, individuals were performing

CPR on David.  Lora was taken by police to Parkland Hospital.  (RR vol. 30, pp.

61-62.)  At the hospital, her clothes were collected by police, and a rape exam was

performed.  (RR vol. 30, p. 63.)

**Investigation of the Scene of the Offense**

On September 26, Lora went to the Mesquite Police Department and gave

Investigator Michael Bradshaw a written statement about the events at Eastfield

College.  She described the suspect shortly after the offense as 5'6" to 5'7", 140 to

165 pounds, approximately age 18 to 24, and a Black male.  (RR vol. 30, p. 66.)  A

few days later, she gave a second statement containing more information.  (RR

vol. 30, pp. 67-68.)  Thereafter, she met with a Dallas police officer who attempted

to create a composite sketch of the suspect.  The sketch wasn't satisfactory to

Lora.  A second composite sketch was done in February of 1994 by Karen Taylor

in Austin, Texas.  The second sketch more accurately resembled the suspect.  (RR

vol. 30, pp. 68-69.)

Wayne Cleere was a City of Mesquite police officer who responded to the

4

crime scene at approximately 9:47 p.m.. He was the first officer to arrive, (RR vol. 30, pp.118-20.) When he arrived, he saw Douglas White lying face down on the ground. An ambulance crew immediately responded, and Cleere began trying to locate individuals who could describe what occurred. (RR vol. 30, pp. 120-21.) Cleere came into contact with Lora White, who was wandering in the field, in a "disoriented" state. (RR vol. 30, p. 122.)

Lora explained to Cleere what had occurred. Thereafter, she was transported by Barry Woodrow, another officer who responded to Eastfield College, to Parkland Hospital for a rape exam. (RR vol. 30, pp. 122-23.) After speaking to Lora White, Cleere made a police report relating the information he had learned. The description noted by Cleere on the police report was that the suspect was that of a Black male, 20's, short. Cleere did not indicate a height, weight, or any other characteristics despite those options being designated on the report. (RR vol. 30, p. 130.) Cleere also recorded that he was told that the suspect was last seen wearing a bandana on his head, with an orange shirt and dark shorts. (RR vol. 30, p. 131.)

Woodrow testified that the college was located in Dallas County, Texas. (RR vol. 30, pp. 135-36.) At the hospital, Woodrow was given Lora's clothes, including her underwear, shorts, and tee-shirt. These items were later submitted to

the Southwest Institute of Forensic Sciences (SWIFS) by Officer Chambless the following day.  (RR vol. 30, pp. 136-38.)

Officer Darrell Simmons was also a Mesquite police officer who responded to the crime scene.  He examined the scene for physical evidence and took photographs.  (RR vol. 30, pp.139-41.)  The photographs taken included the Complainant, Douglas White, live rounds of ammunition found on the ground, and spent shell casings.  (RR vol. 30, pp. 142-43.)  The shell casings were .380 caliber. He also recovered a projectile.  (RR vol. 30. P. 143.)

John McClure, A City of Mesquite Police Officer, responded to the crime scene shortly after the offense, at approximately 10:20 p.m.  Once at the crime scene, he collected two spent .380 shell casings.  (RR vol. 31, p. 13.)  He also recovered a projectile and four live rounds, as well as a small spring.  (RR vol. 31, pp. 13-14.)

**Forensic Investigation**

Patricia Marshall Schniebs was a licensed vocational nurse working at Parkland Hospital at the time of the offense.  She was part of the group that conducted rape examinations.  (RR vol. 30, pp.166-67.)  She was on duty during the early morning hours of September 22, 1993.  She participated in the examination of Lora White, with Dr. Richey.  (RR vol. 30, pp. 169-70.)  After the

6

examination was completed, she placed the rape kit in a locked evidence box at Parkland Hospital.  (RR vol. 30, p. 175.)

Michelle Skidmore Lee was employed as a forensic serologist with SWIFS at the time  of the offense.  (RR vol. 30, p. 155.)  She examined the rape kit obtained from Lora White at Parkland Hospital.  She picked up the results of the examination from a locked cabinet at Parkland Hospital.  (RR vol. 30, pp. 155-56.) She also received items from the Mesquite Police Department which included the clothing taken from Lora White.  (RR vol. 30, p. 157.)  An examination of that clothing revealed the presence of spermatozoa.  (RR vol. 30, p. 158.)  The vaginal swab taken from Lora White also revealed the presence of spermatozoa.  The evidence from the vaginal swab and the underwear was sent to Gene Screen, a private DNA analysis laboratory in Dallas.  (RR vol. 30, pp. 158-60.)

Jeffrey Barnard was the Chief Medical Examiner for Dallas County.  (RR vol. 30, p. 185.)  He was in charge of overseeing both the Medical Examiner's Office as well as the Crime Lab for Dallas County.  He also performed autopsies. (RR vol. 30, p. 186.)  The doctor who actually performed the autopsy on Douglas White was Dr. Guileyardo, who, at the time of trial, was no longer employed at SWIFS.  (RR vol. 30, p. 188.)  External examination revealed two gunshot wounds.  One entered the right side of the face and exited the left side of the jaw.

The second went through the right side of the chest, through the heart, and exited the left side of the back.  (RR vol. 30, pp. 191-92.)  The cause of death was gunshot wound and the case was classified as a homicide.  (RR vol. 30, p. 192.) The injury from the gunshot wound to the face indicated a "medium" range of fire, meaning three-to three-and-a-half feet distance between the barrel of the gun and the Complainant's head.  (RR vol. 30, pp. 193-94.)  Gunpowder residue found on the Complainant's shirt was also consistent with a medium range of fire.  (RR vol. 30, p. 199.)

John McClure was also present at Tyler County Hospital when Applicant's blood sample was obtained.  (RR vol. 31, p. 18.)  The blood sample, which was obtained pursuant to a search warrant, admitted as State's Exhibit No. 16.  In addition to the blood, a buccal swab was obtained from Petitioner.  (RR vol. 31, p. 20.)  All the evidence collected at the Tyler hospital was then transported by McClure to the Garland DPS laboratory.  (RR vol. 31, p. 21.)

**DNA Investigation**

Katherine Long was a forensic scientist at Gene Screen in Dallas.  (RR vol 31, p. 28.)  On February 13, 2001, she received the blood sample taken for Petitioner from Sergeant McClure.  She also received samples from Lora White's clothes and swabs from the rape kit secured from Lora White at Parkland Hospital.

(RR vol 31, pp. 32-33.)   Long concluded that there was a match between Petitioner's DNA and the DNA extracted from the vaginal swab obtained from Lora White.  (RR vol 31, p. 37.)  Petitioner's DNA sample also matched DNA obtained from the underwear worn by Lora at the time of the offense.  (RR vol 31, pp. 37-38.)  Long performed several DNA tests in the case because she was not satisfied with some of the results.  (RR vol 31, p. 47.)

Dr. Paul Goldstein, a professor of genetics at the University of Texas at El Paso, testified for the defense.  He held a Master's degree in genetics from Ohio University and a PhD in genetics from York University and the University of Toronto in Canada.  (RR vol. 31, p. 54.)  He examined all the tests performed in this case specifically related to DNA.  Review of the DNA tests run in this case indicated that the tests were contaminated.  The contamination was manifest by presence of black primer.  (RR vol. 31, pp. 56-57.)  Dr. Goldstein also found the "fine-tuning" done by the Genescreen lab to be "unacceptable."  (RR vol. 31, pp. 57-58.)  The Genescreen report indicated subjective interpretation on the part of the individual conducting the analysis, which is not precise. (RR vol. 31, p. 59.) Dr. Goldstein also believed that the June 26th report, indicating a DNA match to Applicant, was not scientifically valid, and would not be accepted within the scientific community that is involved in DNA testing.  (RR vol. 31, pp. 59-60.)

9

Dr. Goldstein observed that the equipment used by Genescreen was "six generations behind in accuracy." (RR vol. 31, p.62.)  He also rejected the report that the DNA samples "matched,"observing that the only way that a match could be declared was with a test of the whole genome. (RR vol. 31, pp. 62-63.)

Dr. Goldstein reviewed an external audit of the Garland DPS lab conducted by Genescreen and DPS.  The report cited deficiencies in the decontamination protocol, the use of outdated reagents and the absence of qualified personnel at the lab at the time the tests referred to in testimony were performed.  The report also chronicled deficiencies in report preparation.  Based on the audit report, Dr. Goldstein's opinion was that any testing done in the lab was unreliable. (RR vol. 31, pp. 101-06.)

John Donahue was a Texas Department of Public Safety Crime Lab DNA analyst working in Garland.  On February 9, 2001, he received samples of evidence from John McClure which comprised blood and a saliva swab from Petitioner.  He compared DNA from the blood sample from Petitioner to DNA collected on the vaginal swab from Lora White.  He found that the DNA was consistent, and that Petitioner "could not be excluded as a contributor."  (RR vol 31, pp. 112-14.)  He also reviewed the report prepared by Katherine Long, and agreed with her findings.  (RR vol 31, p. 114.)

