IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALVIN AVON BRAZIEL, JR., | § | |
| Petitioner, | § | |
| | § | Civil Action No. 3:09-cv-1591 |
| v. | § | (Magistrate Judge Paul D. Stickney) |
| | § | |
| RICK THALER, | § | *  DEATH PENALTY CASE  * |
| Director, Texas Department | § | |
| of Criminal Justice, | § | ECF |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

In September 1993, Petitioner Alvin Avon Braziel, Jr. approached newlyweds Lora and Douglas White while they were on an evening walk and demanded money. After forcing the Whites to their knees, Braziel shot Douglas in the head, and then forced Lora into a group of bushes where he raped her. Braziel was eventually found guilty of capital murder and sentenced to death for the robbery and murder of Douglas White. He now alleges that numerous constitutional violations occurred during his trial and seeks federal habeas corpus relief in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. As demonstrated below, however, Braziel's federal habeas corpus petition must be denied because it is wholly without merit.

## BRAZIEL'S ALLEGATIONS

The Director understands Braziel to raise the following seven grounds for habeas corpus relief:

1.  He was denied his right to effective assistance of counsel at the punishment phase of trial by counsel's failure to investigate and present mitigating evidence [Petition at 19-22];

2.  The prosecutor's failure to correct testimony that he knew to be false denied him due process by creating the false impression that petitioner was previously convicted of the offense of aggravated sexual assault instead of just sexual assault [Petition at 22-26];

3.  The State failed to disclose a supplemental police report in violation of Brady v. Maryland[1] that revealed that the victim of the previous sexual assault recanted her original allegation that petitioner had used a weapon during the assault [Petition at 26-31];

4.  Because he is mentally retarded, his death sentence violates the Eighth Amendment's prohibition against the imposition of the death penalty to the mentally retarded as set forth in Atkins v. Virginia[2] [Petition at 31-37];

5.  He was denied due process by the trial court's admission of an identification which was the product unduly suggestive photo lineup [Petition at 37-40];

6.  The Texas capital sentencing scheme is unconstitutional because the aggravating factors employed in Texas Code of Criminal Procedure Article 37.071 Section 2(b)(1) are vague and do not properly channel the sentencer's discretion [Petition at 40-49]; and

7.  The Texas death penalty statute, which instructs the jury that ten of them must agree in order to answer special issue no. 1 with a "no" answer or special issue no. 2 with a "yes" answer, is unconstitutional because it coerces jurors into a "majority rules" mentality and fails to inform jurors that the effect of the their failure to reach a unanimous verdict on any issue at the punishment phase would result in a life sentence [Petition at 49-54].

---

[1]     373 U.S. 83 (1963).

[2]     536 U.S. 304 (2002).

None of the above claims raised by Braziel provide an adequate basis for federal habeas relief.  Initially, the Director asserts that Braziel's ineffective assistance of counsel claim (claim 1) has not been presented to the Texas Court of Criminal Appeals for review and is, therefore, unexhausted and procedurally defaulted.  Further, although each of the remaining claims was previously presented to the state court either on direct appeal or in his state habeas application and are thus exhausted, Braziel has completely failed to demonstrate that the state court's adjudication of these claims was either contrary to, or involved unreasonable applications of, clearly established federal law.  As such, federal habeas relief should be denied.

## STATEMENT OF THE CASE

Braziel was indicted, convicted, and sentenced to death in Dallas County, Texas, for the September 21, 1993, robbery and murder of Douglas White.  CR 2 (Indictment), 106-109 (Judgment).[3]  His conviction and sentence were affirmed by the Court of Criminal Appeals on direct appeal in an unpublished opinion delivered October 1, 2003.  Braziel v. State, No. 74,139 (Tex. Crim. App.). Braziel did not seek a writ of certiorari with the United States Supreme Court off of his direct appeal.

While his direct appeal was still pending, Braziel also filed a state application for writ of habeas corpus in the trial court raising a total of six

---

[3]     The Director previously forwarded a copy of the state court records to the Court, which were filed on February 25, 2010.  "CR" refers to the Clerk's Record, and is followed by the relevant page number.  "SHCR" refers to the state habeas Clerk's Record—the transcript of pleadings and documents filed with the court during Braziel's state habeas proceeding—and is also followed by the relevant page numbers.

claims for relief.  Ex parte Braziel, Jr., No. 72,186-01;  SHCR at 2-153.  After considering Braziel's application and exhibits, the State's answer and exhibits, the record of the trial, and the proposed findings submitted by both parties, the trial court ultimately entered findings of fact and conclusions of law recommending that relief be denied on Braziel's application.  SHCR at 469-541. Based upon these findings and conclusions as well as their own review of the record, the Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief.  SHCR at cover; Per Curiam Order dated August 19, 2009.  Braziel subsequently filed a federal petition for writ of habeas corpus in this Court on August 17, 2010.  Docket Entry (DE) 16.

## STATEMENT OF FACTS

I.     Facts of the Crime

On the evening of September 11, 1993, ten-day newlyweds Lora and Doug White drove to Eastfield Junior College in Mequite, Texas, to go for a walk along the school's jogging trail.  Lora testified that although it had gotten dark outside, parts of the trail were fairly well lit from the lights on the surrounding buildings and the highway, and there were other people still out walking.  30 RR 30-40.[4] After they walked for a while, a man later identified both by photograph and in court by Lora as Alvin Avon Braziel, Jr., suddenly appeared from behind some bushes brandishing a silver pistol and demanded money from the couple.  Id. at

---

[4]     "RR" refers to the Reporter's Record of transcribed trial proceedings, and is preceded by volume number and followed by page numbers.  "SX" refers to the State's exhibits followed by exhibit number and page numbers where applicable.  "DX" refers to the Defense's exhibits, and again is followed by exhibit number and page numbers where applicable.

4

42-44.  The Whites responded that they did not have any money on them but that there was some in their truck, and Braziel started to follow them to the truck.  Id. at 44-45.

After a few steps, Braziel reproached Doug several times for looking at him, stating "You shouldn't have done that."  Id. at 45.  Doug told Lora to run, but Braziel put a gun to Doug's head and exclaimed that he would "blow his fucking head off" if she ran.  Id. at 46.  When Lora told Doug that she would not leave him, Braziel became frustrated and told the couple to lie down on the ground.  Both Doug and Lora fell to their knees and began to pray out loud.  As they were praying, Braziel pointed the gun at Doug and asked, "Where is your God at now?" and then shot Doug in the side of the head.  Id. at 46-48.  As Lora continued to pray, Braziel kicked Doug, then grabbed him by the arm, put the gun underneath his chest, and shot him again.  Id. at 49.  Doug said "Oh my God, I'm bleeding," then fell to the ground.  Lora heard air coming out of his chest, and he let out a cry.  Id. at 50-51.

Braziel then grabbed Lora by the arm, put the gun to her head, and walked her across the field to a bushy area off the track.  Id. at 52.  He ordered her to lay down and take her clothes off, and forced her to spread her legs.  Id. at 53-54.  Braziel then raped Lora as she continued to pray.  Id. at 54.  When he was done, he got within six inches of Lora's face, kissed her on the top of her lip, and told her that she had done "real good."  Id.  He then forced Lora to perform oral sex on him at gunpoint.  Id. at 56.  As Lora was getting dressed afterward, Braziel told her that he shot Doug because "he deserved it," but because she "did real good" he would let her live.  Id. at 58.  As Braziel walked away, Lora ran to

5

check on Doug and then to go get help.  When she returned to Doug, someone was already performing CPR on him.  Lora testified that they turned him over so that he was looking at her, and his eyes "were like they were sorry that he had to go."  Id. at 61.  Doug died on the scene at the junior college.  Id. at 63.

Six years later, with this offense still unsolved, Braziel's blood was routinely taken by prison officials after he was incarcerated for a separate offense of sexual assault of a child.  The blood was then sent to the Texas Department of Public Safety (DPS) Laboratory in Austin to be placed in the nation-wide CODIS system (Combined DNA Index System).  32 RR 64-65, 73.  Once placed in the system, Braziel's DNA was matched to the DNA profile extracted from the vaginal swab and panties collected during Lora's rape examination which was entered into the system in 1993.  Id. at 72-76.  Additional testing by an outside laboratory in Utah confirmed that the DNA match was true and correct.  Id. at 75-76.  Braziel's blood and saliva were again taken in February 2001, and DNA tests were run by DPS in Garland and by Genescreen.  30 RR 158-60; 31 RR 33-38, 113-14.  The tests all concluded that Braziel's DNA profile matched the DNA profile taken from Lora's rape examination.  31 RR 37-38; 114.  One analyst concluded that the DNA profile that matched Braziel would occur one in 18.5 quadrillion times in the black population, which was more than the entire population of the earth.  Id. at 51-52.

II.   Evidence Relating to Punishment

In addition to the abundant evidence presented at the guilt/innocence phase of trial concerning the horrific nature of Doug White's murder and Lora White's rape, the jury also heard evidence at the punishment phase concerning

Braziel's past criminal behavior and proclivity for violence. In July 1994, Braziel pled guilty to the offense of evading arrest after leading Dallas Police Officer Wendell Jones on a high-speed chase through a residential neighborhood that included Braziel driving through yards, running a stop sign, and driving down the wrong side of the road. 33 RR 6-14, 23; SX 116. A few years later, Braziel was convicted of sexually assaulting a fifteen-year-old girl for which he ultimately received a five year sentence. 32 RR 13; 33 RR 23; SX 113. According to Braziel's probation officer, Courtney Pearce, Braziel originally received probation but was revoked for failing to abide by the terms of his probation. 33 RR 51-53. Pearce also testified that Braziel was considered a high risk to re-offend, was deceptive, and was "extremely angry" most of the times she spoke with him. Id. at 51-52, 54. On one occasion, Braziel stated that his rape victim "got what she deserved." Id. at 53.

Testimony from several witnesses further established that on the morning of July 14, 1995, Braziel approached Stewart Atnip in his driveway as he was preparing to leave for work. Id. at 35-36. Brandishing a gun, Braziel ordered Atnip to get out of the car, but then changed his mind and told Atnip to get back in the car because he was going to drive. Id. at 37. As Braziel was entering the back seat, Atnip tried to get away by quickly jumping out of the car, but Braziel shot him in the buttocks. Id. at 38. The bullet went down into Atnip's leg and caused complete numbness from the hip down for six months. Id. at 39. He still had not completely recovered feeling in the leg at the time of Braziel's trial. Id. Atnip's car was not found until almost six years later when police executed a search warrant of Braziel's mother's house. Id. at 43-44. Braziel had replaced

the VIN on Atnip's car with one from his own car, but it was identified as Atnip's vehicle by separate VIN numbers located on the engine and transmission.  Id. at 45-47.  The mother of Braziel's child, Danshatta Wilkerson, identified Atnip's car as the one Braziel admitted to her that he robbed a man for and later changed the VIN number on.  Id. at 27-30.

As mitigating evidence, the defense presented the testimony of both Chris and Sandra Freyer whose son, Kenny, was good friends with Braziel while they were in high school.  34 RR 5-21, 25-37.  The Freyers testified that Braziel was a smart and pleasant young man who always had at least two jobs.  Id. at 8-10, 27-29.  Both explained that Braziel spent the night with them often and they considered him family, and that they had no fear whatsoever of letting him into their home.  Id. at 8, 27-29.  They never saw Braziel exhibit any sort of hostility or anger, and believed that he was a good influence on their son and kept him out of trouble.  Id. at 13.  The defense also presented defense attorney William Matt Fry, Jr., who represented Braziel on his sexual assault conviction.  Id. at 22-24.  Fry clarified that Braziel was convicted of sexual assault but not aggravated sexual assault, as he was not charged with using a deadly weapon or causing serious bodily harm.  Id.

In rebuttal, the State presented the testimony of Doug White's younger sister, Diane Green, who recalled the reactions of her loved ones when they heard what had happened to Doug and Lora, and the devastating impact her brother's murder had on her entire family.  Id. at 38-48.

## STANDARD OF REVIEW

Braziel's petition is governed by the heightened standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C.A. § 2254 (West 2010).  Under § 2254(d), Braziel may not obtain federal habeas corpus relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has recently explained this intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011)(citing Felker v. Turpin, 518 U.S. 651, 664 (1996)). In order to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.

The pivotal question for a federal court when reviewing claims previously rejected by a state court is whether the state court's determination was factually or legally unreasonable.  Id.; Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir.

