IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALVIN AVON BRAZIEL, JR.,           §
      Petitioner,                  §
                                   §
                                   §
v.                                 §       CIVIL ACTION No.  3:09-CV-1591-M
                                   §
WILLIAM STEPHENS, Director         §            (Death Penalty Case)
Texas Department of Criminal Justice, §
Correctional Institutions Division §
      Respondent.                  §

**MEMORANDUM OPINION AND ORDER DENYING RELIEF**

    Alvin Avon Braziel, Jr., ("Petitioner" and "Braziel"), has filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 raising seven claims, one of which was not presented to the state court. Following an evidentiary hearing to determine whether the defaulted claim comes within an exception to procedural bar, the application is **DENIED**.

**I**

    Braziel was convicted of capital murder and sentenced to death. *State v. Braziel,* No. F-0140043-QS (282nd Dist. Ct., Dallas Cty., Tex. July 26, 2001) (Clerk's Record, "CR", at 106-09). His conviction and sentence were affirmed on direct appeal. *Braziel v. State,* No. AP-74,139, 2003 WL 22250398 (Tex. Crim. App. Oct. 1, 2003). Braziel filed an application for a post-conviction writ of habeas corpus on July 3, 2003 (State Habeas Record, "SHR", at 2-153), that was denied by the Texas Court of Criminal Appeals ("CCA"). *Ex parte Braziel*, No. WR-72,186-01, 2009 WL 2525638 (Tex. Crim. App., Aug. 19, 2009). Braziel subsequently filed a petition for writ of habeas corpus in this Court (Petition, doc. 16) on August 17, 2010, through appointed counsel. Respondent has filed his answer (Answer, doc. 26).

## II

In his petition, Braziel presents seven grounds for relief, as follows:

1. Braziel was denied the effective assistance of counsel when trial counsel failed to investigate and present mitigating evidence at his trial (Pet. at 19-22);

2. Braziel was denied due process when the prosecution created the false impression that he had been convicted of aggravated sexual assault (Pet. at 22-26);

3. Braziel was denied his rights under *Brady v. Maryland*[1] when the prosecution failed to disclose evidence that the victim recanted her allegation that Braziel had used or exhibited a deadly weapon during the sexual assault (Pet. at 26-31);

4. Braziel is intellectually disabled and ineligible to be executed under *Atkins v. Virginia*[2] (Pet. at 31-37);

5. Braziel was denied due process when the trial court admitted identification testimony that was the product of an unduly suggestive photo line-up (Pet. at 37-40);

6. The Texas death penalty scheme unconstitutionally employs vague aggravating factors and fails to properly channel the sentencer's discretion (Pet. at 40-49); and

7. The jury instructions at the punishment phase unconstitutionally required ten votes to answer the first special issue "no" or the mitigation special issue "yes" (Pet. at 49-54).

Respondent contends that Braziel's first claim (that trial counsel provided ineffective assistance) is unexhausted and procedurally barred (Ans. at 14-16), and alternatively lacks merit (Ans. at 16-28). Respondent asserts that the remainder of Braziel's claims lack merit and were all reasonably rejected by the state court (Ans. at 28-76). For the reasons set out below, all of Braziel's claims are denied.

---

[1] 373 U.S. 83 (1963). Braziel's petition listed the Sixth and Fourteenth Amendments (Pet. at 26), and cited *Brady* in support of this allegation that his constitutional rights were violated by the prosecutor's suppression of exculpatory evidence (Pet. at 30).

[2] 536 U.S. 304 (2002). Braziel's petition used the term "mentally retarded," which has since been replaced by the term "intellectually disabled." *See Hall v. Florida,* 134 S. Ct. 1986, 1990 (2014).

2

**III**

As newlywed couple Lora and Douglas White walked together at Eastfield College on September 21, 1993, Braziel surprised them at gunpoint and demanded money. (Vol. 30, Reporter's Record ("RR") at 31-44.)  The couple had no money on them and on the way to get money for Braziel, he got angry with Douglas for looking at him. (30 RR at 45-46.)  Douglas warned Lori to run, but Braziel threatened to kill Douglas if Lori ran away. (30 RR at 46.)  Douglas and Lori immediately started praying. (30 RR at 47-48.)  Braziel kicked Douglas and said, "yeah, you better pray." (30 RR at 48-49.)  Braziel then asked, "where is your God at now?" and shot Douglas in the head. (30 RR at 48.)  Douglas let out a cry (30 RR at 48), and Braziel told Douglas to get up, picked Douglas up by the arm, put the gun up underneath Douglas's chest and shot him again. (30 RR 49-50.)  Douglas said, "oh God, I'm bleeding," let out another cry and then Lori heard the air leave him. (30 RR at 50-51.)  Braziel then grabbed Lori by the arm and took her into the bushes as he held the gun to her ear. (30 RR at 51-52.)  Braziel then sexually assaulted her at gunpoint while she silently prayed. (30 RR at 52-58.)  Douglas died at the scene as a result of his injuries. (30 RR at 63, 121-22, 197-99.)

Braziel eluded detection for the offense more more than seven years.  He was arrested while serving a prison sentence for sexual assault, having been found based on a DNA match. (31 RR at 6-7, 18-20, 32-38, 85.)  Braziel testified in the guilt phase that he did not commit the offense and was not there at the time. (32 RR at 9, 35.)  In the punishment stage, Braziel's trial counsel did not present any evidence of problems in Braziel's background or mental development.  They called the parents of one of his friends who testified that they trusted him as someone who showed good character and was a good influence on their son  (34 RR at 6-16, 25-32), but the friend's father

changed his testimony to say that he would no longer let Braziel around his family based on new facts brought out in cross examination.  (34 RR at 18-20.)  Braziel's attorneys also called his prior defense attorney (34 RR 22-24) and cross examined the state's witnesses about extraneous offenses (evading arrest in high-speed chase, a conviction for sexual assault of minor, and a car-jacking where he shot a man and stole his car), his probation violations and his risk of reoffending.  (33 RR at 14, 32-34, 41-42, 54-55.)  During the cross examination of his girlfriend, defense counsel brought out that Braziel was a good father to his child, provided for his child and girlfriend, and that she never saw him with a weapon or in a gang.  (33 RR at 33-34.)

## IV

Federal habeas review of these claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This statute sets forth the preliminary requirements that must be satisfied before reaching the merits of a claim made in a federal habeas proceeding.

### A. Exhaustion

Under this statute, a federal court may not grant habeas relief on any claim that the state prisoner has not first exhausted in the state courts.  *See* 28 U.S.C. § 2254(b)(1)(A); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011).  However, the federal court may deny relief on the merits notwithstanding any failure to exhaust.  *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005).

### B. State-Court Procedural Determinations

If the state court denies the claim on state procedural grounds, a federal court will not reach the merits of those claims if it determines that the state-law grounds are independent of the federal

4

claim and adequate to bar federal review. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992);

*Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, if the state procedural determination

is based on state grounds that were inadequate to bar federal habeas review, or if the habeas

petitioner shows that an exception to the bar applies, the federal court must resolve the claim without

the deference AEDPA otherwise requires. *See Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th

Cir.2000) ("Review is de novo when there has been no clear adjudication on the merits." (citing

*Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir.1997))); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th

Cir.1999) ("the AEDPA deference scheme outlined in 28 U.S.C. § 2254(d) does not apply" to claims

not adjudicated on the merits by the state court); *Woodfox v. Cain*, 609 F.3d 774, 794 (5th Cir. 2010)

(the AEDPA deferential standard of review would not apply to a procedural decision of the state

court).

### C. State-Court Merits Determinations

If the state court denies the claim on the merits, a federal court may not grant relief unless

it first determines that the claim was unreasonably adjudicated by the state court, as defined in §

2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim——
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.