Donahue testified that his analysis used RFU (relative fluorescence units) peaks greater that 100, but less than 150, and that he based his opinions on those tests.  (RR vol 31, p. 115.)

Dr. Goldstein testified that the minimum RFU used throughout DNA testing labs in the United States precludes peaks under 150 RFU because peaks under 150 RFU do not reflect actual analysis as opposed to background contamination. Analysis of DNA should never be below 150 RFU because the manufacturer of the equipment used in the analysis states in its guidelines and user manuals that analysis under 150 RFU cannot be reliable due to the presence of possible contamination.  Therefore, a minimum level of analysis is 150 RFU or higher. (RR XXXI 117-18.)

**2001 Identification Investigation**

In 1994, Detective Bradshaw, the lead investigator, showed Lora a photo line up.  She was unable to identify anyone as being the perpetrator of the offense against her and her husband. (RR vol. 31, p. 84)  On February 10, 2001, he showed her another photo lineup which contained a photo of Petitioner when he was 17 years of age.  (RR vol. 30, pp. 72-72; vol. 31, p. 84, 88)   Approximately one week before showing Lora the photo line up, Bradshaw met with her and told her that there had been a DNA match in her case. He also told her that at that time

the suspect was 26 years old. (RR vol. 31, p. 85)  Lora picked Petitioner's

photograph, identifying him as the perpetrator. (RR vol. 31, p. 95).

Petitioner testified that he didn't recall what he had done on September 21,

1993, approximately eight years prior to his trial.  (RR vol. 32, pp. 7-8.)  Petitioner

also denied being present at the crime scene on the day of the offense, and

maintained that he hadn't committed the crime for which he was being tried.  (RR

vol. 32, p. 9.)

Petitioner admitted that in 1996, he pled guilty to the offense of sexual

assault as a result of a relationship that he had with a 15 year-old girl while he was

20 years old.  He was placed on probation in the case.  A year later, his probation

was revoked and he received a five year sentence.  (RR vol. 32, pp.12-13.)

He was visited by Mike Bradshaw on February 8, 2001 at the Gibb Lewis

Unit.  (RR vol. 32, pp. 15-16.)  Bradshaw had a warrant authorizing him to obtain

blood and saliva from Petitioner.  Bradshaw also interrogated Petitioner for

approximately three-and-one-half to four hours about this offense.  (RR vol. 32,

pp. 17-22.)  After the interview, Applicant cooperated with Bradshaw, who took

him to have his blood drawn.  (RR vol. 32, pp. 24-25.)

Dennis J. Lockerman was employed by the Texas Department of Public

Safety, and was assigned to the CODIS laboratory in Austin, Texas. (RR vol 32,

pp. 71-72.) Lockerman compared a DNA sample taken from Applicant's blood with the vaginal swab obtained from Lora White. He determined that the two samples matched.

## STATEMENT OF FACTS - PUNISHMENT

### State's Punishment Evidence

#### Wendell Jones

On April 23, 1994, Wendell Jones, a Dallas police officer, attempted to conduct a traffic stop of Petitioner. was on duty. (RR col. 33, pp. 6-8.) The officer attempted to stop Petitioner by turning on his overhead lights and siren. Petitioner did not stop his vehicle and continued to accelerate, and a car chase ensued. Petitioner was arrested and charged with evading arrest. (RR vol. 33, pp. 6-15.)

#### Glen Edward Thompson

Glen Thompson, a fingerprint technician for the Dallas County Sheriff's Department, obtained a set of fingerprints from Petitioner during trial. He found that the known prints matched those contained in State's Exhibits 113, 114 and 116. State's Exhibit No. 116 showed that Petitioner was convicted of the offense of evading arrest. State's Exhibit No. 113 indicated that on July 8, 1997 Petitioner was convicted of sexual assault of a child, for which he received a five year prison

sentence.  State's Exhibit No. 114 contained disciplinary reports while Petitioner

was in prison.  (RR vol. 33, pp. 22-24.)

<u>Danshatta Wilkerson</u>

Danshatta Wilkerson was the mother of Applicant's child.  She first met

Applicant in 1995.  At the time, Petitioner drove a gray Cutlass.  Petitioner told

Wilkerson that he had stolen the car and that he had robbed a man for it.  He also

told Wilkerson that he "did a VIN number on it."  (RR vol. 33, pp. 25-31.)

Wilkerson also testified that in February of 2001, before trial, she was interviewed

by Mesquite police Detective Meeks, who threatened that if she did not agree to

testify she would "be seeing my children behind bars if I didn't tell him what I

knew."  Wilkerson also testified that Petitioner was a good father to his child, that

he provided for both Wilkerson and the child, and that he was employed and

maintained employment before his arrest.  Wilkerson never saw him with a

weapon and did not know him to be affiliated with any gang.  (RR vol. 33, pp. 25-

34.)

<u>Stewart Atnip</u>

On July 14, 1995, Stewart Atnip was approached by a man with a gun who

demanded the car.  His vehicle was a gray 1988 Oldsmobile Cutlass.  Atnip

jumped from the car as the suspect was getting into the back seat.  Atnip heard a

"pop" as he ran away and later learned he had been shot in the buttocks.  The

bullet exited Atnip's leg.  (RR vol. 33, pp. 35-40.)  Atnip reviewed his Certificate

of Title and told the jury that the VIN was 1G3G011Y9JP313362.  (RR vol. 33, p.

42.)

## Valerie Little

Valerie Little was a police officer with the Mesquite Police Department.  On

February 8, 2001 she was on duty and responded to Colgate Street in Lancaster.

The address was the residence where Applicant and his mother lived.  She

executed a search warrant and seized a gray two-door Cutlass.  The vehicle had a

vehicle identification plate which, upon removal, indicated another vehicle

identification plate underneath.  The underlying vehicle identification plate

indicated a vehicle belonging to Stewart Atnip.  Identification numbers attached to

the engine also indicated the vehicle belonged to Atnip.  The top VIN number

indicated the vehicle belonged to Applicant.  At the time the search warrant was

executed, Applicant was imprisoned in the Gibb Lewis Unit in Woodville, Texas.

(RR XXXIII 443-49.)

## Courtney Pierce

Courtney Pierce was employed as a supervision officer in the sex crimes

unit of the Dallas County Adult Probation Department in June of 1966.  She was

Applicant's probation officer.  Applicant was supervised at the "maximum" level,

requiring frequent visits.  She recalled Applicant as often being angry and "a very

challenging probationer."  While under supervision, Applicant failed to report on

several occasions and failed to complete sex offender counseling.  He failed to pay

his fees and did not maintain regular employment.  Applicant's supervision was

subsequently revoked due to failing to pay fines, and being unsuccessfully

discharged from the sex offender treatment program.  She also testified that

Applicant "mentioned" that he had raped a girl using a gun and said the victim got

what she deserved.  (RR XXXIII 50-55.)

**Defense Punishment Evidence**

<u>Chris Freyer</u>

Chris Freyer first met Applicant when Applicant was a school mate of

Freyer's son in the late 1980's or early 1990's.  On one occasion, on Christmas eve,

Applicant came to Freyer's house looking for Freyer's son.  The two were

approximately 15 or 16 years old at the time.  Freyer's son was out of town, and

Applicant had noone to stay with, so Freyer invited Applicant to spend Christmas

in his home.  Applicant stayed in the home approximately two days.  Freyer

recalled him as well-mannered and very likeable.  Freyer's son and Applicant

remained friends through the years.  Freyer always believed Applicant was

employed.  Freyer and his family felt positively about Applicant, such that they

continued to have contact with him after his conviction for sexual assault.  During

the period that Applicant was on probation, Freyer observed him to have a good

attitude and never seemed angry or hostile in any manner.  (RR XXXIV 4-13.)

William Matthew Frye, Jr.

William Matthew Frye, Jr.  was a criminal defense attorney practicing in

Dallas since 1982.  Prior to being a defense attorney, he was an assistant district

attorney for Dallas County for approximately five years.  He previously

represented Applicant in connection with his charge for sexual assault.  Applicant

was placed on probation for the offense of sexual assault as opposed to aggravated

sexual assault.  None of the facts of the case indicated that the offense involved a

weapon or serious bodily injury, therefore the charge was sexual assault.  (RR

XXXIV 22-24.)

Sandra Freyer

Sandra Freyer first came to know Applicant through her son, Kenny.

Applicant and Kenny used to mow lawns together in the neighborhood.  When she

first came to know Applicant, he was approximately 16 years of age.  In addition

to mowing lawns with Kenny, Applicant would join the family at their home for

dinner, going to church, and going out for meals.  Applicant spent a lot of time at

17

their house with their family.  Sometimes, Applicant would stay overnight.  At one

period of time he spent approximately a week staying at their house.  Often, he

would spend Saturday night so he could accompany the family to church on

Sunday.  Applicant always worked, many times having two jobs at the same time.

Applicant was always welcome in their home, and she never had any fear of him

for any reason.  (RR XXXIV 25-32.)