2000).  It is well established that a federal court may grant habeas relief only if a state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." (Terry) Williams v. Taylor, 529 U.S. 362, 413 (2000).  But under §2254(d), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  An "unreasonable application" occurs then "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  Thus, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.  Harrington, 131 S.Ct. at 786 (citing Lockyer v. Andrade, 538 U.S. 63, 71 (2003)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. (Terry) Williams, 529 U.S. at 409-11; Tucker v. Johnson, 242 F.3d 617, 620-21 (5th Cir. 2001).  Instead, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. (Terry) Williams, 529 U.S. at 411; Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001).  In other words, a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of

10

the state court's decision. Harrington, 131 S.Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001); see Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"); Catalan v. Cockrell, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law. Woodford v. Visciotti, 537 U.S. 19, 24 (2002). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]. " Early v. Packer, 537 U.S. 3, 8 (2002).

In review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Jackson v. Johnson, 150 F.3d 520, 524 (5th Cir. 1998). Moreover, where the petitioner

> has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the

11

claim unless the applicant shows that

(A) the claim relies on

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2); Murphy v. Johnson, 205 F.3d 809, 815 (5th Cir. 2000).

Thus, in state court, a petitioner "must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." (Michael) Williams v. Taylor, 529 U.S. 420, 437 (2000).

## ARGUMENT

I.  **Braziel Was Not Denied the Effective Assistance of Counsel at the Punishment Phase of Trial (Claim 1).**

In his first claim for relief, Braziel asserts that his trial counsel were ineffective for failing to investigate and present compelling mitigating evidence at the punishment phase. Petition at 19-22. In just over three pages, Braziel argues that counsels' investigation into his life history fell "so far below the

standard of care required of counsel trying capital cases" that his constitutional rights were violated.  Id.  Without providing any citations or supporting evidence, Braziel chastises counsel for failing to retain a psychologist, a neuro-psychologist, or a mitigation investigator, and states that there was "significant" mitigating evidence available had counsel obtained his medical records or spoke more often with family members.  Id.  This includes evidence that he suffered a head injury as a child, that he had a poor school and work history, that he was allegedly abused by his step-father, and that some of his family members have a history of mental problems.  Id.

As discussed below, however, Braziel failed to bring this allegation before the Court of Criminal Appeals in either his direct appeal or state habeas corpus proceedings.  Consequently, each of these allegations are unexhausted and procedurally barred in this Court.  Regardless of the procedural bar, Braziel fails to demonstrate that trial counsel performed deficiently in their mitigation investigation or that their performance had any prejudicial effect on the outcome of the punishment phase.  Much of the "evidence" Braziel refers to is either unsubstantiated, unhelpful, or potentially double-edged in nature.  Moreover, he fails to show that a life sentence would have resulted had counsel presented the evidence he now presents to this Court. When the missing evidence, coupled with the evidence that was actually offered by the defense, is weighed against the aggravating evidence, including the circumstances of the crime, there is simply no reasonable likelihood that the outcome of the proceeding would have been any different. Habeas relief should therefore be denied.

13

A.     This claim is unexhausted and procedurally defaulted.

Braziel raises his ineffective assistance of counsel claim for the first time on federal habeas corpus review, having failed to raise this claim either on direct appeal or during state collateral review.  Thus, it is clear Braziel has failed to exhaust state court remedies with regard to these claims.  It is equally clear, however, that he would be barred from raising these claims in a successive state habeas application under Article 11.071 Section 5(a) of the Texas Code of Criminal Procedure.[5]

Pursuant to §2254(b)(1)(A), habeas corpus relief may not be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State."  However, "[b]ecause [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law."  Gray v. Netherland, 518 U.S. 152, 161 (1996) (internal citations omitted); see also Engle v. Isaac, 456 U.S. 107, 125 n.28 (1982); Castille v. Peoples, 489 U.S. 346, 351 (1989); Graham v. Johnson, 94 F.3d 958, 969 (5th Cir. 1996) ("exhaustion is not required if it would plainly be futile").  Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted.  Although under Harris v. Reed, 489 U.S. 255, 265

---

[5]     Article 11.071 Section 5(a), which became effective September 1, 1995, provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception.  Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a).  Braziel has made no showing that one of the article 11.071 exceptions would apply to allow review of this claim in state court.

(1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991). In the instant case, just as in Gray, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." 518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); Nichols v. Scott, 69 F.3d 1255, 1280 (5th Cir. 1995)(same).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071 Section 5(a) would apply to foreclose review of the claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. Beazley v. Johnson, 242 F.3d 248, 264 (5th Cir. 2001); Nobles v. Johnson, 127 F.3d 409, 422 (5th Cir. 1997); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998). A procedural default such as this will bar federal habeas review unless the petitioner can show cause for the default and resulting prejudice, or demonstrate that the court's failure to

consider the federal claim will result in a "fundamental miscarriage of justice." Harris, 489 U.S. at 262; Barrientes v. Johnson, 221 F.3d 741, 758 (5th Cir. 2000).

In this case, Braziel neither distinguishes his case from Nobles and Muniz, nor even attempts to demonstrates cause and prejudice for his failure to raise this claim in state court. Similarly, Braziel has made no attempt to demonstrate that the Court's dismissal of the claim will result in a "fundamental miscarriage of justice." Thus, circuit precedent compels the denial of the claim as procedurally defaulted.

B.     The Strickland standard.

Under Strickland v. Washington, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates that (1) counsel's performance was deficient and (2) this deficiency prejudiced his defense. 466 U.S. 668, 687-88, 690 (1984). In determining the merits of an alleged Sixth Amendment violation, courts "must be highly deferential" to counsel's conduct, and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. Id. at 687-89. A reviewing court "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." Wilkerson v. Collins, 950 F.2d 1054, 1065 (5th Cir. 1992). Every effort must be made to eliminate the "distorting effects of hindsight." Strickland, 466 U.S. at 689. Accordingly, there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." Id.

16

Further, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." Id. at 692. In order to establish that he has sustained prejudice, Braziel "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Id. at 694; Loyd v. Whitley, 977 F.2d 149, 159 (5th Cir. 1992). Because this showing of prejudice must be "rather appreciable," a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of Strickland. Armstead v. Scott, 37 F.3d 202, 206 (5th Cir. 1994). Because Braziel must satisfy both prongs of the Strickland test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. Strickland, 466 U.S. at 697; Ramirez v. Dretke, 398 F.3d 691, 697 (5th Cir. 2005).

C.   Braziel has failed to demonstrate that trial counsel's investigation was deficient.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." Riley v. Cockrell, 339 F.3d 308, 316 (5th Cir. 2003) (citing Moore v. Johnson, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, counsel may be constitutionally ineffective for failing to exercise reasonable professional judgment in investigating a defendant's personal history that would be relevant to evaluating his moral culpability. Id. (citing Wiggins

17

v. Smith, 539 U.S. 510, 522 (2003)).  However, counsel is not per se deficient for failing to present such evidence.  Wiggins, 539 U.S. at 522; Moore, 194 F.3d at 615.  As the Supreme Court has reiterated, counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Wiggins, 539 U.S. at 522.

In order to establish that counsel was rendered ineffective by virtue of a failure to investigate, a convicted defendant must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed and how it would have altered the outcome of the case. United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).  Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  Strickland, 466 U.S. at 699.  This is because "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at 533.  As such, a "conscious and informed decision on trial tactics and strategy is not a permissible basis for a claim of ineffective assistance of counsel unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial."  Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002) (internal quotation marks and citation omitted).

18

Finally, "[c]ounsel's decision to pursue one course rather than another is not to be judged in hindsight," and the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. Gray v. Lucas, 677 F.2d 1086, 1094 (5th Cir. 1982). Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 699. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. Id.

Here, Braziel contends that counsel was deficient for not retaining a psychologist, a neuro-psychologist, or a mitigation expert to investigate his life history. Petition at 19-22. According to Braziel, had counsel investigated properly they would have found compelling mitigating evidence that could have been presented to the jury, including evidence that he suffered a head injury as a child, that he had a poor work and educational history, that he was allegedly abused by his step-father, and that mental illness apparently runs in his family. Id. Yet, Braziel fails to provide any evidence demonstrating that such evidence even exists, much less demonstrate how counsels' investigation into the punishment phase could somehow be considered inadequate under Strickland. In fact, Braziel even admits in his petition that counsel at least met with his mother and his "family" once or twice to discuss the circumstances of his childhood. Petition at 20.

The only evidence Braziel does provide is the hearsay affidavit of his mother, Glenda Turner, who concedes that she was contacted by her son's

19

attorneys and that she met with them "once or twice."  Petition at Exhibit 1.  In her affidavit, Ms. Turner claims that her and several members of her family have been diagnosed as schizophrenics, that Braziel was hit on the head with a wooden stick by her sister-in-law when he was two-years-old, and that Braziel was physically abused by her husband (although she never saw the attacks).  Id.  But Braziel provides no other evidence whatsoever to support the contentions made by his mother on his behalf.  Nor has he provided medical or social services records to demonstrate that a history of mental health problems runs in his family.  Similarly, he provides no records or affidavits to demonstrate that he himself has "manifested symptoms of schizophrenia" or "suffered from organic brain damage" as he now alleges.  As such, Braziel has done nothing more than merely allege a failure to investigate.  Green, 882 F.2d at 1003.

The Fifth Circuit has determined that conclusory allegations do not state a claim for federal habeas corpus relief and are subject to summary dismissal.  Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) ("Mere conclusory statements do not raise a constitutional issue in a habeas case");  Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983)(same); Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982).  Because Braziel fails to provide evidence as to what counsel should have discovered or demonstrate that the investigation done by counsel was in fact deficient, he cannot overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.   Strickland, 466 U.S. at 687, 689.

Furthermore, all of the information Braziel claims counsel should have discovered—mental illnesses in family, abuse, a childhood head injury, and poor

20

work and educational history—was presumably known to both Braziel and his mother prior to trial. However, there is no indication that either of them attempted to inform counsel of this information. The Supreme Court has noted that trial counsel's actions are substantially influenced by information supplied by the defendant, and the reasonableness of investigative decisions depends on this information. Schriro v. Landrigan, 550 U.S 465, 476-77 (2007)(finding that where the defendant interferes with counsel's attempts to present a case in mitigation, he cannot later claim ineffective assistance); Strickland, 466 U.S. at 691. As such, trial counsel cannot be held ineffective for failing to introduce evidence that his client failed to disclose. Johnson v. Cockrell, 306 F.3d 249, 252-53 (5th Cir. 2002); Ransom v. Johnson, 126 F.3d 716, 723 (5th Cir. 1997) (holding that whether or not counsel's investigation is reasonable may critically depend on the information provided by the defendant and the defendant's own strategic choices concerning his representation); see also Sonnier v. Quarterman, 476 F.3d 349, 362 (5th Cir. 2007)(holding that a criminal defendant cannot block his attorney's efforts and later claim that the resulting performance was constitutionally deficient).

The reality is that Braziel has provided absolutely no evidence to justify his assertion that a reasonable sentencing investigation did not take place, or that there was "significant" mitigating evidence that counsel failed to discover. Indeed, as discussed in more detail in the next section, much of what Braziel argues should have been discovered is actually untrue or irrelevant, or was potentially harmful to his defense. Therefore, because Braziel fails to establish that trial counsel's investigation was in any way deficient, his allegation fails the

21

first prong of the Strickland test and must be dismissed. Strickland, 466 U.S. at 697; Ramirez, 398 F.3d at 697.

D.    Braziel was not prejudiced by counsels' allegedly deficient performance.

Even if counsel's performance can somehow be considered deficient for failing to uncover and present certain evidence, no reasonable probability exists that this particular evidence would have affected the outcome of Braziel's trial. See Strickland, 466 U.S. at 694 (holding that a constitutional violation of a petitioner's Sixth Amendment right to counsel is not proven unless it is shown that there is a reasonable probability that counsel's deficient performance affected the outcome of the proceedings). Much of what Braziel claims counsel should have discovered was either insignificant or was potentially double-edged in nature. Additionally, the State's punishment evidence, along with the heinous nature of the murder, was simply too overwhelming for counsels' alleged deficiency to have had any prejudicial effect on the outcome of the punishment phase. Id. at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); Jones v. Johnson, 171 F.3d 270, 277(5th Cir. 1999) (finding no prejudice due to brutal facts of murder).

As an initial matter, it should noted that much of what Braziel faults counsel for not discovering is simply untrue or unsubstantiated. Braziel mentions that he had "been unable to maintain employment" and that this shortcoming "may have been the result of a mental illness." Petition at 20. However, both Sandra and Chris Freyer, the parents of one of Braziel's friends with whom he stayed with often, testified on Braziel's behalf that he held

22

numerous jobs, often two at a time, and even worked for a while as a licensed security guard.  34 RR 27-28; SHCR 334-43.  Braziel himself even spoke of his work as a security guard during his testimony at guilt/innocence.  33 RR 11-12.