*Id.* In the context of § 2254(d) analysis, "adjudicated on the merits" is a term of art referring to a

state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*,

116 F.3d 1115, 1121 (5th Cir. 1997). This provision does not authorize habeas relief, but restricts

this Court's power to grant relief to state prisoners by barring claims in federal court that were not

first unreasonably denied by the state courts. The AEDPA limits rather than expands the availability

of habeas relief. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Williams v. Taylor*, 529 U.S. 362, 412

(2000). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state

court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Richter*, 131 S. Ct. at 784. "This

is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court rulings be given the benefit of the doubt.'" *Cullen v. Pinholster*, 131 S. Ct.

1388, 1398 (2011) (internal citations omitted) (quoting *Richter*, 131 S. Ct. at 786, and *Woodford v.*

*Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

Under the "contrary to" clause, a federal court is not prohibited from granting federal habeas

relief if the state court either arrives at a conclusion opposite to that reached by the United States

Supreme Court on a question of law or decides a case differently from the United States Supreme

Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. at 412-13;

*Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). Under the "unreasonable application"

clause, a federal court may also reach the merits of a claim on federal habeas review if "if the state

court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the

particular state prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1705 (Apr. 23, 2014) (quoting

*Williams*, 529 U.S. at 407-408). " '[C]learly established Federal law' for purposes of § 2254(d)(1)

includes only 'the holdings, as opposed to the dicta, of [the United States Supreme] Court's

6

decisions.' " *Woodall*, 134 S. Ct. at 1702 (quoting *Howes v. Fields,* 132 S. Ct. 1181, 1187 (2012)).

The standard for determining whether a state court's application was unreasonable is an objective

one and applies to federal habeas corpus petitions that, like the instant case, were filed after April

24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Federal habeas relief is not available on a claim adjudicated on the merits by the state court

unless the record before that state court first satisfies § 2254(d). "[E]vidence introduced in federal

court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state

court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was

before that state court." *Pinholster*, 131 S. Ct. at 1400. The evidence required under § 2254(d)(2)

must show that the state-court adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."

### D. *Independent Merits Determination*

As stated above, § 2254(d) does not authorize federal habeas relief. Therefore, relief is not

available merely because this high standard is met. In the event the state-court adjudication is

deemed unreasonable, the federal court must still determine whether habeas relief would otherwise

be appropriate. "When a state court's adjudication of a claim is dependent on an antecedent

unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A

federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti

v. Quarterman*, 551 U.S. 930, 953 (2007). Therefore, in those rare cases when a state prisoner makes

the difficult showing required under § 2254(d), the federal court must make its own independent

determination of whether habeas relief is appropriate and conduct whatever hearings and evidentiary

development are necessary to properly make that determination. *See, e.g., Wiley v. Epps*, 625 F.3d

199, 207 (5th Cir. 2010) ("when a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA"); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir.2007) ("where a petitioner has made a prima facie showing of retardation as Rivera did, the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due"); *Hayes v. Thaler*, 361 Fed.App'x 563, 566 (5th Cir. 2010) (applying *Panetti* standard in review of a *Batson* jury selection habeas claim).

V

### A. Ineffective Assistance of Counsel

In his first claim, Braziel complains that trial counsel provided ineffective assistance in failing to investigate and present certain mitigating evidence at his trial. (Pet. at 19-22.) Respondent asserts that this claim is unexhausted and procedurally barred (Ans. at 13-16), and in the alternative that the claim lacks merit (Ans. at 16-28).

Following the Supreme Court's opinion in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which created a new exception to procedural bar, these proceedings were suspended until the Supreme Court's decision in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), that applied the *Martinez* exception to Texas cases. (Order Suspending Proceedings, doc. 30.) Subsequently, the Court conducted an evidentiary hearing to allow Braziel the opportunity to prove that this claim would come within the newly created exception to procedural bar. Based on the supplemental briefing by the parties, and the evidence and arguments presented at the hearing, the Court finds that Braziel has not shown that this claim comes within an exception to procedural bar.

8

### 1. Exhaustion and Procedural Bar

Generally, a petition containing both exhausted and unexhausted claims must be dismissed or stayed so that the petitioner may return to state court to exhaust state remedies. *See Rhines v. Weber*, 544 U.S. 269, 277-78 (2005); *Rose v. Lundy*, 455 U.S. 509, 519-20 (1982). Such action would be futile and the federal court should find claims to be procedurally barred if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *see also, Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005) (holding unexhausted claims ineligible for stay when state court would find them procedurally barred). However, a habeas petitioner may avoid the imposition of this bar by demonstrating a recognized exception.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.

Texas law precludes successive habeas claims except in narrow circumstances. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (West 2011). This is a codification of the judicially created Texas abuse-of-the-writ doctrine. *See Barrientes v. Johnson*, 221 F.3d 741, 759 n.10 (5th Cir. 2000). Under this state law, a habeas petitioner is procedurally barred from returning to the Texas courts to exhaust his claims unless the petitioner presents a factual or legal basis for a claim that was previously unavailable or shows that, but for a violation of the United States Constitution, no rational juror would have found for the State. *See id.* at 758 n.9. This is an independent and adequate state law ground to bar federal habeas review. *Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008).

9

Therefore, unexhausted claims that could not make the showing required by this state law would be considered procedurally barred from review on the merits in this Court unless an exception is shown. *See Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001).

Braziel acknowledges that his claim was not presented to the state court and would now be procedurally barred if he were to file a subsequent habeas application there, but asserts that federal review of the claim is permitted under the *Martinez* exception.[3] (Petitioner's Supplemental Brief ("P's Supp. Br."), doc. 33, at 4-8.) In *Martinez,* the Supreme Court created an equitable exception to procedural bar for certain substantial claims of ineffective assistance of trial counsel that were not presented to the state court due to the ineffective assistance of state habeas counsel. In *Trevino*, the Supreme Court applied this new exception to Texas cases. Therefore, this Court granted Braziel the opportunity to prove at an evidentiary hearing (the "*Martinez* hearing") that the claim comes within this exception to procedural bar. To show that the ineffective-assistance-of-trial-counsel claim is within the exception, Braziel must demonstrate (1) that the claim is "substantial" in that it "has some merit," and (2) that the claim was not presented to the state court because the habeas petitioner had no state habeas counsel or because his state habeas counsel was ineffective. *Martinez,* 132 S. Ct. at 1318. Respondent can defeat this by showing either that the claim "is insubstantial, *i.e.,* it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Id.,* 132 S. Ct. at 1319.

---

[3]Braziel argued that "the situation in the instant case" was that the procedural default of this claim was the result of the negligence of his state habeas counsel. (P's Supp. Br. at 6.) Braziel also opposed granting a stay, arguing that unless the claim was further developed in federal court "the opportunity to pursue a substantial defaulted claim as provided in *Martinez* and *Trevino* would be emasculated." (P's Supp. Br. at 8.)

### a. Substantiality

Specifically, Braziel claims that his trial counsel was ineffective in failing to discover and present mitigating evidence that he had a poor educational and work history, that he suffered a head injury as a child, resulting in hospitalization, that he was physically abused by his stepfather, and that there was a history of mental illness in his family. (Pet. at 20-22.)

### 1.) Law

The two-pronged standard by which a claim of ineffective assistance of counsel is measured is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient. *Id.* at 687. The second prong of this test requires the defendant to show prejudice resulting from counsel's deficient performance. *Id.* at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Id.* at 697.

In measuring whether counsel's representation was deficient, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).