**State's Rebuttal Evidence**

<u>Diane Green</u>

Diane Green was Complainant Douglas White's younger sister.  On the

night of the offense, she received a telephone call from her older brother regarding

the incident on trial.  Green went downstairs and told her mother.  Later, they

received a second telephone call and were asked to go to the hospital where the

complainant, Douglas White was located.  When they arrived at the hospital, they

discovered that he had died.  (RR XXXIV 38-42.)

## FIRST CLAIM FOR RELIEF

**THE ACTIONS OF PETITIONER'S TRIAL COUNSEL IN FAILING TO INVESTIGATE AND PRESENT COMPELLING MITIGATION EVIDENCE FELL SO FAR BELOW THE STANDARD OF CARE REQUIRED OF COUNSEL TRYING CAPITAL CASES AS TO CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL AND A DENIAL OF THE PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

This claim was not presented in Petitioner's State Application for Writ of Habeas Corpus and is the subject of a Motion to Stay Federal Proceeding filed of even date.

The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

**Trial Counsel Failed to Investigate Petitioner's Life History**

Trial counsel never requested that a psychologist or a mitigation investigator be appointed to assist them in preparation for Petitioner's trial. Notwithstanding the fact that there was evidence of a significant head injury inflicted upon the Petitioner during his childhood, there was no effort to secure the appointment of a neuro-psychologist to conduct testing to determine whether Petitioner suffered from organic brain damage.  Trial counsel did not attempt to

obtain the Petitioner's medical records.  Trial Counsel only met once or twice with

Petitioner's family prior to his trial.  The time or times that trial counsel met with

Glenda Turner, Petitioner's mother, were to discuss the possibility of her testifying

about the circumstances of Petitioner's childhood.  There was no effort to develop

a comprehensive life history to present to the jury. (Petitioner's Exhibit 1,

Affidavit of Glenda Turner).

**There was Significant Mitigating Evidence Available to the Trial Team**

There was evidence that Petitioner had not done well in school at all and

that he had not graduated from high school.  There was evidence that Petitioner

had been unable to maintain employment and that the educational and employment

shortcomings may have been the result of mental illness.  There was evidence that

Petitioner had been physically abused by his step-father.  There was evidence that

Petitioner had suffered a severe head injury at a young age and that, as a result of

his injury, he had been hospitalized for a significant period of time. (Petitioner's

Exhibit 2, Declaration of Amanda Maxwell).

**Trial Counsel Failed to Present the Compelling Mitigating Evidence**

The only testimony at the punishment phase of Petitioner's trial comprised

the testimony of  Matt Fry, the attorney who represented Petitiioner in the

statutory rape case he pled guilty to in 1996 (RR vol. 34, pp. 22-25) and the step-

20

father and mother of a childhood friend, Chris Freyer (RR vol. 34, pp. 5-23) and Sandra Freyer. (RR vol. 34, pp. 25-37).

Mr. Fry's testimony was limited to the fact that Petitioner had not been charged with aggravated sexual assault in the 1996 case.  He also told the jury that there was no plea agreement which allowed Petitioner to plead guilty to a lesser offense than the one committed. This testimony rebutted the testimony offered by the State that Petitioner had used a weapon during the commission of that offense and was convicted of aggravated sexual assault.

The Freyers were divorced by the time of Petitioner's trial.  Chris Freyer described Petitioner as a shy, well mannered, likable guy and a friend of his step-son, Kenny.  He told the jury about Petitioner's spending a Christmas with them because he didn't have any other place to go.  Petitioner stayed with the Freyers even though Kenny was in Mississippi with his father's family.  Sandra Fryer remembered Petitioner spending a lot of time at their home, sometimes up to a week at a time.  She said that Petitioner would also accompany her family to church and out to lunch thereafter.

No evidence was offered about the head injuries that Petitioner suffered, including one, at approximately three years of age, when Petitioner spent approximately two weeks at Parkland Hospital.  Neither was there evidence

offered showing the abuse that Petitioner suffered at the hands of his step-father,

Johnny Lane.  Further, the jury did not hear evidence that mental illness was

common in Petitioner's family and that he had manifested symptoms of

schizophrenia.

The constitutional violations set forth in this claim alone mandate relief

from the conviction and sentence.  However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is

considered together with the additional constitutional errors outlined in the

remainder of this Petition.  Cumulatively, these errors mandate relief from Mr.

Braziel's convictions and sentence.

## SECOND CLAIM FOR RELIEF

**PETITIONER WAS DENIED THE DUE PROCESS RIGHTS
GUARANTEED HIM BY THE FIFTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN
THE STATE CREATED THE FALSE IMPRESSION THAT PETITIONER
HAD PREVIOUSLY BEEN CONVICTED OF THE OFFENSE OF
AGGRAVATED SEXUAL ASSAULT**

This claim was presented as Ground for Relief One in Mr. Braziel's State

Habeas Application.  This claim was rejected by the Court of Criminal Appeals

when it adopted the Findings of Fact and Conclusions of Law entered by the trial

court in *Ex Parte Alvin Avon Braziel, Jr.,* No. WR-72,186-01  (Tex. Crim. App.

22

2009) (unpublished).  The Court's rejection of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

**Pearce's Testimony was Incorrect**

In June 1996 Courtney Pearce was employed in the sex crimes unit of the Dallas County Probation Office.  (RR vol. 33, p. 50.)  She was Petitioner's supervising officer.  (RR vol. 33, p. 51.)  She testified that Petitioner mentioned that he raped a girl and admitted that he used a gun.  (RR vol. 33, p. 53.)

Pearce's recollection was that Petitioner was on probation for aggravated sexual assault.  (RR vol. 33, p. 54.)  Her belief that Petitioner was on probation for aggravated sexual assault was based on the original offense report made in the case.  (RR vol. 33, p. 55.)

Ms Pearce's probation file, produced by the Dallas County Probation Office, in response to a subpoena issued by state habeas counsel, contained a four page "Prosecution Report."  The second page of the report indicates that the victim "can testify that she entered the suspect's vehicle on her own free will at Forney

and Buckner" and does not mention any threat or weapon.  Page four of the report

comprises a narrative statement of the alleged offense and does not mention the

use or exhibition of a weapon during the commission of the offense.  (Ex. 4, State

Habeas Application.)

On cross examination, when confronted with the fact that Petitioner had

pled guilty to sexual assault, not aggravated sexual assault, Pearce said that she

based her reliance on an offense report which said that "he sexually assaulted a

fifteen-year-old at gunpoint."  (RR vol. 33, p. 55.)

## The State Not Only Knew that the Testimony was Incorrect, but Allowed it to Go Uncorrected

The Assistant District Attorney asked a leading question of Pearce that

solicited her testimony about Petitioner's use of a weapon in the commission of

the offense against Ms Taylor. (RR vol. 33, p. 53.)  When the prosecutor heard

Pearce's response, he had reason to know the answer that Pearce gave was

incorrect.  Whether counsel for the defense had or should have had knowledge of

the false impression the state was perpetrating; there can be no doubt that the

Assistant District Attorney did.

The prosecutors knew that there had been a supplemental report of the

sexual assault offense (it may have been the report that Pearce had in her files).

Patrick Bland's supplemental report 1, completed the day after the offense was committed, shows that the charges were sexual performance of a child and sexual assault, both listed as second degree felonies.  (Ex. 4, State Habeas Application; Ex. E, State's Response to Habeas Application.)

In *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), the Supreme Court held that when a prosecutor failed to correct the testimony of a witness which he knew to be false, the accused was denied due process in violation of the Fourteenth Amendment to the Constitution of the United States. The *Napue* Court held that the failure to correct false testimony resulted in the same Fourteenth Amendment violation that intentionally offering misleading testimony did. *Id*. at 269.

The prosecutor's actions in *Napue* may Hve been be more egregious than those before the court.  The witness there lied about not having been promised anything for his cooperation with the prosecution and testified that no such promise had been made.  The result in this case is comparable, though.  As a result of Pearce's testimony, Petitioner's jury was left with the impression that he had used a weapon to effect a sexual assault subsequent to the offense for which he was on trial.  Though the court, in *Napue*, talked in terms of a lie being a lie, the crux of the holding is that when false testimony, regardless of why it is false, is

25

offered and the prosecutor knows that it is false, he has a responsibility to correct it. The prosecutor's failure to make the correction need not be the result of evil intent, "the impact is the same, preventing, as it did, a trial that could in any sense be termed fair." *Id*. at 270. Petitioner was denied a fair trial by the prosecutor's failure to correct Pearce's assertion that Petitioner used a gun in the rape of Tewania Taylor.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Braziel's conviction and sentence.