 Braziel further claims that counsel should have discovered evidence that he suffered abuse at the hands of his step-father, Johnny Lane.  Petition at 22.  But he provides no police, school, social services, or medical records to support his assertion that he was abused.  Braziel's mother even admits that she doesn't remember "seeing the attacks," but witnessed the physical results of the abuse.

Furthermore, Braziel fails to demonstrate how much of the evidence he claims should have been presented during punishment would have been helpful to his case.  Evidence that Braziel sustained an injury as a child would have little mitigating value because the fact that a child, especially a young boy, sustained an injury growing up is hardly surprising, and does nothing to set Braziel's childhood apart from that of most other children growing up.  Without any more elaboration, it is unclear how such evidence would have any mitigating effect on the jury, and is certainly not the "powerful" evidence contemplated by the Court in either Wiggins or (Terry) Williams v. Taylor, 529 U.S. 362, 395-96 (2000).[6]  In addition, some of evidence Braziel refers to may not be considered

---

[6]      In Williams, the evidence petitioner wished to present was that the parents were imprisoned for criminal neglect; that Williams's father beat him repeatedly and severely; that Williams was abused in foster care, and that he was borderline mentally retarded.  529 U.S. at 395-96.  In Wiggins, the missing evidence was that Wiggins was left alone for days at a time by his mother, a chronic alcoholic; Wiggins and his siblings were forced to beg for food, or eat paint chips and garbage; the mother locked the kitchen and beat the children when they broke into it to get food; Wiggins was hospitalized after his mother pressed his hand to a hot stove burner; and he was repeatedly physically and sexually abused both in foster care and in a Jobs

mitigating at all, and may have had a harmful, "double-edged" result.  See Wiggins, 539 U.S. at 535 (Wiggins's history "contained little of the double edge we have found to justify limited investigations in other cases.").  For instance, evidence that Braziel was a poor employee and student and possibly suffers from mental disorders can arguably be considered just as damaging than it is beneficial to Braziel in that it could be used to show the jury that he is likely to continue to be a future danger to society.  As such, this evidence is, at best, a double-edged sword which could reasonably be construed as more likely to prove harmful to Braziel than to serve as mitigating evidence against a death sentence.

The Fifth Circuit has often denied claims such as the one Braziel presents for lack of prejudice due to the double-edged nature of evidence presented.[7]  See also Miniel v. Cockrell, 339 F.3d 331, 346-48 (5th Cir. 2003)(upholding the state court's conclusion that the petitioner was not prejudiced by counsel's failure to

Corps program.   539 U.S. at 516-17.

[7]   *See Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997) (holding that Ransom was not prejudiced by counsel's failure to present any evidence at the punishment phase even though counsel could have presented evidence that "during his childhood Ransom was regularly subjected to physical, emotional, and possibly sexual abuse at the hands of his mother and older siblings;  he was shuttled between his mother and a foster parent [and he] had positive traits to which his former foster mother could have testified); *see also Cockrum v. Johnson*, 119 F.3d 297, 301, 303-04 (5th Cir. 1997) (holding that undiscovered and un-presented evidence of an alcoholic abusive father, a long history of hospitalization, persons who thought highly of the defendant, a history of severe drug abuse and addiction beginning at age nine or ten, several suicide attempts, several psychotic episodes, and expert diagnoses of post-traumatic stress disorder, antisocial personality disorder, poly-substance abuse, and dysthemia were "at least as consistent with the theory that Cockrum is entirely responsible for his own deep-seated destructive tendency as with the theory that he is at least partially a victim of abuse and tragedy" and because there was substantial other aggravating evidence that would have been elicited if this strategy had been chosen, no reasonable probability existed that there would have been a different outcome, had the proposed strategy been chosen).

investigate and present evidence of abuse and neglect during his childhood);
Ladd v. Cockrell, No. 01-41477 (5th Cir. 2002) (failure to present evidence of
troubled childhood, mental retardation diagnosis as a child, low IQ test score,
being put on a psychomotor inhibitor, and good behavior in institutional settings
not prejudicial because some of the evidence was double edged, and the rest had
only "minimal[]" mitigating value; also, evidence of petitioner's future
dangerousness was overwhelming); Johnson, 306 F.3d at 253 (counsel not
ineffective for failing to present evidence of alleged brain injury, abusive
childhood, and drug and alcohol problems because evidence is "double-edged");
Kitchens v. Johnson, 190 F.3d at 702-03 (finding counsel's decision not to
investigate mitigating evidence of child abuse, alcoholism, and mental illness
was sound strategy where evidence was "double-edged" in nature); Williams v.
Cain, 125 F.3d 269, 278 (5th Cir. 1997) (evidence of a defendant's abuse-filled,
violent upbringing and abuse of drugs and alcohol frequently can be "double-
edged").

Finally, when the missing evidence is weighed against the aggravating
evidence presented at trial, it is clear that Braziel was not prejudiced from any
alleged deficiencies in counsels' investigation into mitigating circumstances. See
Strickland, 466 U.S. at 698 (finding no prejudice due to State's overwhelming
evidence on aggravating factors supporting the death penalty); Jones, 171 F.3d
at 277 (finding no prejudice due to brutal facts of murder); Sharp v. Johnson, 107
F.3d 282, 287(5th Cir. 1997) (same); Russell v. Lynaugh, 892 F.2d 1205, 1213
(5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such
testimony when juxtaposed with the overwhelming evidence of guilt, the

horrifying nature of the crime, and the abundant impeachment material available to the State").

The facts of the crime of which Braziel was convicted are particularly cold and brutal: ten days after their honeymoon, Braziel confronted Doug and Lora White as they were out for an evening walk, and demanded money.  30 RR 31-79.  Although the couple had no money on them, Braziel ordered the couple to the ground, and then shot Doug in the head as he and Lora prayed out loud.  Braziel Braziel callously asked "Where is your God at now?" then shot Doug again in the chest as he pulled Doug off of the ground with one arm.  He then forced Lora into some bushes where he raped her at gunpoint as she continued to pray out loud.  Braziel told her that he shot Doug because "he deserved it" but that she "did real good" so he would let her live.  Id.

In addition to the heinous nature of the crime, the State presented evidence of Braziel's escalating pattern of disrespect for the law and propensity for violence at the punishment phase.  The jury that Braziel had been placed on probation for the sexual assault of a fifteen-year-old schoolgirl but was sentenced to five years after he failed to abide by the terms of his probation.   Braziel's probation officer, Courtney Pearce, testified that Braziel told her that the victim "deserved" what he did to her, which is exactly what he told Lora White after killing her husband.  30 RR 58; 33 RR 53.  Pearce also testified that Braziel failed to abide by the terms of his probation, was a high risk to re-offend, and was "extremely angry" most of the time.  33 RR 52-54.

The jury also heard evidence concerning Braziel's July 1995 aggravated assault and robbery where he shot a man in his driveway while he was getting

ready to go to work one morning.  Braziel approached Stewart Atnip as he was getting into his car, put a gun to Atnip's head, and ordered him to get out of his car.  Braziel then shot Atnip in the buttocks as he was trying to flee from the car, leaving one of Atnip's legs completely numb for the next six months.  33 RR 35-42.  The mother of Braziel's child testified that Braziel admitted to robbing a man to get his car, and the car was eventually found at Braziel's mother's house after police executed a search warrant in connection with the instant offense. 33 RR 25-34, 43-49.

In addition, the jury heard evidence that Braziel successfully avoided apprehension on the above offense for approximately five years and the instant offense for approximately seven years, and had previously been convicted of evading arrest in 1994.  33 RR 23; SX 116.  Officer Wendell Jones testified that he tried to pull Braziel over for failing to use a turn signal, but Braziel led Jones on a high-speed pursuit through a residential neighborhood, at times driving through people's yards.  Before finally giving up and pulling over, Braziel ran a stop sign on a busy thoroughfare, hit a median, and drove down the wrong side of the street.  Id.

In Wiggins, the Supreme Court found it noteworthy that Wiggins had very few if any aggravating factors, noting that "Wiggins does not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative."  Wiggins, 539 U.S. at 537.  As clearly demonstrated above, however, Braziel's was not a case where the State's evidence in support of the death penalty was "far weaker" than the mitigating evidence. Id. at 538.  As such, any evidence counsel may have discovered likely

27

would not have induced the jury to vote for a life sentence.  Where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish Strickland prejudice.  Ladd v. Cockrell, 311 F.3d 349, 360 (5th Cir. 2002). Braziel cannot, therefore, demonstrate that relief on this claim would be warranted even if counsels' performance could somehow be considered deficient. Ramirez, 398 F.3d at 697 (reiterating that both prongs of the Strickland test must be satisfied in order to be entitled to relief).

II.    The Testimony of Courtney Pearce, Braziel's Former Probation Officer, Did Not Violate Braziel's Due Process Rights (Claim 2).

In Napue v. Illinois, 360 U.S. 264 (1959), the Supreme Court held that a criminal defendant is denied due process when the State knowingly uses perjured testimony or allows false testimony to go uncorrected at trial.  See also Giglio v. United States, 405 U.S. 150 (1972).  A petitioner seeking to obtain relief on such a claim must show that (1) the testimony is false, (2) the State knew that the testimony was false, and (3) the testimony was material.  Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001); Pyles v. Johnson, 136 F.3d 986, 996 (5th Cir. 1998).

In his second claim for relief, Braziel asserts that the State knowingly created the false impression that he had previously committed aggravated sexual assault when, in fact, he had only been convicted of sexual assault of a child.  Petition at 22-26.  Specifically, Braziel contends that the State's witness, Courtney Pearce—Braziel's probation officer on his 1996 sexual assault offense until Braziel violated the terms of probation—falsely testified that he used a gun to rape fifteen-year-old Tewania Taylor and that he was on probation for

aggravated sexual assault.  Id.  According to Braziel, the State not only knew that the testimony was false, but intentionally allowed it to go uncorrected in order to leave the jury with the impression that he again used a weapon to sexually assault someone subsequent to the instant offense.  Id.

At the punishment phase of trial, the State called Pearce to testify regarding her interaction with Braziel while he was on probation.  33 RR 50-56. Pearce testified that Braziel had mentioned to her that he had raped a girl, and also admitted that he used a gun to do so.  33 RR 52-53.  Later, on cross-examination, defense counsel elicited the following:

COUNSEL:      Ms. Pearce, was Mr. Braziel on probation for sexual assault or aggravated sexual assault?

PEARCE:       He was on probation for aggravated sexual assault.

COUNSEL:      He was?

PEARCE:       I think so.

COUNSEL:      Would you look and—and check that out, please?

[Brief pause in proceedings while the witness examined a document.]

PEARCE:       In my notes, I don't have specifically what the tab charge is; that is, what the actual charge sheet would have on it.  But on his offense report, it stated that he sexually assaulted a fifteen-year-old at gunpoint.

33 RR 54-55.

Braziel argues that the prosecutor knew that the testimony Pearce gave concerning the use of a gun was incorrect, and that he was denied a fair trial by

State's failure to correct the assertion.  Petition at 22-26.  The Court of Criminal Appeals rejected this exact same allegation, however, when Braziel  raised it during his state habeas proceedings.  SHCR 27-35, 470-95; Per Curiam Order dated August 19, 2009.  Because Braziel fails to demonstrate that the state court's adjudication of this claim was either contrary to, or an unreasonable application of, clearly established federal law, relief should be denied.

    A.    To start, Pearce's testimony was not false.

Braziel contends that Pearce testified falsely when she asserted on direct examination that Braziel admitted to her that he used a weapon when he sexually assaulted Ms. Taylor.  Citing a "prosecution report" contained within Pearce's probation file, Braziel seems to insinuate that Pearce knew there was no weapon involved but lied anyway at the behest of the prosecutor.  Petition at 23-24.  What Braziel misunderstands, however, is that Pearce was not testifying concerning her actual knowledge of what happened, but rather only to what Braziel confessed to her during conversations they had while she was his probation officer.  As such, the content of any offense report or probation file is irrelevant to what Braziel admitted to Pearce during their conversations.

Further, Braziel misrepresents the contents of the probation file. Although parts of the probation file fail to mention a weapon or threat of a weapon, additional entries by Pearce in her type-written notes corroborate her testimony.  For instance, on June 3, 1996, Pearce wrote "He was questioned about having sex with a stranger (someone who know less than 24 hours).  He did force sex on a 15 year old girl while he held her at gunpoint."  SHCR 107. The next day, Pearce wrote, "He is hesitate for [sic] taking full responsibility for

raping a 15 year old girl, by explaining that she 'flirted with' him and she also wore a very short skirt at the time of the offense.  Note: P did hold her at gunpoint while he raped her."  Id.  On July 1, 1996, Pearce stated that she "Spoke with P about his offense and the fact that the offense report indicates that he clearly forced a girl at gunpoint to have sex with him."  SHCR 110. Pearce's notes regarding specific discussions she had with Braziel clearly indicate that her testimony concerning these conversations was not false.