To satisfy the second prong of the *Strickland* test, the petitioner must show that counsel's errors were so egregious "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The test to establish whether there was prejudice is whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability under this test is "a probability sufficient to undermine confidence in the outcome." *Id.*

It is not enough for a habeas petitioner to merely allege deficiencies on the part of counsel. The petitioner must affirmatively plead the resulting prejudice in the habeas petition. *Hill v. Lockhart*, 474 U.S. 52, 60 (1985); *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. *See Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir.1985). For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Day v. Quarterman,* 566 F.3d 527, 538 (5th Cir.2009). This requirement applies to both uncalled lay and expert witnesses. *Id.*

*Woodfox v. Cain,* 609 F.3d 774, 808 (5th Cir. 2010).

### 2.) *Analysis*

The state court appointed two qualified trial counsel with ample experience in death penalty cases and who understood the value of mitigating evidence of childhood poverty, abuse, neglect, educational problems and mental illness, having presented such evidence in prior cases. (Tr. at 37, 40-44, 59, 61.) Although "mitigation specialists" had not yet become a commonly available resource for them at the time, Braziel's trial counsel obtained the assistance of a qualified investigator that

12

they knew was good at finding and communicating with witnesses and who had conducted social history investigations in prior cases. (Tr. at 48-49.)

Trial counsel obtained Braziel's prison records from the Texas Department of Criminal Justice ("TDCJ") suggesting that, during his incarceration for sexual assault, Braziel indicated that he had been hit on the head as a child and had headaches and throbbing. (P's Ex. P3 at 2-3; R's Supp. Ex. A at 6-7.) Braziel told his trial counsel that this prison record was "B.S.", refused to be examined by a mental health expert, did not mention any injuries or abuse he may have sustained as a child, and refused to talk about it.[4] (Tr. at 16-31, 39, 51-53, 57-58, 67, 72.) Corresponding TDCJ records also show that Braziel denied having any mental health needs and denied that his family had any history of mental or emotional problems. (R's Supp. Ex. A at 3-4, 6; P's Ex. P3 at 2.) Trial counsel also obtained Braziel's school records that did not show any abuse, head injury, or brain damage. (Tr. at 50.)

The records trial counsel obtained also indicated that Braziel had received an intelligence quotient ("IQ") score of 75 which, if shown to be a valid IQ result, may have brought him within the standard error of measurement for intellectual disability.[5] The state court found in connection with Braziel's *Atkins* claim that this score on the Beta II test was not shown to be a reliable indicator of IQ, but was a group examination not generally accepted by the mental health profession as a valid measure of intellectual functioning. (SHR at 515-16.) Because it was not shown to be a reliable indicator of IQ, it would not have been admissible or useful at his trial without supporting evidence

---

[4]This is consistent with Braziel's later refusal to cooperate with the expert enlisted by his state habeas counsel to evaluate him. (R's Supp. Ex. B, doc. 83-2; Tr.at 133.)

[5]The Supreme Court had not yet issed its opinion in *Atkins v. Virginia,* 536 U.S. 304 (2002), making intellectual disability a cause for exemption from the death penalty. (Tr. at 30.)

13

from a qualified expert. Trial counsel wanted to have Braziel evaluated by an expert, but Braziel refused, limiting the usefulness of the information in those records. (Tr. at 30, 64.)

Braziel did not want trial counsel to talk with his family, but counsel felt it was necessary. (Tr. at 56.) Braziel's family also refused to cooperate with trial counsel's mitigation investigation. (Tr. at 53-55.) They were hostile and only wanted to complain about the criminal justice system. (Tr. at 54-55.) Trial counsel considered calling Braziel's sister as a witness, and she came to the trial, but was so hostile and volatile that they decided to not put her on the stand. (Tr. at 54.)

Trial counsel chose a strategy of presenting Braziel as a positive role model by eliciting testimony from the parents of one of his classmates who were willing to testify for him at the trial that he was "a good kid and that he would be welcome in their home, even after they realized he had been convicted of this offense." (Tr. at 38.) This was an appealing strategy because it relied upon "real people" that had a personal relationship with Braziel rather than employed defense experts, it was consistent with the strategy at guilt-innocence, and seemed compelling to trial counsel.[6] (Tr. at 62.) It was one of the only defensive strategies available to trial counsel due to Braziel's lack of cooperation. (Tr. at 61-62.)

The Court finds that Braziel's ineffective-assistance-of-trial-counsel claim has no merit. Trial counsel diligently sought to investigate and present a mitigation case at trial, and attempted to obtain evidence of Braziel's family history and any mental health problems and abuse that may have existed, but were prevented from doing so because of the refusal of Braziel and his family to cooperate with their efforts. Braziel has not shown that any trial strategy was reasonably available

---

[6]The Court notes that, although the value of this testimony was lessened by facts that came out in cross examination, Braziel makes no complaint that his trial counsel failed to adequately prepare these witnesses. (Pet. at 20-21; Tr. at 38.)

14

to counsel for the punishment phase of his trial other than the one that they chose to pursue. Although Braziel's current counsel repeatedly complained that trial counsel failed even to request funding for a mental health expert (Tr. at 10, 21, 28, 30, 31, 144, 147, 149-51,155), federal habeas counsel has also not requested funding for a qualified mental health expert to evaluate Braziel. (Order, doc. 14, at 4.) There is no competent evidence before this Court to prove who would have testified regarding the mental health issues raised by Braziel, what they would have said, and whether such testimony would have been favorable to Braziel. *See Woodfox,* 609 F.3d at 808.  In short, Braziel has completely failed to prove either prong of the *Strickland* test to show that trial counsel provided ineffective assistance.  Therefore, he has not satisfied his burden to demonstrate that this claim is substantial.

### b. State Habeas Counsel

The state court appointed a qualified attorney to represent Braziel in his state habeas proceedings who was "an experienced death penalty lawyer who has handled over twenty capital cases and has taught at death penalty seminars." (Petitioner's proposed finding of fact No. 17 at p. 6 (citing Tr. at 101).) The state habeas attorney diligently investigated Braziel's claims and obtained funding for a mental health investigator to evaluate Braziel, particularly to determine whether he was intellectually disabled and exempt from the death penalty.  Consistent with his refusal to cooperate with trial counsel's efforts, Braziel refused to cooperate with the postconviction habeas expert, thereby preventing her from evaluating him for possible intellectual disability.  (R's Supp. Ex. B; Tr. at 133.)

State habeas counsel filed a thorough application for habeas relief that raised six claims, three of which are presented in these federal proceedings, and he also included a claim of ineffective

15

assistance of trial counsel for failing to investigate and contest the testimony of a prosecution witness at the punishment phase. (SHR 2-152.) State habeas counsel actually found and researched the instant claim, including it in a rough draft of his application (P's Ex. P-9 at 56-60), but not in the final application (SHR 53-57; P's Ex. P-11 at 51-55). Whether to include a briefed claim in a final petition is the type of decision that would normally be considered strategic. *See Jones v. Barnes,* 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Braziel has not shown that the omission of this drafted claim was due to neglect rather than strategy.[7] *See Masterson v. Thaler,* No. 4:09-CV-2731, 2014 WL 808165, at *25 (S.D. Tex. Feb. 28, 2014) (habeas petitioner did not make showing required by

---

[7]State habeas counsel testified that he was not sure if the claim was omitted due to mistake or strategy, which appears to depend on whether he had obtained the evidence needed to support it.

> I'm not sure how much of that rough claim is based on actual evidence that I had or what I was hopeful of getting. I know that I was at least hopeful of getting some affidavits, because there's blanks in there for people. So I don't know. I may have made a decision not to put that claim in there.

(Tr. at 112.) He later explained, "if at the last of it I did not have information that would justify that claim, it may be that I decided not to put the claim in there, because I couldn't swear that that was the case." (Tr. at 115.) After noting that he thought he had given his file to federal habeas counsel, state counsel explained his thinking and that the needed information would likely be in his file.