## THIRD CLAIM FOR RELIEF

**PETITIONER WAS DENIED THE RIGHTS GUARANTEED HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE STATE FAILED TO DISCLOSE SUPPLEMENTAL POLICE REPORTS WHICH REVEALED THAT THE VICTIM OF THE SEXUAL ASSAULT HE HAD BEEN CONVICTED OF RECANTED THE ALLEGATION THAT PETITIONER USED OR EXHIBITED A WEAPON DURING THE COMMISSION OF THE OFFENSE**

This claim was presented as Ground for Relief Two in Mr. Braziel's State

Habeas Application.  This claim was rejected by the Court of Criminal Appeals

when it adopted the Findings of Fact and Conclusions of Law entered by the trial

court in *Ex Parte Alvin Avon Braziel, Jr.,* No. WR-72,186-01  (Tex. Crim. App.

2009) (unpublished).  The Court's rejection of this claim is both "contrary to" and

an "unreasonable application" of clearly established federal law and based on an

unreasonable determination of the facts:

The facts in support of this claim, among others to be presented after full

investigation, discovery, access to this Court's subpoena power, and an

evidentiary hearing, include the following.

**The Evidence Was Suppressed By The State**

Tewania Taylor, the victim in the 1996 offense committed by Petitioner,

gave an affidavit in support of Petitioner's State Habeas Corpus Application.  Her

affidavit is uncontroverted.  She said that "When I was interviewed by George

West I told him that I was not abducted at gunpoint as I had originally said."  (Ex.

7, State Habeas Application.)  The affidavit could only have been controverted by

West himself and he did not give an affidavit in this matter.  The handwritten

notes comprising Exhibit A to the State's Original Answer to Application for Writ

of Habeas Corpus in Death Penalty Case are no evidence of what Tewania Taylor

told George West or any other representative of the State.  Whoever made the

notes didn't even spell her name correctly.  The notes aren't dated and no other witness claims to have heard Ms Taylor state, after the original report, that a weapon was used.

Prior to trial, West told Petitioner's trial counsel that Taylor, would testify at the punishment phase of Petitioner's trial and that she would say that a gun was used or exhibited during the offense.  (Ex. 8, State Habeas Application.)  It is unclear exactly when West made this representation to counsel, but it is clear that Taylor told him that no weapon was used in the offense before trial began.  (Ex. 7, State Habeas Application.)  West did not disclose to Petitioner's trial counsel that Taylor denied that a gun was used in the perpetration of the offense against her. The fact that no weapon was used in the sexual assault constituted evidence which mitigated the evidence West claimed would be offered.  Whether West knew about Taylor's recantation or not before she told him, he certainly knew so before he asked Pearce, "Did he admit he used a weapon, a gun?"  (RR vol. 33, p. 53.)

It is very unlikely that Petitioner would have "admitted" to using a weapon in an offense when even the victim acknowledged no weapon was used.  It is also revealing that when the State cross-examined Petitioner during the guilt/innocence phase of the trial, he was not asked about using a weapon in the Taylor case.  Even if Petitioner "mentioned" to Pearce that he had used a gun in the sexual assault of

Tewania Taylor, which Petitioner denies, Ms Taylor told West that wasn't the case before the presentation of evidence started. West was charged with the knowledge that there were supplemental reports which clearly indicated that no weapon had been used in the offense against Taylor.

**The Evidence Withheld Was Favorable to Petitioner in Mitigation of Punishment**

Argument was made that if the jurors had been asked if Petitioner would probably commit criminal acts of violence in the future on September 22, 1993, in 1994, or in 1995 and they answered "no,"they "would have been flat out one hundred percent wrong...." (RR vol. 34, p. 51.) This argument insinuated that the jury would have been wrong because Petitioner purportedly committed a criminal act of violence in 1996. Clearly the false testimony that Petitioner had used a weapon in the Taylor case put Petitioner in a far worse light than conviction of statutory rape, the offense which he committed and of which he was convicted.

In the State's closing argument, Mr. West said "The defendant's own words were that he used a gun in the offense. Does that sound like a person who wants to have control and wants to have dominance over someone?" (RR vol. 34, p. 67.) If the truth, that Petitioner had not used a weapon, had been presented to the jury, the State's argument would have been significantly weaker.

In *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S Ct 1194 (1963) the Supreme Court held that the State's failure to turn exculpatory evidence over to counsel for the defense, after receiving a request for such evidence was a violation of the due process guaranteed by the Fourteenth Amendment to the United States Constitution.  The court has also held that, when the prosecution represents that it is making or has made all exculpatory evidence available to the defense, the requirement for a specific request is met.  *Strickler v. Greene*, 527 U.S. 263, 281-282, 144 L. Ed. 2d 286, 119 S. Ct. 1936.  In Petitioner's case, the State was ordered to provide all information in the files of the chief case agent, Michael Bradshaw, to the defense before the presentation of evidence was to begin.  The State claimed then and continues to claim that four boxes comprising Bradshaw's file were made available to the defense.  Trial counsel, in his affidavit, Petitioner's Exhibit 3, Affidavit of Richard Franklin, unequivocally states that the supplemental police reports which recorded the recantation of the victim's original claim that a gun had been used during her sexual assault were not provided to him. Further, trial counsel swears that the State continued, through trial, to claim that a gun had been used or exhibited by Petitioner during the course of the sexual assault.

The constitutional violations set forth in this claim alone mandate relief

from the convictions and sentence.  However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is

considered together with the additional constitutional errors outlined in the

remainder of this Petition.  Cumulatively, these errors mandate relief from Mr.

Braziel's convictions and sentence.

## CLAIM FOR RELIEF FOUR

**ALVIN AVON BRAZIEL IS MENTALLY RETARDED AND THEREFORE INELIGIBLE FOR EXECUTION PURSUANT TO THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND DECISION OF THE UNITED STATES SUPREME COURT IN *ATKINS V. VIRGINIA*, 536 U.S. 304 (2002)**

This claim was presented as Ground for Relief Four in Mr. Braziel's State

Habeas Application.  This claim was rejected by the Court of Criminal Appeals

when it adopted the Findings of Fact and Conclusions of Law entered by the trial

court in *Ex Parte Alvin Avon Braziel, Jr.,* No. WR-72,186-01  (Tex. Crim. App.

2009) (unpublished).  The Court's rejection of this claim is both "contrary to" and

an "unreasonable application" of clearly established federal law and based on an

unreasonable determination of the facts.

The facts in support of this claim, among others to be presented after full

investigation, discovery, access to this Court's subpoena power, and an

evidentiary hearing, include the following:

The American Association on Mental Retardation ("AAMR") defines

mental retardation as: (1) subaverage general intellectual functioning (i.e., an IQ

of approximately 70 or below) existing concurrently with (2) related limitations in

two or more of the following applicable adaptive skill areas: communication, self-

care, home living, social skills, community use, self-direction, health and safety,

functional academics, leisure, and work; and (3) onset before the age of eighteen.

AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION:

DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)

[hereafter AAMR, MENTAL RETARDATION].  The Diagnostic and Statistical

Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly

identical.[1]  Each of the three elements is an essential component of a professional

diagnosis of mental retardation.  The Supreme Court has expressly relied on the

AAMR's three-prong definition of mental retardation, *Penry v. Lynaugh*, 492 U.S.

302, 307-09, n.1 (1989) ("Penry I"), as has the Court of Criminal Appeals.  *Ex*

---

[1]The DSM-IV-TR defines mental retardation as follows:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4ᵀᴴ ed., text rev. 2000) ("DSM-IV-TR").

*parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997).[2]

The first component of the clinical assessment of mental retardation is measuring the magnitude of the individual's intellectual impairment.  To be classified as mentally retarded, an individual must be found to be functioning at the very lowest intellectual level encountered in the general population, as measured by standardized intelligence tests.  The intellectual functioning of any individual with mental retardation will fall within the lowest three percent of the entire population.[3]   Thus, the first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.

The second requirement, deficits in adaptive behavior, serves to confirm the reality of the psychometric measurement of  the individual's severe impairment.  The impairment must be observed to have "real-world" effects on the individual's

---

[2]In late May, 2002, the AAMR release the 10th edition of its manual, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS.  Mental retardation is redefined in this manual, as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

The three diagnostic criteria are the same, but there is now a greater emphasis on adaptive behavior deficits, and the way in which those deficits are described has changed.  *See* Appendix B, Consultation Report of Professor Ruth Luckasson. The Luckasson report, though prepared for another case, Ex parte Briseno, is relevant to this case because of its discussion of impairments and deficits.  The differences between the 1992 AAMR manual and the 2002 AAMR manual are addressed in Professor Luckasson's report.

[3]*See, e.g.*, Amici Curiae Brief of American Psychological Association, American Psychiatric Association, and American Academy of Psychiatry and the Law in *McCarver v. North Carolina*, No. 00-8727, at 7 ("studies invariably put the number [of people with mental retardation] at less than 3% of the general population, usually in the 1% to 3% range"); DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%.").

life functioning.  As the Supreme Court has noted, all people with mental

retardation "have a reduced ability to cope with and function in the everyday

world." *Cleburne v. Cleburne Living Center*, Inc., 473 U.S. 432, 442 (1985).  The

requirement of real, identifiable disabling consequences in the individual's life –

of reduced ability to "cope with common life demands," DSM-IV-TR  42 – assures

that the diagnosis applies only to persons with an actual, functional disability.  See

AAMR, MENTAL RETARDATION 38.  Previous versions of the definition of mental

retardation expressed this requirement in terms of  "deficits in adaptive behavior,"

*see Penry I*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's

classification manual), while more recent formulations employ the terms "related

limitations" in "adaptive skill areas."  AAMR, MENTAL RETARDATION 5; *see*

DSM-IV-TR 42.  Both sets of terms reflect the same concept:  that the impairment

in intellectual ability must have an actual impact on everyday functioning.