On cross-examination, in response to defense counsel's question as to whether Braziel had been convicted of sexual assault or aggravated sexual assault, Pearce testified that she did not know what he was specifically charged with, but that his offense report indicated that he "sexually assaulted a fifteen-year-old at gunpoint."  33 RR 55.  Braziel contends that this, too, is a false statement since the supplemental police report shows that the charges were for sexual performance with a child and sexual assault, not aggravated sexual assault.  Petition at 24-25.  But Braziel overlooks the fact that the original incident report did state that Braziel abducted and then sexually assaulted a fifteen-year-old at gunpoint.  SHCR 284.  Moreover, both the first and second supplemental police reports listed the "Offense/Incident" as aggravated sexual assault, and the second supplement continues to list an automatic handgun under "Weapon Description."  SHCR 287-92.  Thus, because there is no evidence that Pearce testified falsely either during direct examination or on cross-examination, Braziel's allegation must fail.  See Koch, 907 F.2d at 531(holding that "bare allegations" of false testimony do not establish a due process violation).

    B.      There is no evidence that the State either knowingly used perjured testimony or allowed false testimony to go uncorrected.

Braziel argues that once the prosecutor heard Pearce's testimony on direct examination that Braziel admitted to her that he used a weapon during the sexual assault, he "had reason to know" that her answer was false and that he had a "responsibility to correct it."  Petition at 24-26.  As discussed above, however, there is no evidence indicating that Pearce's testimony concerning what Braziel confessed to her was untrue.  As a result, Pearce was free to testify (without correction) as to what Braziel told her had actually occurred regardless of whether or not Braziel was actually charged with aggravated sexual assault.

Furthermore, despite Braziel's assertions to the contrary, the State possessed evidence that supported the notion that Braziel may have used or exhibited a weapon during the sexual assault.  The lead prosecutor in the case, George West, interviewed Ms. Taylor prior to trial and his notes reflect that Taylor referred to a gun in that interview.  SHCR 232.  At the top of the prosecutor's notes  it says "D had black gun, Blk & Silver."  Three paragraphs down he wrote, "Little handgun on coffee table."  Prior to trial, the State had also subpoenaed Braziel's records from the ADAPT Behavioral Healthcare Sex Offender Evaluation and Treatment Program that he had attended as a condition of his probation.  SHCR 243-82.  During one of the sex-offender counseling sessions, when asked how his victim might describe the incident, Braziel responded "that she would say, 'that I had a gun and forced her to have sex with me.'" SHCR 280.  Additionally, once Braziel was developed as a suspect in the instant case, lead detective Mike Bradshaw spent in hour interviewing

Ms. Taylor in order to learn as much about Braziel as possible before interviewing him. In an affidavit submitted to the state habeas court, Bradshaw stated that Ms. Taylor told him that she "saw the butt of a gun on top of the dresser in the bedroom, and that it scared her."  SHCR 240.

All of this evidence in the hands of the prosecution indicated that while he was only charged and convicted of sexual assault, Braziel exhibited a firearm while he perpetrated the offense.  This only served to corroborate the testimony given by Pearce, thus alleviating the need for any "correction" on behalf of the State.   Indeed,  simply  because  Braziel  was  not  charged  or  convicted  of aggravated sexual assault does not mean that the prosecution could not present evidence that he used or exhibited a weapon during the offense if such evidence existed.  Such evidence simply countered the false impression fostered by the defense's arguments that Braziel was convicted of statutory rape only because the victim was underage rather than forcible rape.  See 32 RR 100 ("[Braziel] told you he plead guilty to that statutory rape"); 34 RR 59 ("[T]here was no—no aggravating factors there, no force, no gun . . . He was twenty; the victim was fifteen, fifteen being under-age"); 34 RR 61 ("we've got a—basically, a statutory rape.").

Regardless, although the State was under no obligation to correct Pearce's testimony concerning her conversations with Braziel, the record already reflected that Braziel had been convicted only of sexual assault because the State had previously introduced into evidence Braziel's pen packet from the offense prior to Pearce taking the stand.  33 RR 23; SX 113.  The pen packet contained, among other things, the indictment charging sexual assault (with no

deadly weapon allegations) and the judgment showing that Braziel pled guilty to the charge.  When introducing the packet, the prosecutor specifically stated, "Alvin Braziel, Junior, was convicted of the offense of sexual assault of a child for which he ultimately received five years in the penitentiary."  33 RR 23. Likewise, at the guilt/innocence phase Braziel was asked on cross-examination to confirm that he had been imprisoned on charges of sexual assault, and there was no mention of the offense being aggravated.  32 RR 42.  Finally, defense counsel cleared up any potential misunderstanding by calling Braziel's trial attorney in the sexual assault case, Matt Fry, who testified concerning the difference between aggravated sexual assault and sexual assault.  34 RR 22-24. Fry clarified that Braziel was convicted only of sexual assault, as he was not charged with using a deadly weapon.  Id.

As demonstrated above, the State was under no obligation to correct any potentially misleading testimony as the record clearly indicated both before and after Pearce's testimony that Braziel was not convicted of aggravated sexual assault.  Because Braziel wholly fails to demonstrate that the State knowingly presented perjured testimony or allowed false testimony to go uncorrected, his claim must fail.

> C.    In any event, Braziel fails to show that Pearce's testimony was material to the jury's verdict.

Assuming for the sake of argument that the State did fail to correct false testimony as Braziel asserts, his claim for relief still fails because the evidence in question was not material to the jury's verdict.  Material evidence is only that

evidence creating a reasonable likelihood that it could have affected the verdict.[8] Giglio, 405 U.S. at 150.  Braziel fails to provide any evidence that the outcome of his punishment phase would have been different absent to challenged portions of Pearce's testimony.

Initially, it is unlikely Pearce's testimony concerning Braziel's confession that he used a gun affected the jury's eventual finding of future dangerousness given the fact that there was plenty of evidence before the jury indicating that he was convicted only of sexual assault.  As discussed in the preceding section, the actual indictment and judgment showing Braziel's conviction for sexual assault was already before the jury, as was Braziel's testimony confirming such information.   32 RR 42; 33 RR 23; SX 113.   Defense counsel also directly contradicted Pearce's testimony at the punishment phase by calling Braziel's trial attorney in the sexual assault case to testify about the difference between aggravated sexual assault and sexual assault and how Braziel was only charged with the later. 34 RR 22-24. This testimony allowed defense counsel at closing arguments to cast doubt in the juror's minds of the accuracy of Pearce's testimony by asking, "What else is wrong with her report?"  Because Pearce's

---

[8]    The Giglio materiality standard—which embraces the harmless error rule of Chapman v. California, 386 U.S. 18 (1967)—was arguably abrogated by the Supreme Court's opinion in Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993). See Barrientes, 221 F.3d at 756-57(assuming Brecht harmless error standard applies to Giglio claims raised in federal habeas proceedings) (citing Gilday v. Callahan, 59 F.3d 257, 268 (1st Cir. 1995)).  Because this is a postconviction proceeding, the Director no longer bears the onus of proving harmlessness of trial error under Chapman; rather, it is Braziel who must prove harm.   At a minimum, such a showing would require proof of materiality under United States v. Bagley, i.e., a reasonable probability that, but for the false testimony, the result of the proceeding would have been different.  473 U.S. 677, 682 (1985).  Braziel fails to make such a showing.

testimony that Braziel admitted to using a gun was rebutted by other evidence presented at trial, it cannot be assumed that the jury gave much, if any, weight to this specific testimony.

Moreover, to the extent that the jury believed this portion of Pearce's testimony, Braziel still cannot demonstrate that the results of the punishment phase would have been different without it. To start, the jury heard multiple references to Braziel's conviction for the sexual assault of a child, even though no aggravating factor was ever charged. The jury heard that he was initially placed on probation for the sexual assault but was sentenced to five years after he failed to abide by the terms of his probation. Aside from the testimony concerning Braziel's admitting he used a gun, Pearce provided other unimpeached testimony that the jury could have considered in deliberating Braziel's future dangerousness. She testified that Braziel told her that Ms. Taylor "deserved" what he did to her, which is exactly what he told Lora White after killing her husband. 30 RR 58; 33 RR 53. Pearce also testified that Braziel failed to abide by the terms of his probation, was a high risk to re-offend, and was "extremely angry" most of the time. 33 RR 52-54.

Further, the jury also heard damaging evidence concerning Braziel's July 1995 aggravated assault and robbery of Stuart Atnip where Braziel shot Atnip after he attempted to flee. Braziel approached Atnip early in the morning as Atnip was leaving to go to work, put a gun to Atnip's head, and ordered him to get out of his car. Braziel then changed his mind and ordered Atnip to drive, but as Braziel tried to enter the backseat Atnip fled the vehicle. Braziel shot Atnip in the buttocks, leaving one of his legs completely numb for the next six months

36

and Atnip in extreme pain for the following six years. 33 RR 35-42. The mother of Braziel's child testified that Braziel admitted to robbing a man to get his car, and the car was eventually found at Braziel's mother's house after police executed a search warrant in connection with the instant offense. 33 RR 25-34, 43-49.

In addition to knowing that Braziel avoided apprehension on the above offense for approximately five years and the instant offense for approximately seven years, the jury also heard evidence that Braziel had been convicted of evading arrest in 1994. 33 RR 23; SX 116. When Officer Wendell Jones tried to pull Braziel over for failing to use a turn signal, Braziel led Jones on a high-speed pursuit through a residential neighborhood, where at times he drove through people's yards. Before finally giving up and pulling over, Braziel ran a stop sign on a busy thoroughfare, hit a median, and drove down the wrong side of the street. Id.

Finally, the facts concerning the instant crime are so particularly cold and brutal that they alone would support an affirmative answer to the future dangerousness special issue. See Statement of Facts, supra. Lora White's chilling testimony at the guilt/innocence phase described in great detail the events that unfolded after the newly-married couple went for an evening walk. 30 RR 31-79. After demanding money from the couple and ordering them to the ground, Braziel shot Doug White in the head as he and Lora prayed out loud, then shot him again in the chest after he lifted Doug up off of the ground. Braziel callously asked Doug "Where is your God at now?" right before he shot him. He then forced Lora into some bushes where he raped her at gunpoint as

37

she continued to pray out loud.  After he was done, Braziel told her that he shot Doug because "he deserved it" but that she "did real good" so he would let her live.  Id.

Given the horrendous nature of this senseless crime, along with the plethora of other evidence demonstrating his future dangerousness, Braziel simply cannot show that Pearce's allegedly false testimony somehow created "a reasonable likelihood that it could have affected the verdict." See Giglio, supra. Because this evidence is not material, therefore, relief should be denied.

III.   The State Did Not Withhold Exculpatory Evidence From the Defense in Violation of Braziel's Due Process Rights (Cl.

In relation to his previous allegation, Braziel next claims that the State suppressed evidence that demonstrated no weapon was used during the sexual assault of Tewania Taylor in violation of Brady v. Maryland, 373 U.S. 83 (1963). Petition at 26-31.  In particular, Braziel asserts that the state failed to disclose the supplemental police reports wherein Ms. Taylor recanted the allegation that Braziel had used or exhibited a weapon during the commission of the sexual assault.  Had this evidence been available, Braziel seems to argue, the defense would have been able to more effectively rebut the testimony given by Braziel's former probation officer, Courtney Pearce, concerning Braziel's admission to her that he used a weapon during the offense.  Id.  However, this allegation was rejected by the Court of Criminal Appeals when Braziel raised it during his state habeas proceedings.  SHCR 35-40, 496-513; Per Curiam Order dated August 19, 2009.  Because Braziel fails to demonstrate that the state court's adjudication of this claim was either contrary to, or an unreasonable application of, clearly

38

established federal law, relief should be denied.

In Brady, the Supreme Court announced that due process requires the State to disclose material, exculpatory evidence to the defense. 373 U.S. at 87. In order to establish a Fourteenth Amendment violation under Brady, the petitioner must demonstrate that (1) the prosecution suppressed evidence; (2) that was favorable to the defense; (3) material to either guilt or punishment. Banks v. Dretke, 540 U.S. 668, 691 (2004); Graves v. Cockrell, 351 F.3d 143, 153-54 (5th Cir. 2003). As discussed below, Braziel completely fails to establish that the evidence he refers to satisfies any of the criteria necessary to demonstrate a violation of Brady.