> And if I had the information, which hopefully would be in my file, if I knew where my file was, then, you know, the other possibility would be the only one I can think of, was that it was omitted by error. That would not absolve me from having filed a writ without it, but it would not have been a decision that I made. If I had no justification, if I had no real evidence that this was a true claim, then certainly I would not have filed a claim that I didn't feel was justified by the facts.

(Tr. at 116.) Despite having the file of state habeas counsel, Braziel has not shown that such counsel had the information and that the claim was omitted by error. In fact, federal habeas counsel still does not have the evidence necessary to prove this claim.

*Martinez* by failing to prove whether state habeas counsel's decision to omit a claim was strategic or negligent).

Despite the opportunities afforded by this Court to prove this claim, and the willingness of prior counsel to cooperate, Braziel has entirely failed to prove that any of his prior counsel were ineffective. In fact, Braziel's current counsel appears to have not investigated the information readily available to him in making his case. Federal habeas counsel presented a request for funding to this Court in which they represented that funding had not been granted by the state court for an expert evaluation to support his *Atkins* claim. (Br. Supporting Mot. Fund, doc. 9-2, at 5, 12.) The motion was granted, but only partially, because Braziel had not nominated a person qualified to conduct an evaluation of his *Atkins* claim, and the Court urged counsel to reconsider and nominate a qualified expert. (Order, doc. 14, at 4.) Contrary to the representations of that motion, however, records from the file of state habeas counsel include an ex parte order by the state court granting Braziel $9,000.00 for a mental health evaluation in connection with his *Atkins* claim. (R's Supp. Ex. B, doc. 83-2.) In this same order, the state district judge also stated, "nothing in this order is to preclude Applicant from submitting subsequent motions for additional funding of experts and investigators in the future as warranted." Therefore, the failure to obtain an expert evaluation appears to be due to Braziel's own refusal to cooperate rather than any lack of funding by the state court. (R's Supp. Ex. B; Tr. at 133.)

Preparing this claim and presenting it at the evidentiary hearing granted in this case should also have required an investigation into the status of the file of state habeas counsel, including communicating with state habeas counsel and any federally appointed co-counsel, in order to obtain

all relevant records necessary to adequately examine counsel at the hearing.[8]  Despite the fact that state habeas counsel's file had already been turned over to his co-counsel, federally appointed counsel had not reviewed the file of state habeas counsel before the hearing, and did not know where it was, but guessed that it might be in the possession of his co-counsel. (Tr. at 103, 125, 128.) At the conclusion of the evidentiary hearing, the Court instructed federally appointed counsel to confer with his co-counsel regarding the status of this file and conditioned any withdrawal of co-counsel on the disclosure of such information and production of any such file. (Tr. at 161-62; Order, doc. 65, at 1.) This resulted in the discovery of state habeas counsel's file and the expansion of the record to include the information contained in this file. (Order, doc. 79; Order, doc. 86.)

The performance of state habeas counsel has not been shown deficient. Because the underlying ineffective-assistance-of-trial-counsel claim lacks merit, state habeas counsel could not have been ineffective for failing to raise a meritless claim. *See Garza v. Stephens,* 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"); *Beatty v. Stephens,* 759 F.3d 455, 466 (5th Cir. 2014). Even so, state habeas counsel appears to have diligently attempted to investigate this claim and was prevented from doing so by the same kind of noncooperation that prevented trial counsel from doing so. It would have been a reasonable strategic decision to omit this claim from the application submitted to the state court.

---

[8]The *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* state that postconviction counsel should litigate all issues "in a manner that will preserve them for subsequent review," including an "aggressive investigation." *See* Guideline 10.15.1(C)&(E)(4).

Braziel has not shown that either of these elements of *Martinez* have been satisfied. Therefore, he has not shown that this claim comes within an exception, and the Court finds that this claim is procedurally barred.

### 2. Alternative Merits Analysis

For the reasons showing that the underlying ineffective-assistance-of-trial-counsel claim is not substantial, a *de novo* review of the record and the evidence developed at the evidentiary hearing would require that this claim be denied if it were not procedurally barred.

### 3. Conclusion

Because it is not shown to be substantial nor that it was not presented to the state court because of the ineffective assistance of state habeas counsel, Braziel's first claim does not fall within the *Martinez* exception to procedural bar. Therefore, the claim is **DISMISSED** as procedurally barred. In the alternative, because Braziel has not shown that the claim has any merit despite the opportunity to do so, this claim is **DENIED** for lack of merit.

### B. False Impression and Failure to Disclose

In his second and third claims, Braziel complains of the evidence at trial suggesting that he had used a deadly weapon during his sexual assault of a minor. The second claim asserts that the prosecutor created a false impression before the jury that Braziel had been convicted of aggravated sexual assault by the use or exhibition of a gun during the offense. (Pet. at 22-26.) The third claim asserts that the prosecutor failed to disclose supplemental police reports indicating that the victim of the sexual assault had recanted her allegation that Braziel had used a gun. (Pet. at 26-31.) Respondent asserts that the claims lack merit and were reasonably rejected in the state habeas proceedings. (Ans. at 28-46.)

19

*1. Law*

The Due Process Clause is violated when the prosecutor knowingly uses perjured testimony to obtain a conviction. *See Napue v. Illinois,* 360 U.S. 264, 269 (1959); *see also Creel v. Johnson,* 162 F.3d 385, 391 (5th Cir.1998) ("A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. The defendant must show that (1) the testimony was false, (2) the state knew it was false, and (3) the testimony was material." (internal citations omitted)).   Although some circuits recognize a due process violation when perjured testimony is provided by a government witness even without the prosecutor's knowledge, *see Ortega v. Duncan,* 333 F.3d 102, 108 (2d Cir.2003), this Court is limited by the AEDPA to applying only established Supreme Court precedent in its review of a state court's reasonableness.[9] *See Kinsel v. Cain,* 647 F.3d 265, 271-72 (5th Cir. 2011).  To obtain relief, Braziel must show "1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." *Canales v. Stephens,* 765 F.3d 551, 573 (5th Cir. 2014) (quoting *Pyles v. Johnson,* 136 F.3d 986, 996 (5th Cir.1998).   The testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.; United States v. Agurs,* 427 U.S. 97, 103 (1976); *Giglio v. United States,* 405 U.S. 150, 154 (1972).

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

---

[9] The Supreme Court has "repeatedly emphasized [that] circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court' under] § 2254(d)(1)." *Glebe v. Frost,* 135 S. Ct. 429, 431 (Nov. 17, 2014) (citing *Lopez v. Smith,* 135 S. Ct. 1, 4-5 (2014) (per curiam)).

prosecution." The Supreme Court has set forth "three components of a true *Brady* violation": (1) the evidence at issue, whether exculpatory or impeaching, must be favorable to the accused; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Canales,* 765 F.3d at 574 (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)). The prejudice component is the same as materiality for *Brady* purposes, which is "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," meaning that the probability is "sufficient to undermine confidence in the outcome." *Canales,* 765 F.3d at 574 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

### 2. Facts

On post-conviction habeas review, the state court found that Braziel testified during the guilt-innocence stage of his trial that he had plead guilty to the charge of sexually assaulting a fifteen-year-old girl when he was twenty, and that his probation was subsequently revoked and he was sentenced to serve 5 years in prison. (SHR at 470-72.) At the punishment stage of Braziel's trial, the prosecutor introduced "pen packet" evidence that he had committed a sexual assault of a child with no deadly weapon finding. (33 RR 22-23; 35 RR at 224-237, State's Exhibit No. 113; SHR at 472.) The prosecutor called Braziel's probation officer Courtney Pearce, who testified that Braziel required a maximum level of supervision indicating a high risk of re-offending, was angry and deceptive, failed to abide by the terms of his probation, and refused to take responsibility for his actions. (33 RR at 51-54.) The state court found that Pearce also testified that while Braziel was on probation, he stated to her that he used a gun during the sexual assault. (33 RR at 52-53; SHR at 472-73.) On cross-examination, the defense elicited testimony from Pearce that Braziel was on probation for

aggravated sexual assault and that the offense report stated that he had sexually assaulted a fifteen-year-old at gunpoint. (33 RR at 54-55; SHR at 473.) The defense later called Braziel's prior defense counsel in the sexual assault case and he testified that Braziel was neither charged nor convicted of aggravated sexual assault–which would have involved an aggravating factor such as a gun–but only of sexual assault. (34 RR at 22-24; SHR at 473-74.)