The third  definitional requirement is that the disabling condition must have

manifested itself during the developmental period of life, before the individual

reaches the age of eighteen.  Requiring the disability to have occurred at birth or

during childhood means that the individual's mental development during his or her

crucial early years was affected by the impairment of the brain's ability to

function.  This element of the definition is derived from the understanding of

modern neuroscience about the way the brain develops and the implications of its

arrested development for cognitive impairment.  See AAMR, MENTAL

RETARDATION 16-18.  In practical terms, it means that any individual with mental

retardation not only has a measurable and substantial disability now, but that he or

she also had it during childhood, significantly reducing the ability to learn and

gain an understanding of the world during life's formative years.

Credible evidence exists that Mr. Braziel is mentally retarded.  Although

additional testing has yet to be done, IQ scores obtained from the Texas

Department of Corrections show a full scale IQ of 75, which is within the IQ range

set out in the AAMR manual.  Additional testing has not been completed because

State Habeas Counsel was unable to obtain funds to have Petitioner tested.

Further, the undersigned have requested funds for testing which have been

withheld pending an additional showing of need.

Mr. Braziel's school records also show significant academic deficiencies.

As noted in the declaration of the investigator appointed to assist counsel on the

Atkins issue:

> A review of limited school records reveals that
> Alvin spent two years in first grade.  Both years he
> received N grades in all academic subjects.  In second
> grade he was working on grade level.  However, by
> fourth grade his standardized ITBS scores showed that

he was still on a second grade first month level.  He
continued to struggle academically throughout
elementary school making mostly failing grades.  Alvin
spent two years in seventh grade where ITBS scores
placed him on a fourth grade level.  His standardized
tests scores (TAAS) had a high of 655 out of a possible
2400.  By ninth grade, still failing most subjects, Alvin
dropped out of school.  He was receiving remedial
reading services.  At this time his standardized state
exam on reading revealed a high score of 1400 out of a
possible 2400.

With frequent school and home moves,
academically, Alvin "fell through the cracks."  There is
no indication that Alvin was tested for special education
although it is highly possible he would have qualified for
services with such a history of failure and academic
struggle.  He would absolutely have qualified as a
student with "other health impairment" due to his
traumatic brain injury and continuous academic failure.

As also noted by Ms. Maxwell, the traumatic brain injury sustained by Mr.

Braziel, the rootlessness that was a hallmark of his home life and upbringing, and

his intellectual impairments, resulted in Petitioner's significant adaptive

deficiencies.  The deficiencies are evidenced by his spotty work history and

inability to conform to the rules of probation.

The records also show that the onset of Mr. Braziel's intellectual and

adaptive deficiencies occurred prior to the age of 18 years, thus meeting the

criteria for a diagnosis of mild mental retardation pursuant to both the DSM-IV

and the AAMR manual.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Braziel's conviction and sentence.

## FIFTH CLAIM FOR RELIEF

## PETITIONER WAS DENIED THE DUE PROCESS RIGHTS GUARANTEED HIM BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL COURT ADMITTED AN IDENTIFICATION WHICH WAS THE PRODUCT OF AN UNDULY SUGGESTIVE PHOTO LINEUP

This claim was presented as Point of Error Two in the direct appeal. Brief of Appellant at 24 *et. seq.* This claim was rejected in an opinion by the Texas Criminal Court of Appeals. *State v. Braziel*, No. AP-74,643 at 6 (Tex. Crim. App. Sept. 28, 2005)(unpublished) . The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

The facts in support of this claim, among others to be presented after full

investigation, discovery, access to this Court's subpoena power, and an

evidentiary hearing, include the following:

**Poor Opportunity to Observe**

Lora White's opportunity to observe the person who assaulted her and killed

her husband was limited by poor lighting.

**Detective Taints Viewing of Photo Lineup**

When Petitioner's sexual assault probation was revoked and he was

sentenced to  confinement in TDCJ-ID, an attempt was made to obtain his blood

sample pursuant to Government Code §141.148.  On August 7, 1997, Petitioner

refused to give a blood sample.  (RR vol. 32, p. 66.)  Patricia Marshall, a

phlebotomist with the Texas Department of Criminal Justice took a blood sample

from Petitioner on November 22, 1999. She also had Petitioner place a fingerprint

on the card and sign it.  (RR vol. 32, p. 65.)  The sample and signature card were

sent from the Gibb Lewis Unit to the Department of Public Safety lab in Austin.

(RR vol. 32, p. 67.)

The sample of Petitioner's DNA was first sent, by the DPS, to Myriad

Genetic Laboratory in Salt Lake City for testing.  Myriad found a match between

the DNA extracted from the vaginal swab taken from Lora White and DNA

extracted from Petitioner's blood. When Myriad found a match, the DPS

38

laboratory conducted a confirmation test.  The DPS test, too, produced a match. (RR vol. 32, pp. 75-76.)

Michael Bradshaw showed Lora White a photo lineup of suspects in 1994. She was unable to identify the offender.  (RR vol. 32, p. 84.)  Seven and one half years later, he met Lora in a restaurant in Terrell, Texas. (RR vol. 32, p. 84-85.) He told her that he had a suspect with a DNA match. (RR vol. 32, p. 85.) Approximately five days later, Bradshaw showed Lora the photo lineup which had Petitioner's picture in it.  (RR vol. 32, p. 85.)  Bradshaw told Lora the suspect's age at the time of the offense and at the time they met.  (RR vol. 32, p. 85.) Bradshaw told Lora more about the suspect than he normally would.  The picture placed in the photo lineup was of Petitioner as a 17 year old, notwithstanding the fact that the description given by Lora immediately after the incident indicated that the perpetrator was in his twenties.  (RR vol. 32, p. 88, 90.)

Lora viewed the photo lineup comprising six photographs of black males provided to her by Bradshaw on February 9, 2001. (RR vol. 30, p. 73-74.) Bradshaw did not tell her that the suspect was in the photo lineup.  (RR vol. 30, p. 74.)  Lora picked the photo in space three as the one who had committed the offense.  (RR vol. 30, p. 74.)  Lora identified Petitioner as the man whose photo was in the third position of the lineup.  (RR vol. 30, p. 75.)

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Braziel's conviction and sentence.

## SIXTH CLAIM FOR RELIEF

**ARTICLE 37.071 § 2(b)(1) OF THE TEXAS CODE OF CRIMINAL PROCEDURE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE THE AGGRAVATING FACTORS EMPLOYED IN THE TEXAS CAPITAL SENTENCING SCHEME ARE VAGUE AND DO NOT  PROPERLY CHANNEL THE SENTENCER'S DISCRETION.**

This claim was presented as Point of Error Six in the direct appeal. Brief of Appellant at 48 *et. seq.*  This claim was rejected in an opinion by the Texas Criminal Court of Appeals.  *State v. Braziel*,  No. AP-74,643 at 14 (Tex. Crim. App. Sept. 28, 2005)(unpublished) .  The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an

40

evidentiary hearing, include the following:

The jury in Mr. Braziel's case was instructed to answer this question at the

punishment phase:

> Is there a *probability* that the Defendant, Alvin
> Avon  Braziel, would commit *criminal acts of violence*
> that would constitute a *continuing threat to society*?

CR at 102.

On direct appeal, Mr. Braziel complained that Article 37.071 § 2(b)(1) is

unconstitutional because the description of these aggravating factors is vague and

does not properly channel the sentencing jury's discretion, in violation of the

Eighth and Fourteenth Amendments to the United States Constitution. *See*

*Woodson v. North Carolina*, 428 U.S. 280, 305(1976); *Simmons v. South*

*Carolina*, 512 U.S. 154 (1994); *Godfrey v. Georgia*, 446 U.S. 420 ( 1980) ;  *Sparf*

*v. U.S.*, 15 S.Ct. 273, 293 156 U.S. 51 (U.S.Cal. 1895) *Pennsylvania ex rel.*

*Sullivan v. Ashe*, 302 U.S. 51, 55 (1937). *Gregg v. Georgia*, 428 U.S. 153 (1976).

*Boyde v. California*, 494 U.S. 370 (1990)

In 1972 the Supreme Court struck down the capital punishment statutes then

in effect in this country because they permitted the arbitrary and capricious

infliction of the death penalty.  *See Furman v. Georgia*, 408 U.S. 238 (1972).

Texas immediately revamped its death penalty, and this statute -- article 37.071 --

was held facially constitutional in 1976.  *See Jurek v. Texas*, 428 U.S. 262 (1976).