A. Braziel has not established that the evidence at issue here was actually suppressed.

Braziel accuses the State of failing to disclose the supplemental police report that "clearly indicated that no weapon had been used in the offense against Taylor." Petition at 29. The record clearly indicates, however, that both the prosecution and the Mesquite Police Department made their files on this case available to defense counsel. 30 RR 6. Specifically, at the conclusion of a motion to suppress hearing, the following dialogue occurred:

THE COURT: Well, I'm just going to tell you what you need to do. You need to, Detective [Bradshaw], bring your entire file, every scrap of paper that relates to this case. You need to have it—how long does it take you to get to the office and back?

BRADSHAW: Less than half an hour.

THE COURT: Okay. You need to have that here by 1:00 o'clock this afternoon and provide it all to [the

39

prosecutor].  And I don't want to hear about one thing that you haven't gone through and that hasn't been reviewed before we start trial on Monday.  And anything that they're entitled to see they need to see it did [sic].

* * *

THE COURT:          Okay.  So Bradshaw is going to be back at 1:00 o'clock with everything, everything that relates to this case.  And you're going to provide that to the defense, if not sooner, by then at least.

THE STATE:          [Defense counsel] and I are going up as soon as we leave here, Your Honor, to look at all the stuff that I have now; and anything that comes in he's going to have an opportunity to see.

29 RR 26, 83.  A few days later at the opening of trial, the following dialogue occurred outside the presence of the jury:

THE STATE:          Your Honor, I just want the record to reflect that pursuant to the last hearing, the defense attorneys have had an opportunity to review the records of the police department as well as the files of the district attorney's office?

DEFENSE:            That's correct.

THE COURT:          Okay.

30 RR 6.

Additionally, Detective Bradshaw stated in his affidavit submitted during the state habeas proceedings that he obtained a copy of the Dallas Police Department offense reports associated with Braziel's 1996 sexual assault conviction and kept a copy of the reports in his investigative files.  SHCR 240-41.

40

Bradshaw explained that, pursuant to the trial judge's order, he brought over his entire investigative file in the case—four boxes total—for defense counsel to inspect, and that the supplemental report from the sexual assault case was in there. Id. Although Braziel's defense counsel, Richard Franklin, also submitted an affidavit stating that he specifically requested the police reports but that the prosecution "never furnished them to me," Franklin does not dispute the fact that he had the opportunity to look for them himself when he examined the State's files. SHCR 151-52. Indeed, Franklin never alleges that he was unaware of the supplemental reports or that he looked for them in the file but never found them. Id. As a result, Braziel fails to provide any evidence to prove that the State actually withheld any evidence in this case.

Further, the Fifth Circuit has held that "evidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it." United States v. Runyan, 290 F3d 223, 246 (5th Cir. 2002). That is, Brady does not obligate the State to supply the defense with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence. Kutzner v. Cockrell, 303 F.3d 333 (5th Cir. 2002). Here, Franklin's affidavit demonstrates that the defense knew before trial both that the State was going to introduce some evidence concerning the sexual assault at the punishment phase, and that there were conflicting stories as to whether a gun was used during the offense. Specifically, Franklin states:

> . . . I was advised by Assistant District Attorney George West that the State would offer that [sexual assault] conviction, and its underlying facts, as evidence in the punishment phase of the trial.

41

* * *

> I advised Mr. West that Mr. Braziel and Mr. Fry stated that no gun
> was used in the commission of the sexual assault case but Mr. West
> assured me that [Ms. Taylor] was going to testify that a gun was
> used, and I believed him.

SHCR 151.

Defense counsel was clearly aware that the State planned to introduce evidence that Braziel had used a gun, and was on notice that he needed to review the file to discover the police reports of the incident. Indeed, counsel did not need the police reports in order to know that there was ambiguity regarding whether a gun was actually used in Ms. Taylor's sexual assault or not. Thus, because defense counsel already knew of the discrepancy in stories concerning the use of a gun, Braziel cannot now claim that such evidence was suppressed by the State. See United States v. Agurs, 427 U.S. 97, 103 (1976)(holding that Brady allegations involve "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.").

B.   The allegedly suppressed evidence was neither favorable nor material to Braziel's defense at trial.

Pursuant to Brady, it is clear that a violation of due process occurs where the State suppresses impeachment evidence that is favorable to the defense. 373 U.S. at 87; Strickler v. Green, 527 U.S. 263 (1999); United States v. Bagley, 473 U.S. 667, 676 (1985).   Favorable evidence is any evidence, exculpatory or impeachment, that "if disclosed and used effectively, [] may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676.  Braziel contends that the evidence contained the police reports would have been favorable

impeachment evidence that could have been used to rebut Pearce's testimony concerning Braziel's admission to using a gun during his sexual assault of Ms. Taylor.  Petition at 28.

Yet it is unclear how the police reports could be considered impeachment evidence, as Pearce did not testify to the facts of the sexual assault.  Rather, Pearce's testimony centered around her relationship with Braziel as a probation officer—statements he made to her, his attitude while on probation, and whether he generally was a good probationer (he was not).  33 RR 50-56.  As such, the contents of a supplemental police report detailing the offense have no bearing on statements that Braziel made personally to Pearce during his probation period, and are thus not favorable impeachment evidence that could have been used to disprove her testimony.  Indeed, it is debatable whether the police reports can even be considered favorable at all in this context given that both the first and second supplemental police reports listed the "Offense/Incident" as aggravated sexual assault, and the second supplement continues to list an automatic handgun under "Weapon Description."  SHCR 287-92.

Consequently, because the allegedly suppressed information was irrelevant to Pearce's testimony and could not be used to impeach her testimony concerning Braziel's in-person admissions to her, Braziel fails to show that this evidence was actually "favorable" to his defense, and relief is not warranted on the instant claim.  See East v. Johnson, 123 F.3d 235, 237 (5th Cir. 1997) (holding that to obtain relief on a Brady claim, a habeas petitioner must demonstrate that the prosecution suppressed evidence that was favorable to the defense and material to guilt or punishment).

43

Moreover, Braziel fails to demonstrate that the evidence in question was material.   Under Brady, evidence is material "only where there exists a 'reasonable probability' that, had the evidence been disclosed, the result at the trial would be different."  Bagley, 473 U.S. at 682.  A "reasonable probability" is one sufficient to undermine confidence in the outcome.  Id.; Kyles v. Whitley, 506 U.S. 419, 437 (1995).  Braziel contends that the defense could have used the information in the police reports to impeach Pearce's credibility and weaken the State's argument that he was a violent serial rapist.  Petition at 29.  But Braziel fails to demonstrate how the police reports would help the defense achieve either of these objections.

First, the defense having knowledge of the supplemental reports would not have prevented the State from demonstrating that Braziel was violent rapist and continuing threat to society.  Whether or not he used a gun when he forcibly raped a fifteen-year-old girl does not change the fact that the jury knew unequivocally that Braziel was at the very least a two-time rapist.  Braziel could have asserted dominance or control over Ms. Taylor without the gun simply by being bigger, stronger, older, and verbally threatening to her.  The fact that he asserted his dominance and control over at least two females in three years—including a fifteen-year-old school girl whom he raped and later exclaimed "deserved it"—makes him a future danger regardless of whether he used or exhibited a gun.  Possession of the supplemental police reports would not have changed any of this evidence, and would not have allowed the defense to establish that the rape of Ms. Taylor was not forcible.

44

Further, there is no evidence that the police reports would have aided defense counsel in impeaching Pearce's testimony anymore than they already did.  As discussed in the previous section, the police reports would have little impeachment value because Pearce was not testifying concerning her actual knowledge of what happened, but rather only to what Braziel confessed to her during conversations they had while she was his probation officer.  To whatever extent Pearce's testimony on cross-examination that Braziel was on probation for aggravated sexual assault needed to be clarified, defense counsel was able to do so without the police reports through the presentation of Braziel's trial attorney for the sexual assault conviction.  Thus, because defense counsel did not need the reports to impeach Pearce's testimony on cross-examination, it cannot be deemed material to the punishment phase.  Bagley, 473 U.S. at 682.

Finally, given the chilling nature of the instant offense, along with the overwhelming evidence presented by the State of Braziel's propensity for violence, there is simply no reasonable probability that the results of the punishment phase would have been different had defense counsel specifically been provided the supplemental police reports.  As discussed in more detail in Section II, supra, the jury heard testimony from Lora White about the heinous crime committed against a young, newly-married couple who had their whole lives before them.  Whether or not Braziel used a gun in sexually assaulting Ms. Taylor, the State provided evidence that he fired a gun in two other instances, killing one person and injuring another.  The State also demonstrated that Braziel feels entitled to rob people of the their possessions, and to rape and murder strangers because he believes "they deserve[d] it."  Through Pearce's

45

testimony, the State showed that Braziel is a manipulative, unremorseful, violent person who seeks dominance and control and who is unwilling (or unable) to be restrained by supervision. There is, therefore, no reasonable probability that "the result at the trial would be different" had defense counsel been able to utilize the evidence in question. Bagley, 473 U.S. at 682. As such, it is not material.

In failing to demonstrate that the information at issue was either suppressed, favorable or material to his defense, Braziel has fallen woefully short of proving that the State had a duty to disclose such evidence or that the suppression of this evidence violated his due process rights. Accordingly, Braziel's Brady allegation is meritless and should be denied

IV.   Braziel Has Failed to Demonstrate that He Is Mentally Retarded.

In his next claim for relief, Braziel asserts that he is mentally retarded and, therefore, his death sentence violates the prohibition against the imposition of death sentences against the mentally retarded as set out in Atkins v. Virginia. Petition at 31-37. Relying solely on the unexhausted hearsay affidavit from his investigator and an IQ score of 75 obtained from the Texas Department of Criminal Justice (TDCJ), Braziel boldly contends that "credible evidence" exists supporting his claim of mild mental retardation. Id. at 35-36. But he fails entirely to explain how the state court's conclusion that he "failed to sustain his burden of proving his mental retardation claim" could be considered an unreasonable application of Atkins. SHCR at 525. Braziel does correctly point out that the Supreme Court in Atkins announced that the execution of mentally retarded criminals constitutes cruel and unusual punishment in

violation of the Eighth Amendment.  536 U.S. at 321.  However, the Court also held that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about who there is a national consensus."  Id. at 317.  The Court cited with approval the American Association on Mental Retardation (AAMR) and American Psychological Association (APA) definitions of mental retardation, which require (1) significantly subaverage general intellectual functioning; (2) concurrent significant limitations in adaptive functioning; and (3) ) the existence of these limitations and deficits prior to the age of eighteen.[9]  Id. at 309 n. 3 (internal

---

[9]    Although the Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences," it cited with approval the following definitions of mental retardation:

> The [AAMR] defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18."

> The [APA]'s definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion 1) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion 2).  The onset must occur before age 18 years (Criterion 3).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.

citations omitted), 317 n. 22.

Although Texas does not yet have statutory provisions to implement the Atkins decision, in the interim, the Court of Criminal Appeals has held that it will follow the AAMR or Texas Health and Safety Code criteria for addressing Atkins mental retardation claims. Ex parte Briseno, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). State law defines "mental retardation" as "(1) significantly subaverage general intellectual functioning that is (2) concurrent with deficits in adaptive behavior and (3) originates during the developmental period." Tex. Health & Safety Code § 591.003(13); Howard v. State, 153 S.W.3d 382, 386 n.5 (Tex. Crim. App. 2005) (citing Briseno, 135 S.W.3d at 7). This definition is "essentially the same" as the one utilized by the AAMR. Howard, 153 S.W.3d at 386; see Ex parte Modden, 147 S.W.3d 293, 296 (Tex. Crim. App. 2004) (AAMR criteria "adopted" because consistent with definition set out by legislature in Texas Health & Safety Code Section 591.003(13)).

As discussed below, Braziel wholly failed to establish any of these requirements during his state habeas proceedings. As such, he cannot establish that the state court's subsequent adjudication of this claim was either contrary to, or involved an unreasonable application of, Atkins, and his request for federal habeas relief should be denied.

---

Atkins, 536 U. S. at 309 n. 3 (internal citations omitted); id. at 317 n. 22. The Fifth Circuit has cited the above-described definitions in determining that the evidence offered by a capital petitioner was insufficient to suggest that further development of his retardation claim had any likelihood of success under the Atkins criteria.

A.   Braziel failed to demonstrate that his intellectual functioning is significantly subaverage.

The DSM-IV states that "[s]ignificantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)."[10]   Incredibly, to support the claim that his intellectual functioning is significantly subaverage, Braziel relies solely upon the results of a test, the Beta 2, administered by TDCJ upon Braziel's initial entrance into the prison system indicating a full scale IQ of 75.  Petition at 35; SHCR at 46-47, 295-96.  As the state court's findings and conclusion imply, however, this evidence is not persuasive.