The state court found that the original police report in the sexual assault case included the victim's statement that an automatic pistol and a shotgun were used in her abduction and in connection with her sexual assault. (SHR 496.) The supplemental police report corrected certain statements by the victim and excluded the allegation of a specific weapon that was used from the narrative portion of the report, but continued to list the offense as aggravated sexual assault and the portion that listed weapons continued to state that an automatic pistol was used. (SHR 496-97.) The state court found that Braziel relied upon the supplemental police report and an affidavit from the victim of the sexual assault, but that the content of the police report was irrelevant to what Braziel admitted to Pearce (SHR at 478) and would not have impeached her testimony. (SHR at 504-506.) The state court also found that Braziel had produced no evidence denying that he actually told that to Pearce. (SHR at 478.)

The state court carefully considered Braziel's evidence, finding that the sexual assault victim told the prosecutor prior to trial that her initial statement to the police about being *abducted* at gunpoint prior to the sexual assault was not true (SHR at 479), but also found that the victim's affidavit did not mention whether Braziel used or exhibited a gun *during* the sexual assault itself. (SHR at 480.) The state court also found that the victim referred to a gun in that same interview with the prosecutor, who included its description and location in his notes, and that she also referred to

22

the gun in her interview with a police investigator investigating the capital murder. (SHR at 481.) The state court also described records from a sex offender treatment program for Braziel that included the results of a polygraph examination and other counselor's notes indicating that Braziel had used or exhibited a gun in the sexual assault. (SHR at 482-83.) The state court concluded that evidence supported the prosecutor's belief that Braziel used or exhibited a gun during the sexual assault (SHR at 481), and that Braziel had not shown that Pearce's statement that he admitted to using a gun in the sexual assault was not true, or that the prosecutor should have known that it was not true. (SHR at 484.) The state court also found that the prosecutor failed to correct the false impression created by Pearce's testimony on cross examination that Braziel was on probation for aggravated sexual assault that included a court determination that he committed the offense at gunpoint, but that the defense was able to correct that false impression which rendered it harmless. (SHR at 479, 486-87.)

The state court also found that the police reports were made available to the defense and were therefore not suppressed under *Brady*. (SHR at 498-504.) The state court found that the supplemental police reports would not have been admissible at trial, were silent regarding whether a gun was used in the sexual assault, and were, therefore, not "favorable" under *Brady*. (SHR at 504, 506, 508.) And the state court also found that Braziel had not shown that if defense counsel had read the supplemental reports it would have changed the outcome of the trial, particularly in light of the nature of the capital murder offense and the other aggravating factors presented at the punishment stage. (SHR at 510-12.) The state court specifically found that knowledge of the contents of the supplemental reports "would not have prevented the State from painting Applicant as a violent rapist and a continuing danger to society." (SHR at 510.) Therefore, Braziel established none of the

23

elements of *Brady* and the state court found that his due process rights were not violated.  (SHR at 512-13.)

### 3. Analysis

The state court carefully considered these claims, and acknowledged that false impressions had been created but found that no prosecutorial misconduct occurred and no prejudice resulted.  The state court adjudication of these claims was reasonable and supported by the evidence before it.

Regarding the second claim, the state court reasonably found that although a false impression had been created, the prosecutor acted in good faith and the defense rebutted the false impression. The state court made a reasonable distinction that, although the prosecutor failed to correct the false impression that the victim was *abducted* at gunpoint, Braziel had not shown the evidence that a gun was used or exhibited *during* the sexual assault of the minor to be false, and that the evidence suggesting it was credible.  This Court agrees and believes that the prosecutor acted in good faith in presenting evidence and arguing that a gun was used or exhibited during the commission of that offense.

To the extent that the prosecutor failed to correct a false impression or any confusion regarding the charge and conviction for committing the sexual assault with a gun, this Court also agrees with the state court's finding that the defense was able to rebut that with its testimony from Braziel's defense counsel that the original charge did not include an allegation that a deadly weapon was used or exhibited and the conviction was for the sexual assault of a minor without any aggravation by the finding of a deadly weapon.  In fact, the defense counsel pointed out in his closing argument that, based on the testimony of the attorney and no deadly weapon finding in the actual conviction, "there were no -- no aggravating factors in there no force no gun."  (34 RR at 59.)

24

The state court also reasonably rejected the third claim. This Court finds that the state court's holding that the supplemental police report was made available to the defense and was not suppressed under *Brady* was reasonable based on the record before it. This Court also agrees with the state court's findings that the supplemental report was not "favorable" under *Brady* because it would not have been admissible at trial, and that it was not "material" because Braziel had not shown any reasonable probability that it would have altered the outcome of the trial in light of the nature of the offense and the other aggravating factors presented.

### 4. Conclusion

The state court findings are entitled to deference. The state court denied these claims on the reasonable factual bases that Braziel had not shown to be incorrect, and he has still not made that showing. Therefore, the second and third claims are both **DENIED**.

### C. Intellectual Disability under Atkins

In his fourth claim, Braziel asserts that he is intellectually disabled and ineligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002). (Pet. at 31-37.) Respondent asserts that Braziel has failed to show intellectual disability and that the state court reasonably denied this claim. (Ans. at 46-56.)

### 1. Law

In *Atkins,* 536 U.S. at 317, the Supreme Court held that the Eighth Amendment prohibits the execution of intellectually disabled offenders but left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." In Texas, intellectual disability under the *Atkins* test "is a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by

25

'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex.Crim.App. 2004).

"Significantly subaverage general intellectual functioning" is shown by a measured intelligence quotient ("IQ") of about 70 or below. *See Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008). To find mental retardation, the court must find that this significantly subaverage intellectual functioning must also exist concurrently with related limitations or deficits in two or more recognized adaptive skill areas, such as "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3 (quoting Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992)). Finally, intellectual disability "manifests before age 18." *Id.*

"To succeed on an *Atkins* claim, a defendant must prove by a preponderance of the evidence that he is [intellectually disabled]." *Lewis v. Quarterman*, 541 F.3d at 283. In order to grant habeas relief, the federal court must determine that each of the three elements of intellectual disability found by the state court was based upon an unreasonable determination of the facts in light of all the evidence. *Id.* at 286.

### 2. *State Court Determination*

The state court found on post-conviction habeas review that Braziel did not satisfy any of the three required showings to prove intellectual disability under *Atkins*. The state court noted that Braziel had not produced any expert evaluation that he is intellectually disabled and no valid IQ test results at or below 70. (SHR at 514-18.) Braziel produced one score of 75 on the Beta II test, which

26

was not shown to be a reliable indicator of IQ, but was a group examination that is not generally accepted by the mental health profession as a valid measure of intellectual functioning. (SHR at 515-16.) The state court also found that Braziel had not shown any adaptive deficits capable of satisfying the second element of intellectual disability, but had consistently displayed adaptive skills beyond the abilities of an intellectually disabled person. (SHR at 518-25.) The state court also found that Braziel had not made any showing of intellectual disability within the developmental period, prior to age 18, but that the only IQ test score Braziel produced was at age 22 (SHR at 515), and he denied ever being a special education student. (SHR at 520.)