Developments since 1976, however, make it clear that the Texas statute is

unconstitutional because the aggravators it relies upon are vague and do not

adequately channel the sentencing jury's discretion.

Different states employ different vehicles for submitting aggravating

circumstances to the jury.  "In Texas, the aggravating factor is contained in the

definition of the crime and in our requirement at punishment that the jury find the

defendant to be a continuing threat to society."  *McFarland v. State*, 928 S.W. 2d

482, 520 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997).  That is, the

first special issue under article 37.071 is an aggravator under Texas law.

The Supreme Court has denounced the use of vague aggravating factors.  "A

vague aggravating factor employed for the purpose of determining whether a

defendant is eligible for the death penalty fails to channel the sentencer's

discretion."  *Stringer v. Black*, 503 U.S. 222, 235 (1992).   In *Arave v. Creech*, 507

U.S. 463 (1993), the Court considered the constitutionality of an Idaho aggravator

which asked whether the defendant "exhibited utter disregard for human life."

The Court found that this phrase did pass constitutional muster because the Idaho

courts had adopted a limiting construction, concluding that it was the action of a

"cold-blooded, pitiless slayer."  Cold-blooded and pitiless are not subjective, but

instead describe a defendant's state of mind, ascertainable from the surrounding facts. The Court acknowledged that the question was close. *Id*. at 475.

Although the question was close in *Arave*, it is not in Texas. Unlike Idaho, in Texas, the special issue terms --probability, criminal acts of violence, and continuing threat to society -- are absolutely undefined, by statute and case law. *See, e.g., Patrick v. State*, 906 S.W. 2d 481, 494 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996); *Chambers v. State*, 903 S.W. 2d 21, 35 (Tex. Crim. App. 1995); *Clark v. State*, 881 S.W. 2d 682, 698, 699 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1156 (1995). Thus, Texas juries are left to guess at the meaning of these terms, and, as such, at the meaning of the entire first special issue. Absent clarifying definitions, the aggravators found in the first special issue fails to channel the sentencer's discretion, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner's jury was asked whether there was a "probability" that Mr. Braziel would commit criminal acts of violence that would constitute a continuing threat to society. However, the judge did not inform the jury of the degree of probability, the seriousness of the predicted crimes, or how long such crimes must continue to justify an affirmative answer. The elastic terms and phrases comprising the first special issue render the jury's finding too unreliable to support

Mr. Braziel's death sentence.  Mr. Braziel's sentence, therefore, violates the

Eighth and Fourteenth Amendments to the United States constitution and must be

set aside.  The Supreme Court has consistently held that the death penalty should

be reserved for the most atrocious cases, since the culpability of the average

murderer is insufficient to justify imposition of death.  *Godfrey v. Georgia*, 446

U.S. 420, 433 (1980), *cited with approval in Atkins*, 536 U.S. at 319.  The

vagueness of the terms and phrases in the special issue on future dangerousness

make the application of the death penalty overly broad and would make

defendants subject to the death penalty even if those individuals are not the worst

of the worst.

With respect to the word "probability" in the first special issue, the Texas

Court of Criminal Appeals has established "more likely than not" as its standard

on appellate review.  *Hughes v. State*, 878 S.W.2d 142, 146 (Tex. Crim. App.

1992), *cert. denied*, 511 U.S. 1152 (1994); *Robison v. State*, 888 S.W.2d 473, 481

(Tex. Crim. App. 1994), *cert. denied*, 515 U.S. 1162 (1995).  In this case, the trial

court failed to instruct the jury that this was the criteria to apply to the evidence in

Mr. Braziel's case.  Law abiding, conscientious jurors could have applied a

probability as low as one-tenth of one percent and yet remained faithful to their

oaths to render a true verdict according to the law and the evidence.  Instead of

44

being left to assume any standard, the jury should have been instructed of the proper value for the word "probability," which, to equate with the Texas appellate standard of "more likely than not," would be over 50% certainty.

A failure to require proof that a defendant poses a serious threat to society over a substantial period of time also means that the jury was given too much discretion and not provided necessary guidance in imposing a death sentence on Mr. Braziel.  Texas has not announced any explicit standards for the phrase "criminal acts of violence" or "continuing threat to society."  The jurors in Mr. Braziel's case were simply left to guess about how serious the predicted criminal acts of violence must be, and how long they must be expected to continue.  The word "continuing" begs the questions: "How long?" and  "Under what circumstances?"  Continuing could mean any time interval between seven seconds and seventy years.  With these elastic terms, a law abiding juror could find a defendant to be a future danger by concluding that the defendant bears only a minimal risk that he will commit any offense in the future.  Because of the lack of minimal standards and guidance in these elements, there is no way to determine how likely the jury thought it was that Mr. Braziel would commit criminal acts of violence, how serious such acts were expected to be, or how long or where he was expected to be a threat to society.

45

*Jurek* and its progeny do not foreclose Petitioner's argument that the present Texas capital sentencing statute is unconstitutional. Mr. Braziel argues that the Texas post- *Penry I* amendments to art. 37.071 significantly diminish the precedential effect of the part of the 1976 opinion in *Jurek* that rejected the need for clarification of the terms and phrases of the future dangerousness special issue.

Since *Jurek*, the Texas legislature has repealed important protections against the arbitrary infliction of death. The 1991 "Penry" amendments <u>deleted</u> two of the defendant's important protective filters present in the original special issues upheld in *Jurek:* deliberation and reasonable expectation of death. The Supreme Court has not yet addressed the important constitutional questions raised by 1) the deletion of these elements, and 2) the steadfast refusal of the Texas courts to define the very elastic terms used to describe "future dangerousness".

*Jurek* does not dictate the outcome of claims asserted against Texas' post- *Penry* capital sentencing scheme. The Supreme Court, in upholding the former Texas capital sentencing process[4] in *Jurek*, recognized several frailties inherent in

---

[4]The former Texas special issue capital sentencing scheme, enacted to meet the constitutional standard set in *Furman v. Georgia*, 408 U.S. 238 (1972) was found in the former Texas Code of Criminal Procedure, Art. 37.071., which read as follows: "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation,

it. First, the former statute did not explicitly speak of mitigating circumstances; its constitutionality turned on whether the enumerated questions allowed consideration of particularized mitigating factors. Second, since the Texas Court of Criminal Appeals had yet, in 1976, to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society", the Supreme Court looked to the Texas court's interpretation of those phrases for assurance that, in considering whether to impose a death sentence, the jury may be asked to consider whatever evidence of mitigating circumstances the defense could bring before it.

The *Jurek* court could not have anticipated the great reluctance of the Texas legislature and courts to take steps to inform capital sentencing jurors of the actual criteria needed for them to fully perform their function. Many Texas death sentenced individuals raised claims that the vagueness of the Texas special issues rendered them ineffective to guide the discretion of the jury to limit the death penalty to the worst of the worst. The Texas court rejected all such claims.[5]

---

if any,  by the deceased." Art. 37.071 (b) (Supp. 1975-1976).

[5] See *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977); *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); *Russell v. State*, 665 S.W.2d 771 (Tex. Cr. App.1983) decided under the former statute; and *Sells v. State* , 2003 WL 1055328 (Tex. Crim. App. 2003); *Feldman v. State*, 71 S.W.3d 738, 743-45 (Tex. Crim. App. 2002), citing *Ladd v. State*, 3 SW 3d 547 (Tex. Crim. App. 1999) decided under the present statute.

Litigants pressing these claims have fared no better in the Fifth Circuit.[6] Both the

Texas court and the Fifth Circuit have simply assumed that *Jurek* forecloses any

attack on the post-*Penry* Texas scheme.

_____It is respectfully submitted, however, that *Jurek* and its progeny do not

foreclose Mr. Braziel's argument that the process that produced the  "future

dangerousness" jury finding was too unreliable to support his  death sentence. It

seems elementary that a person who has committed murder under circumstances

making it capital murder, and who has done the crime deliberately, and with a

reasonable expectation that the victim would die, is very likely to be, and remain,

dangerous. *Jurek* could not, and did not, sanction the imposition of death on those

who did not act deliberately or without the reasonable expectation of death. The

*Jurek* court observed, as to all three *former* Texas special issues, that the issues

have a common-sense core of meaning, and that criminal juries should be capable

of understanding them. This Court need not revisit the *Jurek* court's interpretation

of the former statute in Mr. Braziel's case, tried under the revised statute.  Mr.

Braziel suggests that the fair reading of the three original special issues that the

_____

[6]*Hughes v. Johnson*, 191 F.3d 607 (5th Cir.1999), citing  *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir.1996).  (noting the long line of Fifth Circuit cases holding that the terms in the Texas punishment special issues need not be defined in the jury instructions); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir.1993) (not necessary to define "deliberately," "probability," "criminal acts of violence," or continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir.1993) (not necessary to define "deliberately," "probability," or "society").