To start, Braziel has not established that his score of 75 on the Beta 2 was significantly subaverage.  In Texas, for an individual to be considered mentally retarded his IQ score must be more than two "standard deviations below the age-group mean for the tests used."  Tex. Health & Safety Code 591.003(13) (defining mental retardation).  To determine the standard deviation for the Beta 2 test, and thus the significance of Braziel's score of 75, requires knowledge of the test's standard error of measurement and its mean score.  But Braziel failed to present this information either to this Court or the state court below, depriving both courts of the tools necessary to interpret this Beta 2 score.  However, a diagnostician with TDCJ interpreted Braziel's score of 75 as a passing score,

---

[10]     APA, Diagnostic and Statistical Manual of Mental Disorders IV-Text Revision 49 (4th ed. 2000) (DSM-IV-TR).  See also American Association on Mental Deficiency (AAMD), Classification in Mental Retardation 1 (Grossman ed. 1983).

indicating that a score of 71 or higher on the Beta 2 is a passing score.[11]   SHCR at 295.  Because this interpretation has not been refuted by Braziel, no evidence has been presented to demonstrate a significant subaverage intellectual function.

Moreover, the Beta 2 test is not a reliable or valid measure of a person's intellect because it is not an individually administered exam.  When Braziel first entered prison in 1997 he, along with a group of inmates, was administered the Beta 2 by TDCJ as part of the classification process to determine if more testing was necessary.  SHCR at 295-96.  In group settings such as this, there are obvious distractions, and the person administering the exam is less likely to detect a single individual's poor understanding of instructions, lack of effort, or depression and anxiety.  Consequently, the mental health profession does not recognize the results of group IQ exams such as the Beta 2 as a valid measure of intellectual functioning.  See DSM-IV at 41 ("General intellectual function is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests")(emphasis added).  Likewise, Texas law requires a score from an individually administered IQ test to classify an individual as mentally retarded.  See 25 Tex. Admin. Code 419.238(a)(1)(A) (2003) (a person must "have a full intelligence quotient score of 69 or below, obtained my administering an standardized individual test" to meet eligibility requirements for Texas's mental retardation program).

---

[11]     As a result, no further testing was done on Braziel to determine if he belonged in the Mentally Retarded Offender Program.  Id.

Furthermore, the fact that Braziel failed to present any IQ score of 70 or below disqualifies him from Atkins protection. While the Fifth Circuit has recently specified that "mental retardation can be found in range of 70-75," Moore v. Quarterman, 342 F. App'x 65, 68 n.5 (5th Cir. 2009) (emphasis added), the Court has only granted relief on Atkins claims where an inmate presents at least one base score below 70.[12] When all of an inmate's scores fall above 70, the Fifth Circuit has consistently denied relief.[13] Even when an inmate has scored below 70, the Fifth Circuit has found no mental retardation if the circumstances show that the inmate has exaggerated his deficits.[14] Because Braziel has not shown any base score falling within the range eligible for a diagnosis of mental retardation, he cannot satisfy the first requirement for relief under Atkins.

Finally, and perhaps most importantly, Braziel has failed to provide any evidence showing that he ever tested as mentally retarded on any IQ test prior to reaching the age of eighteen.   The only IQ test cited by Braziel was administered by TDCJ when Braziel first entered the prison system in 1997 at the age of twenty-two.  SHCR at 295-96.  As such, the state habeas court was correct in finding that Braziel failed to establish that he was mentally retarded.

[12]     See Moore, 342 F. App'x at 68 (finding significantly subaverage intellectual functioning with IQ scores ranging from 66 to 76); Rivera v. Quarterman, 505 F.3d 349, 361 (5th Cir.2007) (finding mental retardation with scores as low as 66).

[13]     See Pierce v. Thaler, ___ F.3d ___, 2010 WL 1532738, at *13 (5th Cir. 2010) (WAIS-III score of 70); Williams v. Quarterman, 293 F. App'x 298, 310-11 (5th Cir. 2008) (three different IQ tests scoring a 70 or 71); Eldridge v. Quarterman, 325 F. App'x 322, 325 (5th Cir. 2009) (scores ranging from 72 to 112).

[14]     See Moreno v. Dretke, 450 F3d 158, 165 (5th Cir. 2006) (post-Atkins score of 64 with substantial testimony that it underestimated his abilities).

B.     Braziel also failed to prove that he has significant limitations in adaptive functioning.

"Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." AAMD at 11.  Both the AAMR and APA have also described the factors in evaluating adaptive functioning.  Atkins, 536 U.S. at 309 n.3.  For example, the AAMR's ninth edition text refers to "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).  The APA guidelines require "significant limitations in adaptive functioning" in at least two of its list of similar skill areas.  DSM-IV at 42.  The AAMR's tenth edition refers to "significant limitations ... in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." Mental Retardation: Definition, Classification, and Systems of Supports 1 (10th ed. 2002).  As the Court of Criminal Appeals has explained, adaptive behavior "measures a person's ability to function properly in society such as, for example, meeting the needs of day to day life." Ex parte Tennard, 960 S.W.2d 57, 61 (Tex. Crim. App. 1997).

In an attempt to establish significant impairments in adaptive functioning, Braziel contends that his poor academic performance should be considered evidence of an "intellectual impairment." Petition at 35-36.  Relying

almost exclusively upon the unexhausted hearsay affidavit of Amanda Maxwell, a licensed clinical social worker hired to assist federal habeas counsel in their investigation, Braziel points out that he spent two years in the first and seventh grades, that he made mostly failing grades in elementary school, that his standardized test scores were below average, and that he had dropped out of school by the ninth grade. Petition at Exhibit 2. According to Braziel, these "intellectual impairments," along with an alleged traumatic brain injury he suffered as a child and the "rootlessness that was a hallmark of his home life and upbringing," resulted in his having significant adaptive deficiencies. Petition at 36. Yet, without explaining what these deficiencies are, Braziel simply concludes that they "are evidenced by his spotty work history and inability to conform with the rules of probation." Id. Regardless of the veracity of these allegations, however, none of them effectively prove that Braziel has any actual adaptive behavior deficits.

First, the fact that Braziel struggled in school and never made it past the ninth grade does not necessarily signal mental retardation. There are several viable explanations for why an individual might have problems in school and eventually drop out, including lack of motivation, behavioral issues, necessity and personal choice. And the fact that Braziel's academic performance improved dramatically while he was incarcerated belie any assertion that his poor performance in school was the result of an "intellectual deficiency." Beginning in 1997, Braziel enrolled in the prison school system, regularly attended classes, and improved his reading, language and math skills over time. SHCR at 318-27. He eventually scored well on educational achievement tests, achieving the

reading and language skills of a senior in high school and the math skills of an eighth grader.  SHCR 332.  Braziel even became eligible to take a GED exam and took it in November 2000, passing each of the exam's five sections.  Id.  Although he fell just three overall points shy of passing the exam, Braziel's performance was certainly beyond the capabilities of a person with mental retardation.

Further, despite his allegation to the contrary, Braziel's work history does not indicate any limitations in adaptive functioning.  Braziel held numerous jobs, often two at a time, and even worked for a while as a licensed security guard.  33 RR 11-12; 34 RR 27-28; SHCR 334-43.  While he was working, Braziel also obtained a driver's license and purchased a car.  34 RR 28; SHCR 346, 349.  Braziel also learned a trade while he was imprisoned.  SHCR 323, 352-58.

Even Braziel's illegal activities evince an aptitude well beyond that of a mentally retarded person.  His culpability for the instant capital murder went unsolved for over seven years, and the car-jacking and shooting went unsolved for five years.  31 RR 83-85, 112-14; SX 100, 101.  In the instant case, Braziel evaded detection in part by revealing the crime to no one and by refusing to supply authorities with a DNA sample.  32 RR 14-15.  Braziel's concealment of the car-jacking perhaps demonstrates even more foresight and cunning as he placed the VIN from the car he legally purchased over the VIN plate of the car he had stolen.  33 RR 29, 43-48.

Finally, none of those who know Braziel best have ever described him as a person of limited abilities.  In her affidavit to this Court, Braziel's mother, Glenda Turner, makes no mention any mental deficiencies Braziel may have had

54

other than her lone opinion that he showed symptoms of schizophrenia at times when he was incarcerated.[15] Petition at Exhibit 1. Sandra and Chris Freyer, the parents of Braziel's highschool friend, considered Braziel to be a leader and role-model for their son. 34 RR 13, 31. The mother of his child also described him as a good father who provided for their child and maintained a job; she made no mention whatsoever of any deficiency in Braziel's mental abilities. 33 RR 32-34. And until this claim was raised during his state habeas proceedings, none of Braziel's attorneys had asserted any defense of mental deficiency, including his trial attorney, Richard Franklin, who submitted an affidavit in support of Braziel's state writ application. SHCR 151-52.

Braziel has failed to provide this Court with any evidence that he suffers from a significantly subaverage intellect or any deficits in his adaptive behavior. Quite the contrary, plenty of evidence demonstrates that Braziel is a bright, cunning man who simply chose a life of violent crime rather than one of legitimate pursuits and is now trying to avoid the results of his conduct. For these reasons, Braziel cannot demonstrate that relief is warranted under Atkins.

C.     Braziel utterly failed to prove onset of limitations prior to age eighteen.

Lastly, Braziel must establish that he exhibited "both significantly

---

[15]     Although Ms. Turner claims that Braziel was hit on the head with a wooden stick by her sister once when he was a child, Braziel has provided absolutely no records to prove that such injury occurred or any explanation as to how such alleged injury is relevant to a determination of limited adaptive deficits. As such the assertion is conclusory and of little value. Koch v. Puckett, 907 F.2d at 530 ("Mere conclusory statements do not raise a constitutional issue in a habeas case."); Ross, 694 F.2d at 1011(same); Schlang, 691 F.2d at 799.

subaverage intellectual functioning and concurrent deficits in adaptive behavior" before the age of eighteen. Atkins, 536 U.S. at 309 n.3; Ex parte Tennard, 960 S.W.2d at 61. Braziel provides no records to show that he was ever diagnosed as mentally retarded or ever placed in special education classes because of his alleged retardation. And while it might be possible that he could have slipped through the cracks for all these years, it is simply not probable. The fact that Braziel may not have always made good grades or might have been unable to keep employment for very long does not establish that he is retarded, but is more likely explained by other factors, such as lack of motivation. Thus, because Braziel cannot demonstrate that the state habeas court's conclusion that he failed to prove his mental retardation was either contrary to or an unreasonable application of Atkins, and his claim should be dismissed.

V.   The Trial Court Did Not Err In Admitting Lora White's Pre-Trial Photographic Identification (Claim 5).

Braziel next alleges that his due process rights were violated by the trial court's admission of Lora White's pre-trial photographic identification of Braziel as the man who raped her and murdered her husband. Petition at 37-40. Although he provides a two-page summary of the facts surrounding Lora's identification, Braziel neither cites any case law nor attempts any explanation as to what part of the identification process he believes is improper. Instead, he makes the following one-sentence conclusory assertion: "The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence." Id. at 40.

Other than this lone sentence, Braziel has not provided any argument, evidence, or authority to support his bald assertions.  Because Braziel failed to adequately brief this issue by failing to specifically argue and analyze his position or provide authorities, his claim is not entitled to relief.  Smith v. Cockrell, 311 F.3d 661, 679 n.12 (5th Cir. 2002)("Issues not briefed, even if raised on appeal, are considered waived or abandoned.") (citation omitted); Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an argument adequately, we consider it waived.") (footnote omitted); Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) ("Mere conclusory statements do not raise a constitutional issue in a habeas case.").

Regardless, Braziel previously raised this claim on direct appeal, where the Court of Criminal Appeals ultimately denied relief after finding that the photo identification "was not impermissibly suggestive."  Braziel v. State, No. 74,139, slip op. at 5.  Braziel fails to establish that the state court's adjudication of this claim was either contrary to, or involved an unreasonable application of, clearly established federal law.  As a result, he is not entitled to federal habeas relief.

A.     Background

Both Lora White and Sergeant Michael Bradshaw of the Mesquite Police Department testified at a pre-trial suppression hearing held before the trial court concerning Lora's identification.  29 RR 4-76.  Lora testified that on the night of the offense she described the offender to police as a black man between the ages of eighteen to twenty-four, 5'6" to 5'8" in height, and weighing between 140 to 160 pounds.  Id. at 41.  That description matched Braziel.  Id. at 41, 52.