### 3. Analysis

The state court determined that Braziel had not established any of the three elements of an *Atkins* claim based on the record before it,[10] but had not granted an evidentiary hearing on the issue. Therefore, even though the parties do not expressly address the issue, this Court must determine whether the state court's denial of this claim is entitled to AEDPA deference. If it is, then evidence presented in federal court, such as in the requested evidentiary hearing, could not be considered by this Court in making the § 2254(d) determination. If it is not, then Braziel's claim should be reviewed *de novo* by this Court, including evidence in any evidentiary hearing that is not otherwise prohibited by § 2254(e)(2).

In *Wiley v. Epps,* 625 F.3d 199 (5th Cir. 2010), the Court of Appeals held that "when a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him

---

[10]The state court also noted the five-point standard error of measurement ("SEM"), but does not appear to have calculated it correctly, finding that the IQ score of 75 was just outside of the range (SHR at 517) rather than at the upper end of the range. *See Hall v. Florida,* 134 S. Ct. 1986, 1996-97 (2014). Even so, the state court did not apply this as a bright-line cutoff in violation of *Hall,* but fully considered the other two criterion for intellectual disability.

with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA." *Id.* at 207 (citing *Rivera v. Quarterman,* 505 F.3d 349, 358 (5th Cir.2007)). In state court, Wiley presented the affidavit of Dr. David Grant, who opined that Wiley was mentally retarded. Dr. Grant evaluated Wiley, administered the Wechsler Adult Intelligence Scale-Third Edition indicating a full scale IQ of 68, and concluded that Wiley had adaptive behavior deficits in at least two defined areas and that Wiley's mental retardation manifested by age eighteen. *Id.* at 203. Wiley also produced affidavits from Dr. Billy Fox, also indicating that Wiley was borderline mentally retarded. Despite this evidence, the Mississippi Supreme Court denied Wiley an evidentiary hearing on his *Atkins* claim because it found that he failed to present a prima facie case. *Id.* The United States District Court disagreed, and granted additional expert evaluations. Both of the appointed experts opined that Wiley was mentally retarded, but the state's expert expressed the opposite opinion. The district court found that the state court denied Wiley a hearing in violation of its own precedent, thereby depriving Wiley of due process. The district court declined to afford deference to the state court's resolution of Wiley's claim, found that Wiley was mentally retarded, and granted habeas relief. *Id.* at 204.

The Court of Appeals affirmed, finding that Wiley had presented a prima facie case of mental retardation to the state court and concluding that the state court's departure from its own procedural standards in the face of Wiley's evidence of retardation failed to provide Wiley with the minimum constitutional protections. *Id.* at 211, 23. Therefore, the federal court was not bound to afford AEDPA deference to the state court's decision. *Id.* at 213.

Unlike Wiley, however, Braziel did *not* present an expert evaluation to the state court stating that he was intellectually disabled. Instead, he asserts that the necessary intellectual testing was not

28

completed "because State Habeas Counsel was unable to obtain funds to have Petitioner tested." (Pet. at 35.) Respondent has shown that this is not true, but even if it was, this would be insufficient to avoid the deference due to the state court adjudication for multiple reasons.

First, the requirement to afford AEDPA deference does not depend on whether adequate funding was granted to develop the *Atkins* claim. In *Brumfield v. Cain,* 744 F.3d 918 (5th Cir. Feb. 28, 2014), *pet. for cert. filed,* No. 13-1433 (May 29, 2014), the Court of Appeals reversed the district court's grant of habeas relief because it improperly failed to afford deference to the state court's denial of an *Atkins* claims. The district court faulted the state court for failing to provide the funds necessary for Brumfield to develop his *Atkins* claim, granted the sought expert funding and conducted an evidentiary hearing. The Court of Appeals observed that it was the violation of due process in *Wiley* that rendered deference to the state court findings inappropriate, not the denial of funds. "[T]here is no Supreme Court decision that has held that prisoners asserting *Atkins* claims are entitled to expert funds to make out a prima facie case." *Brumfield,* 744 F.3d at 925. The Court of Appeals also observed that no due process violation had been shown, in that neither Brumfield nor the district court could point to any state law or procedure violated by the state court when it denied his *Atkins* claim and request for funds. *Id.* at 926 n.7.

Second, Braziel has not shown that the state court denied any request for funding, much less one made in time to obtain the expert assistance necessary to prepare his application for state habeas relief. Instead, an affidavit of state habeas counsel filed in federal court states, "I filed a funding request and a request for an evidentiary hearing as a part of Ground for Relief Number No.3 of my Application for Writ of Habeas Corpus," and that these requests were not granted. (Parks Aff., doc. 9-3, at 1.) Embedded in the briefing of his state habeas application is the statement that a "stay of

execution, a grant of a funding request, and an evidentiary hearing are needed" to provide counsel the opportunity to fully develop the *Atkins* claim. (SHR at 47.) A request for funding in the state application itself would appear to be too late.[11]

Respondent has shown that the trial court granted Braziel adequate funding for an expert evaluation of his *Atkins* claim. Respondent's supplemental evidence includes records from the file of state habeas counsel that had been turned over to federal habeas counsel. These records included an ex parte motion and order authorizing "forensic psychological expert assistance," approving "funding in an amount not to exceed $9,000.00," and suggesting that additional funding may be granted as warranted. (R's Supp. Ex. B, doc. 83-2.) Two days before the state habeas application was filed on July 3, 2003, Dr. Gilda Kessner wrote a letter to state habeas counsel on July 1, 2003, saying that she tried to evaluate Braziel for intellectual disability but was "unable to formulate a determination of his intellectual and adaptive functioning" because of his lack of cooperation. (R's Supp. Ex. B.) There is no evidence before this Court regarding whether any further attempt was made to evaluate Braziel, but any lack of expert assistance was apparently not due to any lack of funding by the state court.

---

[11]Section 3 of article 11.071 of the Texas Code of Criminal Procedure requires counsel appointed in the state habeas proceedings to investigate expeditiously and to file not later than the 30th day prior to the date that the application for writ of habeas corpus is due a request for prepayment of expenses, including expert fees, to investigate and present potential habeas corpus claims. That state law also provides for reimbursement of investigatory expenses, including expert expenses, when prepayment is not sought in advance. The filing of the application starts the clock for other state court deadlines, such as the State's answer and the trial court's determination of "whether controverted, previously unresolved issues material to the legality of the applicant's confinement exist." Sec. 8(a). These state court procedures reasonably anticipate that any expert evaluations and testing necessary to show a prima facie case would be completed prior to the time that the application is filed.

Therefore, Braziel has not shown that the state court violated any of its own procedures or denied him due process in its consideration of his *Atkins* claim.  No expert evaluation necessary to support an *Atkins* claim was presented to the state court, despite its grant of sufficient funds for such assistance, apparently because of Braziel's own refusal to cooperate.  Accordingly, no prima facie case was presented to the state court that would have required an evidentiary hearing.  In fact, no prima facie case has been presented to this Court that would require an evidentiary hearing, even if one was permitted, despite the opportunities afforded.