Supreme Court expected and approved was that Texas would reserve death for those individuals who have 1) murdered another, 2) under limited circumstances elevating the crime to capital murder, 3) more-than-intentionally, 4) expected the victim to die from his acts, 5) acted without justification or serious provocation, 6) demonstrated a high probability to repeat fatal or at least serious acts of violence, 7) over enough time to conclude that 8) he or she is a more or less permanent threat to society. Elements 3, 4, and 5 have been removed, while 6,7, and 8 have never been adequately defined to select the worst from the worst, thus violating the Eight and Fourteenth Amendments.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Braziel's conviction and sentence.

## SEVENTH CLAIM FOR RELIEF

**MR. BRAZIEL'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE PUNISHMENT CHARGE, WHICH REQUIRED AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE FIRST SPECIAL ISSUE AND AT LEAST TEN "YES" VOTES FOR**

**THE JURY TO RETURN AN AFFIRMATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE.**

This claim was presented as Point of Error Seven in the direct appeal. Brief of Appellant at 52 *et. seq.* This claim was rejected in an opinion by the Texas Court of Criminal Appeals. *State v. Braziel*, No. AP-74,643 at 14 (Tex. Crim. App. Sept. 28, 2005)(unpublished). The court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law and based on an unreasonable determination of the facts.

The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following:

Point of Error Seven of his direct appeal brief to the Texas Court of Criminal Appeals complained that Petitioner's constitutional rights were violated by the punishment charge, which required at least ten "no" votes for the jury to return a negative answer to the first special issue and at least ten "yes" votes for the jury to return an affirmative answer to the second special issue. Citing *California v. Brown*, 479 U.S.538, 541(1985), Mr. Braziel argued that Article 37.071 violates the constitution, since in order to answer Special Issue One "yes" the jury must unanimously agree, and to answer the issue "no" ten jurors must agree. Further, in

50

order to answer Special Issue Two "no" the jury must unanimously agree, and to answer "yes" ten jurors must agree. Mr. Braziel argued that this scheme is unconstitutional because this "12-10 rule" creates an irrational process which is death-weighted and death-driven.

Texas law requires that neither the court, the state, nor counsel for the defense may inform a juror or prospective juror of the effect of the jury's failure to agree on special issues at punishment. TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(a)(Vernon Supp. 2002). All parties in this case acted in compliance with this statute at Petitioner's trial.

Texas law also requires that the capital sentencing jury be instructed that it may not answer the first special issue "yes" or the second special issue "no" unless 10 or more jurors agree. *See* TEX. CODE CRIM. PROC. ANN.art. 37.071 §§ 2(d)(2) & 2(f)(2)(Vernon Supp. 2002).

The "10-12 rule" contained in TEX. CODE CRIM. PROC. ANN. art 37.071[7] violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 294 (1990). The "10-12 provision" requires that, in order for the jury to return answers to the special issues

---

[7] *See* Robert J. Clary, *Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 ST. MARY'S L. J. 353, 358-59 (1987).

that would result in a life sentence, (i) at least ten jurors must vote "no" in answering the first special issue or (ii) at least ten jurors must vote "yes" in answering the third special issue.  This "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.  Such a "majority rules" mentality could lead jurors to change their potential holdout votes for life to a vote for the death penalty.

Hypothetically speaking, if all twelve members of the jury individually agree that a mitigating factor has been established and that, under state law, a life sentence is appropriate.  That is, all twelve jurors could have believed that a mitigating factor existed which, under state law, should have caused the capital defendant to be sentenced to life.  However, jurors are given the impression that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which factor has been established, however, they are left without guidance as to how to proceed.  In

the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the constitution to tolerate. *See McKoy v. North Carolina, supra; Mills v. Maryland, supra*. Accordingly, Mr. Braziel's sentence of death must be vacated and the cause remanded for a new trial.

The foregoing violation of Mr. Braziel's constitutional rights constitutes structural error and warrants the granting of this Petition without a determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Braziel's rights had a substantial and injurious effect or influence on Mr. Braziel's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not

mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Braziel's conviction and sentence.

## **PRAYER**

For the foregoing reasons, Petitioner respectfully submits that this court should abate the prosecution of this cause and permit Petitioner to exhaust his *Wiggins* claim in the state court; grant relief and order a new trial on guilt/innocence; or, in the alternative, grant relief and order a new trial on punishment.

Respectfully submitted,

Law Office of Richard L. Wardroup, LLC
1001 Main Street, Suite 707
Lubbock, Texas 79401
Phone (806)744-1911
Fax (806)762-1699

By: s/ Richard L. Wardroup
    Richard L. Wardroup
    SBN 20861200
    Attorney for Petitioner

Don Vernay

Attorney at Law
1604 Golf Course Road SE
Rio Rancho, NM 87124
Phone (505)892-2766
Fax (505)892-8119


By: s/ Don Vernay _____
      Don Vernay
      SBN 24035581
      Attorney for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

In the 17th day of August, 2010, the forgoing Petition for Writ of Habeas

Corpus was electronically filed.  A copy of this petition was mailed to Petitioner

at:      Alvin Braziel #999393
         Polunski Unit
         3872 Fm. Rd. 350 South
         Livingston, TX 77351

                              s/ Richard L. Wardroup _____

# PETITIONER'S EXHIBIT 1,
# AFFIDAVIT OF GLENDA TURNER

STATE OF TEXAS §

§ AFFIDAVIT

COUNTY OF DALLAS §

BEFORE ME, THE UNDERSIGNED AUTHORITY, personally appeared Glenda Turner, who being by me duly sworn, on her oath deposed and said:

"My name is Glenda Turner. I am over the age of 18 and capable of making this affidavit. I am the mother of Alvin Braziel, Jr. He was born on March 16, 1975. I am also the mother of Kinard Braziel and Lakicia Turner.

"In the time before Alvin's trial for capital murder, I was contacted by my son's attorneys. I went to Rick Harrison's once or twice. I do not remember ever going to the office of Richard Franklin to discus Alvin's case. Neither do I remember either of the attorneys or their representative coming to my home.

"I was never asked to assist the trial team to prepare a social history for Alvin. More specifically, I was never asked whether Alvin had ever suffered serious head injuries or whether my family or Alvin's father's family had any history of psychiatric or psychological treatment. Neither was I asked about the circumstances of the homes that Alvin grew up in.

"I have been diagnosed with schizophrenia. I take Seroquel for my symptoms. My son Kinard, too, has been diagnosed with the disease. He is prescribed Zyprexa and Depakote for his symptoms. My mother has suffered two 'nervous breakdowns' and has been sent to the state hospital. My brother, Mark Webster, too, has been diagnosed with schizophrenia. I remember times when Alvin showed symptoms of schizophrenia, usually audio hallucinations. The times that I remember this most is when he was incarcerated relative the allegations of sexual assault of Tewania Taylor.

"When Alvin was two and a half years old, he was being watched by my sister-in-law, Vanessa Jernigan. For some reason, Vanessa hit Alvin in the head with a wooden stick causing a serious injury. Alvin was taken to Parkland Hospital and was kept there for approximately two weeks.

"Alvin was physically abused by my husband, Jimmy Lang. He and Kinard were whipped viciously by Lang. Though I don't remember seeing the attacks, I saw the physical results to the boys.

"At Alvin's trial, I was told that I had to remain out of the courtroom because I might be a witness, but I never testified."

Further affiant sayeth not.

Signed. August   7___, 2010.

*Glenda Turner*

Glenda Turner, Affiant

SWORN TO AND SUBSCRIBED BEFORE ME this ___ day of August, 2010.

_____

Notary Public, State of Texas

# PETITIONER'S EXHIBIT 2,
# DECLARATION OF AMANDA MAXWELL

## DECLARATION OF AMANDA S. MAXWELL, LCSW

**I, Amanda Stevenson Maxwell, LCSW, hereby state as follows:**

1. I am a Licensed Clinical Social Worker duly licensed to assess, diagnose and treat mental illness in the state of Texas. I completed my Master's Degree in Social Work at the University of Texas at Arlington in 1997. I then obtained licensure as a Licensed Master of Social Work (LMSW) through the state of Texas in 1997. I completed two years (3000 hours) of advanced clinical supervision in 2005 and received my advanced clinical license in 2007. I received Mitigation Specialization training from the Texas Defender Association in October 2004. In 1998, I completed training for Relational Family Mediation in order to become a Qualified Texas Family Court Mediator. I received my Board Approved Clinical Supervisor certification in 2010 after the required 40 hour graduate course.

2. I am a member of the National Association of Social Workers.

3. I currently provide mitigation investigation throughout Texas but primarily in the Dallas/Ft Worth area. I have attended numerous CLE-approved training seminars sponsored by the Texas Defender Service, Texas Criminal Defense Lawyers Association, and National Criminal Defense Trial Lawyers Association. In 1996, I was trained as a Court Appointed Special Advocate (CASA) for children. In 1999, I received training in forensic interview techniques and graphology from the University of Texas at Houston. In 2001, I was awarded a Meadows Fellowship for the advancement of best clinical practices in area psycho-therapists. Prior to obtaining my social work degree, I was employed on a contract basis as a private investigator for numerous investigative firms in Texas, Oklahoma and California.