57

An initial composite drawing was made within weeks based on Lora's recollection, but Lora was not satisfied that it was an accurate depiction of the assailant.  Id. at 23, 53.  A second composite drawing was made in February 1994 which Lora testified accurately resembled Braziel.  Id. at 22-23, 41, 53, 75. Also in 1994, Lora viewed a photographic lineup but did not identify anyone as the offender.  Braziel was not in that lineup.  Id. at 4, 8, 54, 70.

Seven years later in February 2001, Sergeant Bradshaw met Lora at a restaurant in Terrell and told her they had a suspect based on a DNA match. Id. at 11-13.  Bradshaw testified that he may have told Lora the suspect's age at the time of the offense and his current age, but Lora testified that he did not tell her anything about the suspect except that he was incarcerated.  Id. at 13-14, 73-74.  About a week later, Bradshaw showed a six-photo lineup to Lora at his office.  Id. at 4, 17, 45.  The pictures were all of black males similar in appearance and approximately the same age.  Id. at 5; SX 11.  Prior to viewing the lineup, Bradshaw never told Lora whether or not the suspect they had discussed the previous week would be in the lineup, or that she should pick out any particular person.  29 RR 6, 45-48.  Lora was also given written instructions about viewing the lineup, which provided in part that "the person who committed the crime may or may not be in the group of photographs," that "it is equally important to eliminate innocent persons as it is to identify those persons responsible," and that "you are in no way obligated to identify anyone."  29 RR 5, 8, 15; SX 10.  After reading and signing the instructions, Lora unequivocally identified the third photo, Braziel, as the person who raped her and murdered her husband.  29 RR 7, 18, 46-47.

58

Lora testified that even if she had not been shown the lineup she would be able to identify Braziel in court based on her close contact with him the night of the offense.  Id. at 48, 55.  When Braziel first demanded money from the couple, he was standing only four steps from her, and there was enough light for her to see his face.  Id. at 48-50.  He was not wearing anything over his mouth or eyes. Id.  She also saw Braziel when he shot her husband both times, and when he walked her over to the bushes nearby.  Id.  Braziel was also only a few inches from her face the entire time he sexually assaulted her.  Id.  Lora testified that her in-court identification of Braziel at the pre-trial hearing was based solely on her observations the night of the crime.  Since the crime, she had seen Braziel's face in her mind over and over again, and she stated that she would never forget what he looked like.  Id. at 55.

      B.      Braziel's due process rights were not violated by the pre-trial photographic lineup.

In Simmons v. United States, the Supreme Court declared that a conviction based on an eyewitness identification at trial following a pretrial identification will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification.  390 U.S. 377, 384 (1968); see also Herrera v. Collins, 904 F.2d 944, 946 (5th Cir. 1990).  Thus, the admissibility of identification evidence is governed by a two-step analysis.  First, a determination must be made as to whether the identification procedure was impermissibly suggestive and conducive to irreparable mistaken identification.  Peters v. Whitley, 942 F.2d 937, 939 (5th Cir. 1991) (citing Stovall v. Denno, 388 U.S. 293, 302 (1967));

59

Herrera, 904 F.2d at 946.  If the procedures are found to be impermissibly suggestive, the second inquiry is whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification.  Id.

In this case, the facts adduced during the pretrial hearing demonstrate that the pre-trial photo lineup shown to Lora White was not impermissibly suggestive.  29 RR 4-76.  All of the men in the six photos shown to Lora were black men of approximately the same age with similar facial features.  Id. at 5, 46; SX 11.  Although there were slight variations in skin tone between the six individuals, neither Bradshaw nor Lora believed that Braziel stood out as noticeably lighter or darker than the others.  29 RR 10-11, 46-47.  Further, Lora was never told whether or not the suspect they had discussed the previous week would even be in the photo lineup, and Bradshaw never suggested in any form who she should pick out.  29 RR 6-7, 45-48.  In short, there is nothing in the record indicating that this lineup violated Braziel's due process rights.

Assuming arguendo that the identification procedure could be deemed impermissibly suggestive, Braziel still has not met his burden of demonstrating that the procedure gave rise to a substantial likelihood of irreparable misidentification. An impermissibly suggestive identification procedure does not violate due process if the identification possesses sufficient aspects of reliability. Herrera, 904 F.2d at 947 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)). The Supreme Court has listed several factors to be considered when reviewing the reliability of a pretrial identification.   These factors include (1) the opportunity of the witness to view the criminal, (2) the witness's degree of

attention, (3) the accuracy of the description, (4) the witness's level of certainty, and (5) the elapsed time between the crime and the identification.  Id. at 947. As the state court noted on direct appeal after weighing these factors, the pre-trial lineup procedures in this case "were not so corruptive as to outweigh the factors supporting the identification."  Braziel v. State, slip op. at 5-6.

First, although it was nighttime and there was no direct lighting, Lora testified that there was plenty of ambient light from a nearby building and the interstate for her to clearly view Braziel.  29 RR 48-50; 30 RR 36, 78-79.  Lora had ten to twenty minutes—the time it took for Braziel to confront the couple, shoot Doug White twice, and sexually assault Lora—in which to view Braziel's uncovered face at a very close proximity.  29 RR 48-50; 30 RR 43-45, 49-50, 54-55.  In fact, Lora testified that Braziel was within inches of her face during the sexual assault.  29 RR 50; 30 RR 54-55.  Further, given the intensity and severity of the circumstances, Lora's degree of attention was almost certainly high.  The descriptions she gave to police immediately following the crime, along with even more detailed descriptions given to composite artists  at later dates, were also wholly consistent with Braziel's physical characteristics.  29 RR 22-23, 41, 53, 75; 30 RR 66, 69.  Even though the offense occurred more than seven years prior to the lineup, Lora unequivocally identified Braziel has her assailant, and stated that she would never forget what he looked like.  29 RR 7, 18, 46-47, 55; 30 RR 76, 108.

In sum, it is evident that the state court's conclusion concerning Lora's identification of Braziel being reliable was correct.  Lora was never told whether or not Braziel's picture was part of the photo lineup, nor was she under any

influence to identify anyone.  Moreover, Lora observed Braziel throughout the entire episode, gave police an accurate description of Braziel, and was positive in her identification of Braziel as the man who raped her and murdered her husband.  She even testified that she could have identified Braziel in court even without having seen the earlier photographic lineup.  Thus, the state court correctly rejected Braziel's Simmons claim, and federal habeas relief should be denied.

C.     Regardless, any error was harmless.

Even assuming the trial court erred in admitting the pre-trial photo lineup, Braziel still would not be entitled to relief because the error was harmless.  The Supreme Court has held that the test for harmless error on federal habeas review is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, at 637 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)).  A federal habeas court must assess the prejudicial impact of constitutional error in a state court criminal trial under the Brecht harmless error analysis regardless of whether the state court found error and review it for harmlessness.  Fry v. Pliler, 551 U.S. 112, 121-22 (2007).

To start, even if Lora's pre-trial lineup identification of Braziel was somehow "so impermissibly suggestive as to give rise to a substantial likelihood of misidentification," her in-court identification of Braziel would still be

admissible because it was made independent of the initial line-up.  In United States v. Wade, the Supreme Court held that a witness who has made an unconstitutional pre-trial lineup identification should not be allowed to make a subsequent in-court identification unless the State can establish "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification."  388 U.S. 218, 239-40 (1967) (citing Murphy v. Waterfront Commission, 378 U.S. 52, 79 (1964)). The Court further determined that various factors should be considered in determining whether the in-court identification derives from an independent source other than the line-up, which included, among other things, whether the witness had a prior opportunity to have observed the criminal act, and the existence of any discrepancy between any pre-lineup description and the defendant's actual description.  Wade, 388 U.S. at 241.

As discussed previously, Lora observed Braziel at a close proximity for ten to twenty minutes as he committed these heinous crimes, and her description of Braziel to police was consistent with Braziel physical appearance.  She also testified that her in-court identification was based on what she observed the night of the offense and not based on the photograph identification.  29 RR 55; 30 RR 77.  There was no question in her mind that Braziel was the man who committed these crimes, and stated that she would never forgot what he looks like.  29 RR 7, 18, 46-47, 55; 30 RR 76.  This constitutes clear and convincing evidence that Lora's identification of Braziel during the trial derived independent of the line-up, and would thus still have been admissible regardless of whether the pre-trial lineup violated his due process rights.

Furthermore, any error in admitting the pre-trial lineup was harmless due to the overwhelming nature of the DNA evidence presented at trial. As discussed in more detail in the Statement of Facts section, supra, Braziel's blood and saliva were taken and placed in the CODIS system after he was incarcerated for a separate offense. Once placed in the system, Braziel's DNA was matched to the DNA profile extracted from the vaginal swab and panties taken from Lora immediately following the offense. Three separate laboratories all confirmed that Braziel's DNA profile matched the DNA profile taken from Lora's rape examination. As such, it is clear that an error that may have occurred in admitting Lora's pre-trial identification did not result in any actual prejudice to Braziel.

For the foregoing reasons, Braziel has wholly failed to demonstrate how the state court's adjudication of this claim is contrary to, or an unreasonable application of, clearly established federal law. As a result, federal habeas relief should be denied.

VI.    The Texas Future Dangerousness Special Issue Is Not Unconstitutionally Vague (Claim 6).

During the punishment phase of Braziel's trial, the jury was charged with answering the following special issue:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Alvin Avon Braziel, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?

CR 102; see also Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). Braziel contends that this special issue is unconstitutional because the description of the

"aggravating factors" is vague and does not properly channel the jury's discretion. Petition at 40-49.  In particular, Braziel points out that the terms "probability," "criminal acts of violence," and "continuing threat to society" are undefined for the jury by either statute or case law.  Id. at 43.  Because these terms are not defined, Braziel argues that individual jurors are left to guess at the meaning of the terms and end up giving the various terms different meanings, resulting in the random and arbitrary assessment of the death penalty. Id. at 43-49. This claim was rejected by the Court of Criminal Appeals on direct appeal based on the court's prior decisions finding that these terms need not be defined.  Braziel v. State, slip op. at 14.  Because the Texas courts' rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law, Braziel is not now entitled to relief.

To start, the future dangerousness special issue is part of the Texas capital punishment scheme that has been repeatedly upheld by the United States Supreme Court against similar challenges.  See Johnson v. Texas, 509 U.S. 350, 373 (1993);  Franklin v. Lynaugh, 487 U.S. 164 (1988); Jurek v. Texas, 428 U.S. 262 (1976); see also Pulley v. Harris, 465 U.S. 37, 50 n. 10 (1983)(stating that Texas's punishment issues are not impermissibly vague because they have a "common sense core of meaning"). The Fifth Circuit has also repeatedly rejected similar arguments that the words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the jury cannot discern what is being asked without having those terms defined in the jury instructions. Hughes v. Johnson, 191 F.3d 607 (5th Cir. 1999); James v. Collins, 987 F.2d 1116, 1120 (5th Cir. 1993)(rejecting claim that court should have

65

defined "deliberately"); Milton v. Procunier, 744 F.2d 1091, 1095 (5th Cir. 1984) ("Under Texas law, these terms are sufficiently common that their definition is not required in a jury charge under the capital murder statute.").

Furthermore, a more precise definition of what is required under the future dangerousness special issue is unnecessary because its terms are not unconstitutionally vague, but rather are "sufficiently common" that the jury is presumed to understand them without instruction. Indeed, the Texas special issues have a "common-sense core of meaning . . . that criminal juries should be capable of understanding," and are more than adequate to perform their function of permitting jury consideration of a broad array of evidence, while at the same time minimizing the possibility of arbitrariness by focusing the jury's consideration on the particularized circumstances of the offense and the offender. Tuilaepa v. California, 512 U.S. 967, 973 (1994).

The Supreme Court has explained that to satisfy the requirements of the Eighth Amendment, a capital sentencing scheme must both (1) "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," and (2) provide for individualized consideration of the particular offender and offense. Zant v. Stephens, 462 U.S. 862, 877 (1983); Johnson v. Texas, 509 U.S. at 372-73; see also Barclay v. Florida, 463 U.S. 939, 958 (1983). Under the Texas scheme, the first constitutionally required narrowing function is performed by the penal statute defining the offense of capital murder, Texas Penal Code Section 19.03, which encompasses aggravating elements that distinguish capital murder from simple murder.

66

Jurek, 428 U.S. at 268-71; Lowenfield v. Phelps, 484 U.S. 231, 243-46 (1988). Where, as in Texas, this "eligibility" decision is performed at the guilt-innocence phase, further narrowing at the punishment phase is not required.  Id. at 246. Thus, contrary to Braziel's assertion, the fact that the Texas sentencing jury must also answer special issues to impose the death penalty is not part of the constitutionally-required narrowing process.