Braziel contends that he has requested funds for testing from this Court "which have been withheld pending an additional showing of need." (Pet. at 35.) This is incorrect.  In granting pre-petition funding, the Court observed that Braziel had *not* nominated an investigator or expert that was shown to have any qualifications to make any expert evaluation of intellectual disability under *Atkins* or even to administer an intelligence test. (Order Granting Funding, doc. 14, at 4.) Therefore, the Court declined to use the entire presumptive funding limit for the services of someone without the necessary qualifications, urged Braziel to reconsider his request in order to obtain a qualified expert, and included a procedure for doing so. (Order Granting Funding at 4-5.) No further request for funding on this *Atkins* claim was made, nor did Braziel heed this Court's invitation to seek funds available within the presumptive limit for a qualified expert.  Braziel's failure to obtain and present a qualified expert evaluation is not due to any refusal to provide appropriate funds by this Court or by the state court.

An evidentiary hearing on this claim is not permitted in this Court for three reasons.  First, it is prohibited by § 2254(e)(2).  Braziel failed to develop the factual basis for this claim in the state court proceedings either in person by refusing to cooperate with the mental health expert or by his

counsel failing to timely request funding.  As noted above, Braziel did not follow the state court's established procedures for requesting preauthorization of funds for expert or investigative assistance, and refused to be evaluated by the expert that did come to see him.  Second, none of the evidence that would be presented in such a hearing could be considered by this Court in making its determination under § 2254(d).  *Pinholster*, 131 S. Ct. at 1400.  Finally, even if a hearing was not prohibited and the evidence could be considered, Braziel has not shown that he could establish any of the three elements of *Atkins*.  Despite the opportunities for qualified expert assistance, Braziel has not presented any IQ scores within the standard error of measurement for intellectual disability other than the Beta II group test that he has not shown to be a reliable indicator of IQ and that was specifically found by the state court not to be a valid indicator of his intellectual functioning.  (SHR at 514-16.)  And despite the funding granted by the state court and the opportunities to request funding for a qualified expert from this Court, Braziel has not produced any expert evaluation indicating adaptive deficits, intellectual disability, or onset before age 18.

The state court findings on this claim are entitled to deference.  Its denial of this claim has not been shown to be contrary to or an unreasonable application of federal law, or based on an unreasonable determination of facts based on the record before it.  Therefore, Braziel's fourth claim is **DENIED.**

## D. Tainted Identification Testimony

In his fifth claim, Braziel asserts that the trial court erred in admitting identification testimony that was the result of an unduly suggestive photo lineup.  Braziel asserts that this claim was presented to the state court as his second claim on direct appeal, and was rejected in an opinion by the Texas Court of Criminal Appeals that violates 28 U.S.C. § 2254(d).  (Pet. at 37.)  Respondent

asserts that the trial court properly admitted the identification testimony, that there was nothing wrong with the identification process, and that Braziel has wholly failed to show that there was. (Ans. at 56-57, 64.)

### *1. Law*

"The Due Process Clause protects against the use of evidence obtained from impermissibly suggestive identification procedures." *United States v. Moody,* 564 F.3d 754, 762 (5th Cir. 2009) (quoting *United States v. Guidry,* 406 F.3d 314, 319 (5th Cir. 2005)). "[A] conviction based on an eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." *Coleman v. Quarterman,* 456 F.3d 537, 544 (5th Cir. 2006) (citing *Herrera v. Collins,* 904 F.2d 944, 946 (5th Cir.1990) and *Simmons v. United States,* 390 U.S. 377 (1968)).

> The admissibility of identification evidence is governed by a two-step test: First, we determine whether the identification procedure was impermissively suggestive, and second, we ask whether the procedure posed a "very substantial likelihood of irreparable misidentification." ... If we answer both questions in the affirmative, the identification is inadmissible.

*Guidry,* 406 F.3d at 319 (quoting *United States v. Rogers,* 126 F.3d 655, 658 (5th Cir.1997)). "This is known as the *Brathwaite* test, after *Manson v. Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L.Ed.2d 140 (1977)." *Moody,* 564 F.3d at 762. The Supreme Court has identified five factors to help determine the likelihood of misidentification: "(1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the

confrontation; and (5) the length of time between the crime and the confrontation." *Coleman,* 456

F.3d at 544 (citing *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972)).

### 2. State Court Adjudication

The Texas Court of Criminal Appeals on direct appeal observed as follows.

In his second point of error, appellant claims the trial court erred in denying his request to suppress the out-of-court photographic identification of appellant by witness Lora White, in violation of the Due Process Clause of the United States Constitution. Appellant argues that the identification was tainted because the police officer who showed the witness the photo lineup told her beforehand that a suspect had been identified through a DNA match.

It was established at the suppression hearing that Lora and Douglas White were walking along a jogging trail on the Eastfield College campus on the evening of September 21, 1993. A man carrying a pistol stepped out from behind some bushes and demanded money. Lora testified that the man was within about four steps of them and was not wearing anything covering his face. The man shot Douglas twice and then took Lora to some nearby bushes where he sexually assaulted her. Douglas ultimately died as a result of the shooting. Lora observed the perpetrator closely throughout the offense. During the sexual assault, the man was within inches of Lora's face. The encounter with the man lasted from ten to twenty minutes. Although it was a dark night, Lora testified that the trail was close to a highway and a parking lot where there were lights. The night of the offense Lora described the offender to police as a black man between the ages of 19 and 24, 5'6" to 5'8" in height, and weighing 140 to 160 pounds. She also described him as wearing a bandana on his head, an orange wind breaker and calf-length baggy shorts. An initial composite drawing was made by the Dallas police department within a couple of weeks of the offense, but Lora was not satisfied that it was an accurate depiction. A second drawing was done by a different artist in February of 1994, which Lora testified accurately resembled the offender. Lora viewed a photo lineup in 1994 but did not identify anyone as the offender.

In February 2001, Lora was contacted by Detective Michael Bradshaw, who informed her that they had found a DNA match. Bradshaw testified that he probably told Lora the suspect's age, although Lora testified that Bradshaw did not tell her anything about the suspect except that he was incarcerated. A week to ten days later Lora viewed a photo lineup in Bradshaw's office. The lineup consisted of six photographs. All six were black males approximately the same age. Bradshaw did not tell Lora whether or not the suspect they had located through DNA evidence would be in the lineup. Lora was given written instructions about viewing the lineup,

providing in part that "[t]he person who committed the crime may or may not be in
the group of photographs," that "[i]t is equally important to eliminate innocent
persons as it is to identify those persons responsible," and that "[y]ou are in no way
obligated to identify anyone." After reading and signing the instructions, Lora
unequivocally identified appellant as the offender. Lora testified that she would be
able to identify appellant in the courtroom based on her contact with him on the night
of the offense, even if she had not viewed the lineup.

A couple of weeks before the suppression hearing, Bradshaw and Lora went
to the courthouse for a meeting with the prosecutor. Bradshaw decided to show Lora
the courtroom so that she could easily find it on the day of trial, not realizing that jury
selection was ongoing in appellant's case. They looked in at the courtroom through
the window at the back for about ten to fifteen seconds. Lora testified that she only
saw the back of appellant's head.

*Braziel v. State,* No. AP-74,139, 2003 WL 22250398, at *1-2 (Tex. Crim. App. 2003). These

findings are entitled to deference. *See* 28 U.S.C. § 2254(e)(1). The state court applied the

*Brathwaite* test and the five *Biggers* factors and concluded that the photo array was not

impermissibly suggestive. *See Braziel,* 2003 WL 22250398, at *2.

All of the individuals were black males of approximately the same age. Although
there are slight variations in skin tone between individuals, appellant does not stand
out as significantly or noticeably darker than the others. The fact Bradshaw informed
Lora prior to the lineup that they had found a suspect is more troubling. But even if
such exchange rendered the procedure impermissibly suggestive, appellant does not
meet his burden in proving that the procedure gave rise to a very substantial
likelihood of irreparable misidentification in this case.