4. From 1997 to present, I have been employed by the Dallas Independent School District as a clinical social worker in the Psychological Services Department. I am responsible for completing psychosocial assessments, social histories and treatment plans for children and adults. I provide direct clinical services in

group, individual and family settings. I provide consultation services for medical and educational record interpretation, special education, and emotional, academic and behavioral intervention. I am responsible for crisis intervention and prevention, needs assessment and service coordination. I provide grief and bereavement counseling; brief solution focused intervention, as well as staff development for clinicians and educators. I have been trained in non-violent restraint techniques. I have provided expert witness testimony in Dallas County Family and Juvenile Courts.

5. From 1997-2004, I worked as a medical social worker on contact basis for Home Health and Hospice agencies in a six county area. I provided medical case management services to chronic and terminally ill individuals. I educated the patient and family on disease process and treatment and provided counseling on lifestyle choices and end of life issues. I conducted psychosocial histories, needs assessments and provided service coordination. I assisted with Medicare, Medicaid and SSI application, process and appeal.

6. I have been asked by Attorneys Don Vernay and Richard Wardroup to investigate the educational, psychological, medical, institutional, cultural and social history of their client and client's family in order to discuss the effects of these factors on his development and behavior. In my investigation of the client's social history and other mitigating factors, I will follow the standard of care required by mental health and medical professionals in forming a professional opinion.

7. The following records were reviewed to complete this limited social history:

   **EDUCATIONAL HISTORY**: achievement, performance and behavior, special education needs, cognitive limitations, and learning disability;

   **FAMILY AND SOCIAL HISTORY**: (i) physical, sexual or emotional abuse; (ii) prior adult and juvenile records; (iii) prior correctional experience including conduct in the institution and clinical services; (iv) religious and cultural influences.

**MEDICAL RECORDS** were requested from Parkland Memorial Hospital and never received.

After interviewing Alvin's mother, Glenda Turner and his sister, Lakecia Turner, as well as a review of limited school records, pen packets and TDCJ psychological assessments I discovered the following:

A complete mitigation investigation was never completed at the guilt innocence phase of Alvin's trial proceedings nor was a mitigation investigation completed at the State Writ level. Further, there was limited contact with any member of Alvin's family by previous counsel. No medical, mental health, complete school records, criminal background or other life records were ever requested or reviewed.

Alvin was exposed to alcohol and marijuana in utero. It is possible that Alvin suffers from Fetal Alcohol Syndrome/Fetal Alcohol Exposure. There is limited information on other substance abuse issues in the family. According to his mother and sister, Alvin did not experiment with any drugs harder than marijuana. However, they were not in constant contact with him after age 15.

Alvin was born to a seventeen year old who was already parenting a one and a half year old daughter. His mother was under extreme stress both during and after his gestation and delivery. After treatment for breast cancer, Glenda does not remember the specifics of Alvin's labor and delivery. She was overwhelmed and had little assistance from family or friends with her young children.

After her second child, Glenda dropped out of high school thereby limiting her opportunity for gainful employment. Her erratic behavior caused her to lose many jobs.

Alvin's mother made frequent moves living with friends and occasionally family. She and the children were intermittently homeless.

The family lived in extreme poverty and there was rarely enough food in the house.

The children were frequently left alone unsupervised and had to fend for themselves in low rental housing complexes. They were exposed to community violence and according to Alvin's sister, Lakecia "we heard gun shots every night." "We always lived in the back where apartments were boarded up and kids were tearing up the concrete."

Alvin suffered a traumatic brain injury at age three years after being bludgeoned over the head with a broom handle by his aunt. Alvin lost consciousness for an extended period of time and was hospitalized with a TBI. He lost developmental skills and had to relearn how to speak, walk and perform self care tasks. According to Alvin's mother "his skull was split from front to back." (Medical records from Parkland Hospital are in transit.) He received very little follow up care once he was released from the hospital

A review of limited school records reveals that Alvin spent two years in first grade. Both years he received N grades in all academic subjects. In second grade he was working on grade level. However, by fourth grade his standardized ITBS scores showed that he was still on a second grade first month level. He continued to struggle academically throughout elementary school making mostly failing grades. Alvin spent two years in seventh grade where ITBS scores placed him on a fourth grade level. His standardized tests scores (TAAS) had a high of 655 out of a possible 2400. By ninth grade, still failing most subjects, Alvin dropped out of school. He was receiving remedial reading services. At this time his standardized state exam on reading revealed a high score of 1400 out of a possible 2400.

With frequent school and home moves, academically, Alvin "fell through the cracks." There is no indication that Alvin was tested for special education although it is highly possible he would have qualified for services with such a history of failure and academic struggle. He would absolutely have qualified as a student with "other health impairment" due to his traumatic brain injury and continuous academic failure.

Alvin and his sister were frequently "farmed out" to their great aunt, Annetta Varmer. While she didn't want them in her home, she tolerated them. Alvin and his sister knew they were not wanted by anyone including their aunt and their mother. They had no contact with their biological fathers. They tried to become invisible.

Glenda Turner had numerous boyfriends in and out of the children's lives. She allowed these men to verbally and physically abuse her and her children. Glenda felt like she had to have a man in her life to help support her and her children. If whatever man she was with wanted her to have his baby, she complied. At this point she had three children with three different fathers.

When Alvin was eleven years old, his mother married Jimmy Lang. Jimmy liked to preach the gospel, dress like a gangster, call himself Vito Correlone and abuse his step children. When Glenda gave birth to Jimmy's daughters, Alvin, Lakecia and Kennard were informed in no uncertain terms that the two little girls were more important than they were. Jimmy made it clear that the two older children were to cater to their new sisters. They had to change and wash the cloth diapers Jimmy insisted on.

When Alvin was fifteen, trying to defend his mother, he and Jimmy Lang engaged in a physical brawl. Alvin was fed up with seeing his step father beat on his mother. Alvin determined that even if his mother would not defend herself, he would defend her. After this altercation, Alvin moved out of his mother's home. He lived on the streets staying at friend's homes, shelters and wherever he could find lodging. According to his sister, Lakecia, "we never knew where he would be."

There was never any affection for Alvin and Lakecia from their mother or any other family member. They felt unloved and unwanted. On one occasion Glenda Turner actually kissed her children on the cheek. According to Lakecia, they were so shocked "we thought she was having one of her episodes."

There is a strong history of maternal schizophrenia and bipolar disorders. Alvin's mother and brother Kennard are currently receiving medical treatment for schizophrenia. There are reports of schizophrenia and bi-polar disorders in Alvin's maternal grandmother, aunts and half siblings. Alvin's sister Lakecia suspects that her son may have one of these disorders. It is possible if not probable that Alvin also suffers from schizophrenia or bipolar disorder.

Currently, Alvin refuses all written and physical contact from his family.

**I, Amanda S. Maxwell, LCSW, declare under the penalty of perjury, and by the law of the State of Texas, that the forgoing statement is true and correct to the best of my knowledge and belief.**

_____ Date 8-11-10 _____

Amanda S. Maxwell, LCSW

# PETITIONER'S EXHIBIT 3, AFFIDAVIT OF RICHARD FRANKLIN

## AFFIDAVIT

COUNTY OF DALLAS
STATE OF TEXAS

BEFORE ME, the undersigned official, on this day appeared Richard K. Franklin, who is personally known to me, and first being duly sworn according to law upon his oath, deposed and said as follows:

"My name is Richard K. Franklin. I am over 18 years of age, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

I am currently a criminal defense lawyer in private practice. I was appointed, along with Rick Harrison to represent Alvin Braziel charged with capital murder. The State sought and obtained the death penalty.

This is the second affidavit I have provided in this case. The issue continues to be whether the State turned over to the Defense certain supplemental reports from the Defendant's prior conviction for sexual assault. The answer is and always has been no, the State did not. The supplemental reports would have revealed that the complaining witness had recanted the allegation that a gun was used in the offense.

The State contends that four boxes of documents, which allegedly contained the supplemental reports, were provided to us to inspect. The documents were not there or they were removed. We know that because the State kept contending a gun was used. The State would not have done so had it suspected we would have information to the contrary.

In the punishment phase of the trial in a bench conference, George West, representing the State, stated to the Presiding Judge that WE would be misleading the jury if we put on the defense lawyer, who had represented the Defendant in the prior offense, to testify there was no gun involved in the offense. He told the Judge that the complaining witness was going to testify. Subsequently, the complaining witness did not testify.

The State never corrected what it knew was not true. In fact, the State argued over and over that it was correct about the gun, while knowing the entire time it was wrong. The State misled the jury, not the Defense."

Richard K. Franklin

SUBSCRIBED AND SWORN TO BEFORE ME, on the _7_ day of August, 2010, to certify
which witness my hand and official seal.

_Sandra L. Jones_
Signature

SANDRA L. JONES
MY COMMISSION EXPIRES
September 1 2011