The Texas special issues actually represent the second constitutional requirement, or the "selection" decision, where the jury determines whether a death-eligible defendant should in fact receive that sentence.  The Supreme Court applied a vagueness analysis to the "selection" aspect of the capital decision-making process for the first time in Tuilaepa.  The Tuilaepa Court held that the standard for analyzing vagueness claims in the context of the selection decision is whether the factor has some "common-sense core of meaning ... that criminal juries should be capable of understanding."  512 U.S. at 973 (citing Jurek, 428 U.S. at 279 (White, J., concurring in judgment)).  The Court also held that review of vagueness claims must be quite deferential because "the proper degree of definition" of factors often "is not susceptible of mathematical precision."  Id.

The Court further recognized that with regard to the selection decision, states are free to adopt capital-sentencing procedures that allow a jury to exercise wide discretion.  While eligibility-phase factors must almost of necessity involve an answer to a question with a factual nexus to the crime or the defendant to "make rationally reviewable the process for imposing a sentence of

death," the selection decision must be "expansive enough to accommodate relevant mitigating evidence" to assure "an individualized determination [of the defendant's culpability] on the basis of the character of the individual and the circumstances of the crime."  Id. at 972 (internal quotations omitted); see Eddings v. Oklahoma, 455 U.S. 105, 110 (1982); Lockett v. Ohio, 438 U.S. 586 (1978) (plurality opinion).[16]  The Court also noted the "obvious utility" to the capital defendant "of these open-ended [selection-phase] factors as part of a neutral sentencing process." Tuilaepa, 512 U.S. at 973-74.  Finally, the Court found that the controlling objective when examining eligibility or selection factors for vagueness is whether the state's sentencing procedure is "neutral and principled so as to guard against bias or caprice in the sentencing decision," which was condemned in Furman v. Georgia, 408 U.S. 238 (1972).  Id. at 973.

Applying the deferential standard of review recognized by the Court in Tuilaepa, the above-mentioned terms in the Texas special issues are not unconstitutionally vague.  These terms are meaningful, evidentiary inquiries to be determined from facts and circumstances, and do not even resemble the kinds of "pejorative adjectives . . . that describe a crime as a whole and that [the Supreme] Court has held to be unconstitutionally vague." Arave v. Creech, 507 U.S. 463, 475-476 (1993); see Tuilaepa, 512 U.S. at 974.  Indeed, the Supreme Court has never suggested, much less held, that the terms Braziel complains

---

[16]    These decisions stand for the principle that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett, 438 U.S. at 604.

about, or any other term for that matter, must be defined.  See, e.g., Johnson, 509 U.S. at 350; Jurek, 428 U.S. at 262.  Rather, the Court has expressly held that the Texas special issues possess a "common-sense core of meaning" and "criminal juries should be capable of understanding them."  Jurek, 428 U.S. at 279 (White, J., concurring). Therefore, the special issues, while permitting the jury to consider a broad array of evidence, minimize the possibility of arbitrariness by focusing the jury's consideration on the particularized circumstances of the offense and the offender, and are thus not unconstitutionally vague.

Braziel simply fails to cast doubt upon the validity of the Supreme Court's decisions holding that the Texas death penalty system is constitutionally adequate.  But to rule otherwise and hold that Texas must now define the terms used in the special issues would also require the announcement and retroactive application of a new rule of constitutional law in violation of Teague v. Lane, 489 U.S. 288 (1989).  Under Teague, new rules of constitutional criminal procedure[17] will not be announced on federal habeas review and then retroactively applied unless an exception applies.  489 U.S. at 301.  The first exception to Teague's retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways.  Graham v. Collins, 506 U.S. 461, 477 (1993).  The second

---

[17]    "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or on the federal Government [.]  To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."  Teague, 489 U.S. at 301.

Teague exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial.  Id.  In Braziel's case, however, he fails to establish that the relief he requests falls under either exception to Teague's retroactivity limitation.[18]

Braziel's requested relief without question calls for a new rule of constitutional law because the Supreme Court has expressly and unambiguously rejected similar challenges to the future dangerousness special issue. See Jurek, 428 U.S. 262; Franklin, 487 U.S. 164; Johnson, 509 U.S. at 373.  For this Court to now hold to the contrary would establish a new rule in violation of Teague. Yet Braziel's proposed rule certainly is not the type of rule contemplated by the Court's first Teague exception.  Further, Braziel cannot meet Teague's second exception because his proposed rule would not be "implicit in the concept of ordered liberty." Teague, 489 U.S. at 313; see also Graham, 506 U.S. at 477.  As a result, Braziel's allegation is unquestionably barred by the non-retroactivity principle of Teague.

Thus, in light of the state courts' reasonable rejection of this claim, the AEDPA mandates the denial of federal habeas corpus relief as well.

VII.   The Constitution Does Not Require Jurors to Be Instructed Regarding the Effect of a Single Negative Vote to the Special Issues (Claim 7).

In his final claim for relief, Braziel submits that the Texas capital punishment scheme is unconstitutional because it fails to inform the jury regarding the consequences of a single negative vote on the special issues.

---

[18]    Indeed, Braziel fails to even acknowledge Teague.  Petition at 40-49.

Petition at 49-54.   Specifically, he contends that the Eighth and Fourteenth Amendments require jurors to be instructed that a life sentence is automatically imposed if the jury is unable to respond unanimously to the special issues.  Id. On direct appeal, the Court of Criminal Appeals rejected this claim along with a number of other challenges to the trial court's jury charge, finding that this argument has been raised and rejected previously.  Braziel v. State, slip op. at 14.  Because this claim is wholly without merit, and because Braziel has failed to establish that the state court's adjudication of this claim was either contrary to or involved an unreasonable application of clearly established federal law, his request for federal habeas relief on this claim should be denied.

Braziel's jury received the following instructions concerning the first special issue:

> The State has the burden of proving beyond a reasonable doubt that special issue one should be answered "yes."

> You shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that mitigates for or mitigates against the imposition of the death penalty.

> You may not answer special issue one "yes" unless the jury agrees unanimously, and you may not answer special issue one "no" unless 10 or more members of the jury agree.

> The members of the jury need not agree on what particular evidence supports a negative answer to special issue one.

If you do not find and believe from the evidence beyond a reasonable doubt that the answer to special issue one should be "yes," or if you have a reasonable doubt thereof, then you shall answer special issue one "no."

If you have answered special issue one "no" then you shall cease your deliberations.  If you have found beyond a reasonable doubt that the answer to special issue one is "yes" then you shall next consider special issue two.

Regarding the second special issue, the mitigation special issue, Braziel's jury received the following instructions:

You not answer special issue two "no" unless the jury agrees unanimously, and you may not answer special issue two "yes" unless 10 or more members of the jury agree.

The members of the jury need not agree on what particular evidence supports an affirmative finding on special issue two.

In arriving at your answer,  you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

You are further instructed that if the jury returns an affirmative finding on special issue one and a negative finding on special issue two, the Court shall sentence the defendant to death.  If the jury returns a negative finding on special issue one, the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

CR 97-98.

Finally, Braziel's jury was instructed that they were not to be swayed "by mere sentiment, conjecture, sympathy, passions, prejudices, public opinion or

72

public feeling in considering all of the evidence" before them.  CR 99.  The jury was not instructed, however, that if it failed to answer either issue (because the ten or twelve votes could not be mustered), the judge would sentence Braziel to life in prison.  Tex. Code Crim. Proc. art. 37.071, § 2(g).

Braziel contends that the trial court's failure to explain the consequences of the jury's inability to reach a verdict on the special issues generated confusion among jurors and created a danger that confused jurors would acquiesce to the "majority rules mentality" rather than hold out.  As a result, he argues that the "12-10" rule itself violates the principles of the Eighth and Fourteenth Amendments that protect him from cruel and unusual punishment.  Yet, the Supreme Court has explicitly rejected the theory that the Eighth Amendment requires jurors to be instructed as to the consequence of their failure to agree.  Jones v. United States, 527, U.S. 373, 381 (1999).

In Jones, the Court first noted that petitioner's requested instruction—informing the jury regarding the consequences of a deadlock— was not essential to either of the functions constitutionally required in all capital sentencing schemes.  That is, the instruction had no bearing on the "eligibility decision" of the sentencing process, nor did the failure to issue such an instruction prevent the jury from broadly inquiring into all constitutionally mitigating evidence, as required to make the "selection decision."  Id. at 381.  The Court also rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process." Id. at 281-82.

The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process. Id. Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." Id.

Braziel attempts to support his assertion by claiming that Mills v. Maryland, 486 U.S. 367 (1988), established that a constitutional violation occurs under the Texas scheme because reasonable jurors instructed pursuant to Article 37.071 are led to believe that ten jurors must agree to a "negative" response to a special issue in order to give effect to any mitigating circumstance. Thus, if only one juror was inclined to vote negatively in response to one of the special issues, it would be reasonable for that juror to conclude that his/her vote was meaningless and of no value unless nine other jurors joined them. He further submits that this creates an impermissible risk that such jurors will succumb to "majority rule" rather than hold out. However, Braziel's reliance upon Mills is misplaced.[19]

In Mills, the Court reversed the death sentence because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed on the existence of a particular circumstance

---

[19]     See Alexander v. Johnson, 211 F.3d 895, 897 (5th Cir. 2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas "12-10" rule); Miller v. Johnson, 200 F.3d 274, 288-89 (5th Cir. 2000) (holding Mills inapplicable to a Texas capital sentencing proceeding).

supported by that evidence.  486 U.S. at 384.  "[E]ach juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question of whether to vote for a  sentence of death."  McKoy v. North Carolina, 494 U.S. 433, 442-43 (1990).  But the Texas statutory scheme is materially distinguishable  from  the  capital  punishment  statute  that  yielded  the unconstitutional jury instruction in Mills.  Whereas the Maryland jury deciding punishment in Mills was required to first determine the existence of specific mitigating  factors  before  giving  them  effect  by  balancing  them  against  the aggravating  factors  present,  jurors  in  the  instant  case  were  permitted  to individually take into account any mitigating circumstance when casting their vote on the special issues.  See Jacobs v. Scott, 31 F.3d 1319, 1328-29 (5th Cir. 1994).  That is, one juror could not preclude the entire jury from considering a mitigating circumstance.  Thus, Mills is inapplicable.  Id.

Further, the plain language of the jury instruction in the instant case does not support Braziel's assertion that a reasonable juror would believe that an individual negative response was meaningless unless accompanied by similar responses from nine other jurors.  The jury instructions clearly stated that the jury  could  not  answer  the  first  special  issue  "yes"  unless  they  agreed unanimously, and explained that the ten jurors needed for a "no" answer "need not agree on what particular evidence supports a negative answer" to  the issue. CR 97.  Similarly, the jurors were instructed that they could not answer the second special issue "no" unless they agreed unanimously, and explained that the ten jurors needed for a "yes" answer "need not agree on what particular

75

evidence supports an affirmative finding." CR 98. With this knowledge, a reasonable juror could deduce, at a minimum, that a jury verdict for a death sentence required unanimity—which one single "no" vote could defeat. Thus, even without the specific knowledge that the effect of a single "no" vote would result in the automatic imposition of a life sentence, a juror could reasonably find value and meaning in his or her individual vote.

Because neither the Eighth Amendment nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, this claim must fail. Furthermore, even if this claim had merit, the Fifth Circuit has repeatedly held that a claim challenging the "12-10" rule is barred under the non-retroactivity principle of Teague. Hughes v. Dretke , 412 F.3d 582, 594 (5th Cir. 2005) (holding extension of the rule in Mills to Texas is foreclosed by Teague); Alexander, 211 F.3d at 897; Webb v. Collins, 2 F.3d 93, 95-96 (5th Cir. 1993). Braziel has not, therefore, stated a ground upon which this Court may grant relief, and this claim must be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that Braziel's petition for writ of habeas corpus be denied, and that no Certificate of Appealability issue in this case.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


   s/ Jeremy Greenwell
JEREMY C. GREENWELL*
Assistant Attorney General
Postconviction Litigation Division
State Bar No. 24038926

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)
E-mail: jeremy.greenwell@oag.state.tx.us

*Lead Counsel                           ATTORNEYS FOR RESPONDENT

77

CERTIFICATE OF SERVICE

I certify that on the 14th day of February, 2011, a copy of the above pleading was electronically served to the following counsel for Braziel by filing the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.


DON VERNAY                          RICHARD WARDROUP
1604 Golf Course Road SE            P.O. Box 879
Rio Rancho, NM 87124               1001 Maine Street, Suite 707
minimal243@yahoo.com                Lubbock, TX 79401
                                    rickwardroup@gmail.com


__ s/ Jeremy Greenwell _____
JEREMY C. GREENWELL
Assistant Attorney General