Although it was nighttime and there was no direct lighting, Lora had ten to twenty
minutes in which to view the assailant's uncovered face at a very close proximity.
Lora's level of attention was high considering the intensity of the circumstances.
Lora gave a general description of the offender on the night of the offense and gave
considerably more detailed information to two composite artists later. Lora's
descriptions were consistent with appellant's physical characteristics. Lora's
identification of appellant in the lineup was unequivocal. Even though the offense
occurred more than seven years before the lineup, the other factors weigh heavily in
support of the reliability of Lora's identification. The lineup procedures were not so
corruptive as to outweigh the factors supporting the identification. Brashaw did not
tell Lora that the suspect would appear in that particular lineup. To the contrary, Lora
was specifically instructed in writing that the offender "may or may not" be in the

35

lineup and that she was under no obligation to identify anyone. Finally, Lora testified that she could have identified appellant in court even without having seen the earlier photographic lineup. In these circumstances, the trial court did not err in denying appellant's motion to suppress the out-of-court identification evidence.

*Id.*

### 3. Analysis

Braziel has not shown that the state court analysis was incorrect, much less unreasonable. The witness was personally encountered by her attacker and appears to have had a good opportunity to observe the person who committed this murder and sexual assault. Although he claims that the lighting was too poor to make a good identification (Pet. at 38), Braziel apparently did not think so at the time of the offense, having committed the murder apparently because Douglas had been looking at Braziel. (30 RR at 45-46.) The state court findings that the witness had a good opportunity to view her attacker, that her level of attention was high, that her prior descriptions were accurate, and that she was certain of her identification all weigh in favor of the reliability of her identification and are supported by the record. The circumstances show that four of the five *Biggers* factors indicate a low likelihood of a misidentification. The state court adjudication of this claim is correct. Braziel's fifth claim for relief is **DENIED**.

### E. Texas Death Penalty Procedures

In his sixth and seventh claims, Braziel makes complaints against the jury instructions at the punishment stage of his trial. Braziel's sixth claim complains that the language of the special issues at punishment are vague and do not properly channel the sentencer's discretion. (Pet. at 40-49.) Braziel's seventh claim complains of the special issues that required a minimum number of votes

36

to return answers in his favor.  (Pet. at 49-53.)  Both of these claims have been repeatedly denied in this Circuit and lack merit.

### 1. Vague Terms

Braziel complains that the first special issue in the punishment phase of his trial contained the following language: "Is there a *probability* that the Defendant, Alvin Avon Braziel, would commit *criminal acts of violence* that would constitute a *continuing threat to society*?" (Pet. at 41) (citing SCR at 102) (emphasis in petition).  Referring to the terms "probability," "criminal acts of violence," and "continuing threat to society" as aggravating factors, Braziel claims that the use of such "vague" terms violate the Eighth and Fourteenth Amendments.  (Pet. at 40-41.)  Respondent asserts that this claim lacks merit and is barred by the nonretroactivity bar in *Teague v. Lane,* 489 U.S. 288 (1989).  (Ans. at 69-70.)

The United States Court of Appeals for the Fifth Circuit has consistently rejected similar complaints regarding the alleged vagueness of the same terms and also of similar terms.  *See James v. Collins,* 987 F.2d 1116, 1120 (5th Cir.1993) (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" "have a common-sense core of meaning that criminal juries should be capable of understanding") (internal quotation omitted); *Hughes v. Johnson,* 191 F.3d 607, 615 (5th Cir.1999); *Woods v. Johnson,* 75 F.3d 1017, 1033-34 (5th Cir.1996).  This claim is also foreclosed by the non-retroactivity doctrine of *Teague. See Leal v. Dretke,* 428 F.3d 543, 553 (5th Cir. 2005) (finding that reasonable jurists "could not find the district court's resolution of this issue debatable").  Braziel's sixth claim for relief is foreclosed by Circuit precedent, barred by the *Teague* nonretroactivity doctrine, and **DENIED** for lack of merit.

37

### 2. *Twelve-Ten Rule*

Braziel claims that the requirement that ten jurors agree in order to answer the first special issue negatively, and to answer the mitigation special issue affirmatively, violates his due process and jury trial guarantees.  (Pet. at 49-53.)  He refers to this as the "12-10 rule"  (Pet. at 51) and the "12-10 provision." (Pet. at 51-52.)   Respondent asserts that this claim lacks merit and is also barred by the *Teague* nonretroactivity bar.  (Ans. at 76.)

Braziel relies upon an extension of *Mills v. Maryland,* 486 U.S. 367 (1988) and *McCoy v. North Carolina,* 494 U.S. 294 (1990), that has also been consistently rejected in this Circuit.  *See Miller v. Johnson,* 200 F.3d 274, 288-89 (5th Cir. 2000) (quoting *Jacobs v. Scott,* 31 F.3d 1319, 1329 (5th Cir.1994)).  Circuit precedent also provides that "no clearly established federal law invalidates the 10-12 Rule or calls its constitutionality into doubt," *Blue v. Thaler,* 665 F.3d 647, 670 (5th Cir. 2011), and that *Teague* bars the federal court from extending *Mills* to invalidate the Texas scheme. *Druery v. Thaler,* 647 F.3d 535, 543 (5th Cir. 2011) (citing *Hughes v. Dretke,* 412 F.3d 582, 594 (5th Cir.2005)).  This ground for habeas relief is also foreclosed by Circuit precedent, barred by *Teague*, and **DENIED** for lack of merit.

### VI

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro v. Landrigan,* 550 U.S. 465, 468 (2007).  Prior to the AEDPA, "[w]hen there is a factual dispute, [that,] if resolved in the petitioner's favor, would entitle [him] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing." *Goodwin v.*

38

*Johnson*, 132 F.3d 162, 178 (5th Cir. 1997) *abrogated on other grounds by Smith v. Robbins*, 528 U.S. 259 (2000).  In *Schriro*, the Supreme Court observed that while the basic rule has not changed, the standards for granting relief have.

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.

*Schriro*, 550 U.S. at 474 (footnote omitted) (internal citations omitted).  Regarding any claim adjudicated on the merits, the proper standard is set forth in 28 U.S.C. § 2254(d).  Federal habeas review under § 2254(d)(1) is, "limited to the record that was before the state court," *Pinholster*, 131 S. Ct. at 1398, and review under § 2254 (d)(2) is limited to the "determination of the facts in light of the evidence presented in the State court proceeding."

On the allegations and record before this court, an evidentiary hearing on the merits of any of his claims would not enable Braziel to establish a right to federal habeas relief.  Even if facts were further developed in federal court on any of the claims presented, it would not establish a right to federal habeas relief under the AEDPA.  Accordingly, Braziel's request for an evidentiary hearing is **DENIED**.

## VII

Braziel's first claim (that trial counsel provided ineffective assistance) is **DISMISSED** as unexhausted and procedurally barred.  In the alternative, it is **DENIED** for lack of merit.

Braziel's remaining claims (claims two through seven) are all **DENIED**.  Braziel has not shown that the adjudication of these claims by the state court either resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 22S4(d).

Therefore, the petition for writ of habeas corpus (doc. 16) is **DENIED**.

## VIII

Considering the record in this case and pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing §§ 2254 and 2255 proceedings, and 28 U.S.C. § 2253(c), the Court **DENIES** a certificate of appealability. The Court finds that the petitioner has failed to show (1) that reasonable jurists would find this Court's "assessment of the constitutional claims debatable or wrong," or (2) that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In the event the petitioner files a notice of appeal, the Court notes that the petitioner will be allowed to proceed *in forma pauperis*.

**SO ORDERED.**

Date: May 28, 2015.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS